# EXHIBIT E



Transcript of the Testimony of

**TRACEY L. GORDON**

November 25, 2024

**NICHOLAS BARONE**

*v*

**TRACEY L. GORDON and CITY OF PHILADELPHIA**

Reliable Court Reporting

Phone – 215-563-3363

Fax – 215-563-8839

www.reliable-co.com

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

| | | |
|---|---|---|
| NICHOLAS BARONE, | : | CIVIL ACTION. |
| | : | |
| Plaintiff, | : | No. 2:23-cv-02821-MSG |
| | : | |
| | : | |
| vs. | : | |
| | : | |
| | : | |
| TRACEY L. GORDON, | : | |
| individually, and | : | |
| CITY OF PHILADELPHIA, | : | |
| | : | |
| Defendants. | : | |
| | : | |

- - -

Monday, November 25, 2024

- - -

Videotaped Deposition of TRACEY L. GORDON, taken pursuant to notice, was held at COHEN, PLACITELLA & ROTH, P.C., Two Commerce Square, 2001 Market Street, Suite 2900, Philadelphia, Pennsylvania 19103, commencing at or about 3:38 p.m., before Tisa R. Francis, Court Reporter - Notary Public there being present:

**COPY**

- - -

Reliable Court Reporting
1650 Arch Street
Suite 2210
Philadelphia, Pennsylvania 19103
(215)563-3363

NICHOLAS BARONE v
TRACEY L. GORDON and CITY OF PHILADELPHIA                    TRACEY L. GORDON

---

Page 2

```
1   A P P E A R A N C E S :
2
3             COHEN, PLACITELLA & ROTH, P.C.
              BY:  JAMES P. GOSLEE, ESQUIRE
4             Two Commerce Square
              2001 Market Street
5             Suite 2900
              Philadelphia, Pennsylvania 19103
6             (215)567-3500
              jgoslee@cprlaw.com
7             Representing Nicholas Barone
8
9
10            MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN
              BY:  JAHLEE J. HATCHETT, ESQUIRE
11            2000 Market Street
              Suite 2300
12            Philadelphia, Pennsylvania 19103
              (215)575-2871
13            jjhatchett@mdwcg.com
              Representing Tracey L. Gordon and City of
14            Philadelphia
15
16
17
18
19
20
21
22
23
24  A L S O  P R E S E N T :
25  Lindsay Duphily, Video Specialist
```

---

Page 3

```
1                    I N D E X
2   WITNESS                          PAGE
3
4   TRACEY L. GORDON
5
6   BY MR. GOSLEE                       5
7
8
9
10                   E X H I B I T S
11  NUMBER          DESCRIPTION       PAGE
12  Exhibit-1    Performance Evaluation   53
13  Exhibit-2    E-mail Exchange          66
14  Exhibit-3    E-mail                   71
15  Exhibit-4    Deposition Transcript    76
16  Exhibit-5    Termination Letter       84
17  Exhibit-6    Sworn Declaration        90
18  Exhibit-7    Memo                    109
19  Exhibit-8    Sworn Declaration       113
20
21
22
23
24
25
```

---

Page 4

```
1         THE VIDEOGRPAHER:  This is the videotaped
2   deposition of Ms. Tracey Gordon, taken by the
3   Plaintiff, in the matter of Nicholas Barone,
4   Plaintiff, vs. Tracey L. Gordon, individually,
5   and the City of Philadelphia, Defendants, Civil
6   Action No. 2:23-cv-02821.  We're going on the
7   record on November 25th, at approximately 3:38
8   p.m.
9         This deposition is being held at 2001
10  Market Street, Philadelphia, PA.  The court
11  reporter is Tisa Francis, with Reliable
12  Reporting.  My name is Lindsay Duphily, and I'm
13  the Videotape Specialist with Reliable
14  Reporting.
15        Counsel will now introduce themselves and
16  the court reporter will swear in the witness.
17        MR. GOSLEE:  Jamie Goslee on behalf of the
18  Plaintiff, Nicholas Barone.
19        MR. HATCHETT:  Jahlee Hatchett on behalf
20  of the Defendants.  Ms. Gordon, if you haven't
21  already, now might be a good time to silence or
22  put your phone on vibrate.
23        THE WITNESS:  It is.
24        MR. HATCHETT:  Okay.  Thank you.
25                       - - -
```

---

Page 5

```
1         TRACEY L. GORDON, after having been first
2     duly sworn, was examined and testifies as
3     follows:
4                       - - -
5   BY MR. GOSLEE:
6     Q.   All right.  Good afternoon, Ms. Gordon.
7   I'll reintroduce myself.  I'm Jamie Goslee.  I'm
8   representing the Plaintiff in this case.  We're
9   here, obviously, for your deposition.  You've done
10  this three times now?
11    A.   I lost count.
12    Q.   All right.  You're a professional.
13    A.   I don't think nobody's a professional.
14    Q.   I'm just kidding about that.  All right.
15  You've done it a few times.  I'm not going to go
16  over the lengthy instructions, just a couple
17  noteworthy ones.
18    A.   Okay.
19    Q.   One, only one of us can speak at a time.
20    A.   Mm-hmm.
21    Q.   So let me finish my question before you
22  answer and I'll give you the same courtesy.  Okay.
23    A.   Okay.
24    Q.   Two, you're shaking your head yes, as you
25  say "yes" and "no".  And that's fine, but keep all
```

Page 6

1  of your answers verbal because we do have a court
2  reporter here taking everything down.  Okay.
3      A.   Yes.
4      Q.   You're here with your counsel today.
5      A.   Yes.
6      Q.   All right.  If I ask you any questions
7  that could potentially elicit any communications you
8  had with Counsel, I don't want you to answer those
9  questions.  Okay.
10     A.   Okay.
11     Q.   All right.  If I ask you a question today
12 and you don't understand it or it's confusing, let
13 me know and I'll rephrase the question.  Okay.
14     A.   Okay.
15     Q.   If I ask you a question and you answer it,
16 I'm going to assume that you understood the
17 question.  Fair.
18     A.   Yes.
19     Q.   I don't think we'll be here more than a
20 couple hours.  Although, it's coming from a lawyer,
21 so take that for what it's worth.  But if at any
22 point you want to take a break, you just let me
23 know.  Okay.
24     A.   Thank you, yes.
25     Q.   All right.  Ms. Gordon, you did fire my

Page 7

1  client, Nicholas Barone, correct?
2      A.   Yes.  Nick Barone was let go, yes.
3      Q.   Okay.  Can you tell me why you fired Nick
4  Barone?
5      A.   Nick Barone refused to do a duty that was
6  assigned to him and other things that was going on
7  down at the -- in the Archives.  And it was more or
8  less, like, the final straw.  I had gotten a report
9  from one of the supervisors down there.  And I don't
10 recall which supervisor it was at the time.  And
11 they called to let me know that Nick Barone refused
12 to make the deliveries that he was supposed to make
13 to City Hall from Archives.
14     Q.   Okay.  I'm gonna unpack that.  I'll take
15 it one at a time.  The first thing you said is, he
16 refused to do a duty and that you learned of that
17 from a supervisor down at Archives?
18     A.   Yes, I did.
19     Q.   Okay.  Do you recall the name of the
20 supervisor?
21     A.   I'm believing it was Tom Campion.
22     Q.   Tom Campion?
23     A.   Mm-hmm.
24     Q.   Okay.  And what specific -- did
25 Mr. Campion call you directly?

Page 8

1      A.   Yes.  Mr. Campion called me -- yeah, he
2  did.  We had gotten complaints.  We were getting
3  complaints about the work not getting done.  And it
4  was just so many complaints about Archives.  And
5  that particular -- I don't recall the day or the
6  time, but I had gotten, you know, either a call from
7  Tom Campion and he said that or -- I don't really
8  recall if he called me directly or if he delegated
9  it to one of the supervisors.  But it had gotten to
10 me that Nick Barone was refusing to make deliveries.
11     Q.   Was it more than one delivery that he
12 refused to make?
13     A.   I don't recall how many deliveries, but
14 they said he just refused to.  I guess, the rotation
15 of deliveries.  They rotate deliveries and he was
16 refusing to make any deliveries.  He said he wasn't
17 coming to City Hall.  That's what I recall being
18 told to me.
19     Q.   All right.  So if I understand your
20 testimony correctly, there were a lot of issues down
21 at Archives.  Mr. Campion called you and said, Nick
22 is refusing to make deliveries.  And that call was
23 sort of, like, the final straw for you in terms of
24 your decision to fire Mr. Barone; is that a fair
25 summary?

Page 9

1      A.   Yeah.  Either -- I don't recall if it was
2  a phone call or it was a message that had gotten to
3  me from one of the supervisors down there.  Or I
4  don't even know if Tom Campion was out.  Because, at
5  one point, Tom Campion had gotten injured and Mark
6  Wilson was a temporary supervisor.  So I really
7  don't recall, at this point, who from Archives
8  got -- sent me the information.  But that
9  information was given to me, that he had refused to
10 make deliveries to City Hall from his supervisors.
11     Q.   And his supervisors would have been Tom
12 Campion, or potentially if he was out with an
13 injury, it would have been Mark Wilson?
14     A.   Yeah, Mark stepped in as a temporary.  So
15 it would be the Tom Campion.  Tom Campion got
16 injured, or it was Mark Wilson.  I don't recall.
17     Q.   Okay.  It was one of the two.  And if Tom
18 Campion was still working at that time, it would
19 have been him; is that fair?
20     A.   Yes, it would have been Tom Campion.  Yes.
21     Q.   All right.  What day was it that
22 Mr. Campion or Mr. Wilson, whoever it was, called
23 you or came to you and told you that Nick was
24 refusing to make deliveries?
25     A.   I don't remember the day that they came to

Page 10

1   me.  I don't remember how the message came to me,
2   whether it came from -- because at times I would
3   send Keith Harris, who was my driver and one of my
4   deputies, I would send him down there to see what
5   was going on.  Because we were getting, like, a
6   whole bunch of complaints about Archives and inner
7   fighting between I believe it was Nick and Mark.  It
8   was a whole bunch inner fighting.
9               And I just kept getting complaints
10  after complaints about Archives not finding files,
11  not delivering files and not performing their work.
12  So I just kept getting calls.  And then -- about the
13  work.  And then I don't recall who gave me -- either
14  it was Mark Wilson or Tom Campion, they were going
15  there.  And I think it was around -- I was walking
16  upstairs in the Marriage Department on 4th floor.
17  And if I recall -- I really don't recall.  It just
18  was so long ago.  I really don't recall.  But I do
19  know that was -- made me say, okay, if he's not
20  gonna do the work and he's not doing it so then, you
21  know, dismiss him.
22      Q.   Okay.  Let's set aside the general issues
23  with the Archive Department.  I just want to focus
24  on this communication from Mr. Wilson or Mr. Campion
25  about my client, Nick Barone.  The day that either

Page 11

1   one of those supervisors told you that Nick was
2   refusing to make deliveries, do I understand your
3   testimony, you don't recall what specific day that
4   was?
5       A.   No, I don't.
6       Q.   Do you know what month it was?
7       A.   No, I don't.
8       Q.   My client, I'll represent to you, was
9   terminated on January 7th of 2022.  Do you recall
10  whether this occurred where the supervisors came to
11  you about Nick Barone and complained about him not
12  making deliveries?  Do you recall whether it was in
13  2021 or early 2022?
14      A.   I don't recall that far back.
15      Q.   Okay.  You said that you -- let me ask
16  this other question.  Do you recall what time of day
17  it was?  Was it the morning, was it the afternoon?
18      A.   I don't recall the time of day.  I know it
19  wasn't in the morning.  I know it wasn't in the
20  morning.  I don't remember the day or the time.
21      Q.   Okay.
22      A.   No.
23      Q.   You do -- I think you have some
24  recollection of potentially being in the Marriage
25  Department when this occurred, when you were

Page 12

1   notified by either Mr. Wilson or Mr. Campion about
2   my client?
3       A.   I was -- I believe if -- I believe that I
4   was -- because normally I would do my walk-arounds.
5   And I believe that I may have been going to the
6   Marriage Department.  I know I wasn't sitting in my
7   office.  I know it didn't come there.  I do believe
8   I ran into, like, one of the supervisors who was
9   delivering mail.  I don't recall specifically that
10  many years ago.
11      Q.   Who was there with you when you were told
12  that my client was refusing to make deliveries?
13      A.   I believe it was -- I believe it was -- I
14  -- I don't recall who was with me.  If anybody would
15  have been with me who walks around with me, it may
16  have been Keith Harris.  It may have been Keith
17  Harris.
18      Q.   You don't have a recollection of that,
19  though, is that what you're saying?
20      A.   No, I don't have recollection.  Not -- no,
21  I apologize.  I don't.
22      Q.   Okay.
23          MR. HATCHETT:  May I before your next
24      question.  Ms. Gordon, I'll just remind you not
25      to guess.

Page 13

1          THE WITNESS:  Okay.
2          MR. HATCHETT:  If you need to estimate,
3      you can estimate, but don't guess.
4          THE WITNESS:  Okay.
5          MR. HATCHETT:  Respectively.
6          THE WITNESS:  Yeah, well, I don't recall.
7   BY MR. GOSLEE:
8       Q.   Okay.  Fair enough.  Did Nick say why he
9   was refusing to make deliveries?
10      A.   No.
11      Q.   Did anybody ask him, hey, Nick, why are
12  you refusing to make deliveries?
13      A.   I'm not sure if anybody asked him.
14      Q.   Fair to say you didn't contact Nick and
15  ask him why he wasn't making deliveries?
16      A.   No, I didn't.
17      Q.   Okay.  In your experience, had Nick ever
18  refused to make deliveries before?
19      A.   Not that I know of.
20      Q.   All right.  So this would have been a
21  one-time occasion where Nick had refused to make
22  deliveries?
23      A.   I don't know if it was a one-time
24  occasion.  But I know they told me that one time.
25      Q.   That's a fair distinction.  This is the

NICHOLAS BARONE v
TRACEY L. GORDON and CITY OF PHILADELPHIA                    TRACEY L. GORDON

Page 14

1  first time you had ever heard about Nick refusing to
2  make deliveries?
3      A.   Yes.
4      Q.   Okay.  But you're not aware of anybody
5  asking why he was refusing to do it; is that right?
6      A.   I'm not aware.
7      Q.   Okay.  Do you recall specifically what
8  documents Nick was refusing to deliver?
9      A.   No.
10     Q.   Do you know where those records were
11 intended to go, the ones that he was refusing to
12 deliver?
13     A.   No, I don't know where they was supposed
14 to go.  They were either gonna go one or two places.
15 They were either gonna go to Marriage Records or
16 they were gonna go to Estate Services.  That's the
17 only...
18     Q.   The only two places you'd be doing --
19     A.   Normally.
20     Q.   Okay.
21     A.   I mean, sometimes, you know, it --
22 sometimes -- yeah, that's where they are.  Either it
23 would go to Estate Services or it would go to --
24 like, one of the deputies might call for a record.
25 But on a daily basis, they either are gonna go to

Page 15

1  Marriage Records or they're gonna go to Estate
2  Services.
3      Q.   Okay.  All right.  But Nick refusing on
4  this one occasion to deliver records, that was sort
5  of the straw that broke the camel's back and why he
6  was fired.  But you did reference some ongoing
7  issues within the Archives Department.  Did I
8  understand that testimony correctly?
9      A.   There had been ongoing issues with the
10 Archives Department, yes.
11     Q.   Okay.  And can you just tell me what, as
12 you recall, those ongoing issues within Archives
13 were?
14     A.   At one point, they reported to me that
15 Nick and Mark Wilson had gotten into a tussle, a
16 fight or it was, like, a heated argument.  They
17 weren't getting along.  I had gotten numerous
18 reports over and over that Archives were not
19 finding -- they couldn't find Archives records, and
20 my supervisors would go down there and find them.
21 There were complaints about Tom Campion's management
22 style from our supervisors in both Marriage and
23 Estate Planning.  It was just numerous complaints.
24          We had to send HR down there to see
25 what was going on.  I believe one time Nick even

Page 16

1  called for a meeting and I came down to see, you
2  know, what grievances they had to try to make them
3  better.  And, you know, I took their grievances
4  seriously and I did everything that they asked me to
5  do as far as everybody having a desk, as far as, you
6  know, everybody being -- sitting in COVID distance,
7  making sure that we ordered the proper ladder.
8  Because we were borrowing the ladder from the
9  Records Department, so I made sure we put that order
10 on.  And then making sure that they had masks and
11 making sure they had the disinfect.  That was one
12 time that I remember that actually Nick called a
13 meeting and I came down and talked to him and made
14 sure that they were taken care of.
15     Q.   Okay.  I'm gonna take -- you said a couple
16 things.  I'll just break it down the best I can.  I
17 think the first thing you mentioned was, at some
18 point, Nick and Mark Wilson had gotten into some
19 sort of altercation?
20     A.   I -- that's what they were reporting down
21 there, that they didn't get along.  Mark and Nick
22 weren't getting along, they didn't like each other.
23 And, you know, I sent HR down there to see what was
24 going on.  I sent my deputies down there to see if
25 everything was okay.

Page 17

1      Q.   Who told you that Nick and Mark were not
2  getting along or had an altercation?
3      A.   I had gotten that report from -- I'm not
4  sure who gave me that report.  I don't know if it
5  came from Tom Campion or -- I don't know.  I don't
6  remember.  It was either -- only reports that I
7  would get is, either it would come from the
8  supervisor down there, Mark Campion, or it would be
9  Keith Harris, who was my driver, who I would often
10 send down there.
11     Q.   All right.  But you mentioned a report.
12 Would this be a written report you had received
13 about Mark and Nick not getting along?
14     A.   It was verbal.
15     Q.   It was verbal, but you don't remember who
16 specifically delivered that to you?
17     A.   No, I don't.
18     Q.   Was it more than one occasion that you got
19 a report that Mark and Nick were having altercations
20 or disagreements?
21     A.   I think it was just one time.
22     Q.   One time.  Do you recall whether Mark and
23 Nick received any sort of warning in response to the
24 report of altercations or disagreements between
25 them?

NICHOLAS BARONE v
TRACEY L. GORDON and CITY OF PHILADELPHIA                    TRACEY L. GORDON

Page 18

1    A.   I believe they did.  I'm not sure if they
2  received any written.  I'm not sure.  I can't
3  recall.
4    Q.   Okay.  Would it have been you that
5  provided that warning or someone on your staff?
6    A.   It would be -- it would come from HR.  And
7  I do know that I reported to HR that they needed to
8  get down there and see what was going on and make
9  sure everything was okay.
10   Q.   Was HR at the time Charmaine Collins?
11   A.   Yes.
12   Q.   Okay.  So when you're using the term HR,
13 at this point, you're referring to Charmaine
14 Collins?
15   A.   Yes, Charmaine Collins.
16   Q.   All right.  So that was the report of an
17 altercation that would have come from Charmaine?
18   A.   I don't remember if it was the physical,
19 but it was just they didn't get along.
20   Q.   All right.  Let me change my question so
21 we're speaking the same language.  I'm not trying to
22 trick you.
23   A.   I know.
24   Q.   So, at some point, you received, you
25 believe from Charmaine Collins, a report that Nick

Page 19

1  and Mark Wilson were not getting along, correct?
2    A.   Not from Charmaine.
3    Q.   Okay.
4    A.   Not from Charmaine.  Charmaine didn't --
5  Charmaine worked remote.
6    Q.   Okay.
7    A.   Okay.  I got -- it was word that I got
8  from Tom Campion.  I don't know how it came.  Tom
9  Campion would have gave me the report, but it would
10 have came from Keith.  Because send Keith -- we
11 would send Keith down there to kind of, you know,
12 see what was going on.  I was like, Keith, go down
13 there and see what's going on, make sure
14 everything's okay.  And Keith, you know, would come
15 and tell me and Tom Campion told me.  And I don't
16 remember the day that I believe it was Nick -- well,
17 yeah, Nick and Mark didn't get along.
18   Q.   All right.  That report that Mark and Nick
19 didn't get along would have came from Tom Campion to
20 Keith Harris and then from Keith Harris to yourself?
21   A.   Yes.
22   Q.   Okay.  You don't remember when that was,
23 but it was at least one occasion that you recall?
24   A.   I remember it was -- yeah, it was just,
25 like, they didn't get along.

Page 20

1    Q.   Okay.
2    A.   You know.  But, you know, people don't get
3  along on they jobs.  You know, as long as they don't
4  actually physically get into a fight, you know.  And
5  as long as the work is getting done, you know.  They
6  worked in a small quarter.
7    Q.   Yeah, I got it.  So your recollection,
8  though, is that Charmaine Collins would have went
9  down to check out the situation?
10   A.   Well, I asked her -- she wouldn't go
11 physically.  Because Charmaine was concerned about
12 COVID at the time and she had just had a baby.  So
13 she would do most of her stuff, you know, phone or
14 writing.  Phone or --
15   Q.   E-mail?
16   A.   E-mail, yeah.
17   Q.   Do you have a recollection of Charmaine
18 reporting back to you that she spoke with Mark and
19 Nick about their disagreements?
20   A.   I don't have that specific report, but I
21 had reports about her -- we've gotten reports from
22 Charmaine saying that -- you know, that they had
23 concerns about the workload.  And the -- the -- the
24 report as far as them, the altercation, I didn't put
25 that in writing.  I didn't have them put that in

Page 21

1  writing at all.
2    Q.   Okay.  And was that a conscious decision
3  you made not to put that into writing?
4    A.   It was.
5    Q.   Why?
6    A.   I didn't want a bad report on him.  I
7  didn't want -- I didn't feel like -- I didn't want
8  anybody get a bad report like that in their records.
9    Q.   Okay.
10   A.   If it was just, like, you know, somebody
11 had a bad day.
12   Q.   Yeah.
13   A.   You know.
14   Q.   So your recollection is, you told
15 Charmaine that disagreement, the issue with Mark and
16 Nick disagreeing, you know, talk with them, but
17 don't put that in writing; is that right?
18   A.   I did say don't put it in writing.  We
19 just never wrote it up, that I can recall.
20   Q.   Right.  But that was you didn't want that
21 written up because they could have been having a bad
22 day, you didn't want them to have that record?
23   A.   Yeah.  Because it was a lot of times that
24 when we tried to work things out before taking it in
25 another level or putting it in writing.  I was

Page 22

1  basically new there so, you know, I -- you know, my
2  style was sort of like I didn't have a punitive
3  style.  You know, I didn't want to, you know, every
4  little thing written up when, you know, I figured,
5  you know, they grown men, you know.  Maybe Mark had
6  a bad day, maybe he had a bad day.  You know, I just
7  used to send Keith down there.  Go down there and
8  see whats's going on, is everything okay down there.
9  And then he would say, well, everything is going
10 good, you know.
11        Q.   Did things improve after that discussion
12 with Nick and Mark about their disagreements?
13        A.   I don't know about that issue about Mark
14 and Nick disagreements.  I don't know if that -- I
15 just never got anymore reports.  However, I know
16 that I constantly got reports about the workload.
17 Like, everything worked smooth in the Register of
18 Wills.  But, I mean, we have, like, five guys down
19 there.  And I remember I transferred another guy.
20 His name was Keith.  I forgot his name.  And he was
21 just like, it's a mess, you know.  And he was --
22 because we transferred him up.  And he just was
23 like -- I was like, you know, what's going on down
24 there, you know.  And he was just like, they don't
25 get along.  You know, it was -- I think the whole

Page 23

1  thing was, you know, they used to count how much
2  each of them did.  Like, okay, I just got on the
3  lift, now you get on the lift.  Okay, I just pulled
4  a file, now you pull a file.  So it was really -- I
5  think the gist of the problem came from the top,
6  which was Tom Campion wasn't able, I guess, to
7  manage them or whatever.  But it was just constant
8  complaints.  Like, Emilio would come to me, like,
9  exhausted, exhausted.
10        Q.   Who's Emilio?
11        A.   Emilio is -- was one of my chief deputies.
12        Q.   Okay.
13        A.   Di Gregorio.
14        Q.   Emilio Di Gregorio.  Do you recall Emilio
15 ever going down to Archives and trying to get the
16 guys working down there, get their issues and
17 complaints straightened out?
18        A.   He would actually go down there and do the
19 work.
20        Q.   He would do the work?
21        A.   He would actually do it.  He would do that
22 work for them, actually.  And then he just got
23 exhausted.  Like, you know, it was a situation, and
24 I know this was put in writing with, Wayne Perry,
25 who was my supervisor.  And he was ready to quit.

Page 24

1  He said he couldn't deal with Tom Campion anymore.
2  He said the work is not getting done.  You know, he,
3  you know, constantly said, you know -- you know,
4  they been waiting for work for days and days and it
5  ended up weeks.  And Emilio, they would constantly
6  go to Emilio about it and Emilio -- Emilio basically
7  handled everything.
8        Q.   Let me ask this question:  With respect to
9  Archives generally, was -- I'm hearing two potential
10 issues.  One is that there were a lot of complaints.
11 And, two, that the guys working in Archives maybe
12 weren't that productive; is that fair?  Is that the
13 two categories of complaints?
14        A.   You hit it on the nose.
15        Q.   I rarely do that, so I appreciate that.
16        A.   Yeah, you hit it on the nose.
17        Q.   And Emilio would be one of the guys you'd
18 send down there to try to straighten out the issue
19 of the complaints and productivity; is that right?
20        A.   Emilio was the guy.
21        Q.   He was the guy.  Did Emilio ever come back
22 to you with specific complaints or criticisms of my
23 client, Nick Barone's performance?
24        A.   He would come down and just say they're a
25 total mess, everybody.  But he wouldn't specifically

Page 25

1  say anyone's name.
2        Q.   Okay.  Your recollection is, he never
3  said, you know, Nick is causing some issues down
4  there, he's not being very productive --
5        A.   No, no.
6        Q.   -- or complaining or anything like that?
7        A.   No, he didn't say Nick's name.  He didn't
8  specifically say any name.  He just was saying that
9  he don't understand why they can't get along and why
10 they can't get the work, the work was sitting right
11 there.
12        Q.   Okay.  And did he make any
13 recommendations, Emilio, as to how that situation
14 should be handled?
15        A.   Yeah.  Eventually he said that --
16 eventually he was like dissolve -- he said, we need
17 to get rid of them.
18        Q.   Okay.  The entire Archives Department?
19        A.   Yeah.  That's the only -- I wouldn't -- I
20 wouldn't know.  Well, by then Nick was gone.
21        Q.   Nick had already been terminated at the
22 time Emilio said let's get rid of everybody?
23        A.   Yes.
24        Q.   Okay.  Okay.  But in terms of -- and I'm
25 just kind of coming back to it.  In terms of

NICHOLAS BARONE v
TRACEY L. GORDON and CITY OF PHILADELPHIA                    TRACEY L. GORDON

Page 26

1   specific complaints about my client, other than the
2   complaints that he was refusing to deliver records,
3   you don't remember anyone ever saying to you, Nick
4   is not being very productive or Nick is complaining
5   too much; is that fair?
6       A.   Yeah.  They said him -- Tom Campion
7   complained about Nick and he complained about Mark.
8   Those are the two that he complained about
9   constantly.
10      Q.   Okay.  Tell me what Tom said about Nick?
11      A.   Him and Mark is always -- not getting --
12  him and Mark just can't get along.  It's tension
13  between them two.  And when he said that he refused
14  to deliver the product, deliver his work.
15      Q.   Okay.  Okay.  So that in terms of Tom
16  Campion's complaints about Nick Barone, focusing on
17  that for a second, it was Tom and Mark don't get
18  along and now Nick's refusing to make deliveries?
19      A.   Yes.
20      Q.   Okay.  And that's all the complaints you
21  recall receiving about Nick Barone from Tom Campion;
22  is that right?
23      A.   Yes.
24      Q.   Okay.
25      A.   And particularly individually, yes.

Page 27

1       Q.   Okay.  Do you know whether prior to Nick's
2   termination, whether Tom Campion ever kind of wrote
3   up or memorialized Nick's refusal to deliver
4   records?
5       A.   I don't recall if he wrote it up.
6       Q.   All right.  We'll come back to that in a
7   second.
8       A.   Okay.
9       Q.   I think you said at some point that Nick
10  may have called for a meeting with you?
11      A.   Yeah.
12      Q.   Okay.  Tell me more about that.
13      A.   He -- and this was right during the COVID.
14  It was during -- well, we were the only ones in City
15  Hall that were back to work.  We were the only one
16  in the City, except for the essential workers.  And
17  but Nick wanted to meet -- he told Keith he'd like
18  to meet with me because he had some concerns.  And
19  the concerns were basically about just COVID and
20  making sure that the desk was -- you know, the
21  distance, making sure they had, you know, gloves,
22  sanitation products.
23      Q.   Okay.
24      A.   And so I just went down there and I met
25  with them.  Because I believe, at that time, they

Page 28

1   might have was talking about -- I think they was
2   talking about medical.  Because they were concerned
3   because they were part time.  I think that meeting
4   I -- that's when I decided I made them all full
5   time, so they could at least have medical, and I
6   gave them all raises.
7       Q.   Prior to this meeting that Nick requested,
8   he was working part time, that's your understanding?
9       A.   Mm-hmm.
10      Q.   And that you gave -- you made him and
11  others full time and you gave them raises; is that
12  right?
13      A.   Yes.
14      Q.   Okay.  The other reasons Nick wanted to
15  meet with you is because of COVID sort of safety
16  issues?
17      A.   Safety issues, yes.  That's what I meant.
18      Q.   Those concerns that Nick expressed, were
19  they reasonable concerns that he had from your --
20  from what you saw?
21      A.   Yeah.  I think, yes, they were.
22      Q.   All right.  Now, when he raised these
23  concerns with you, was he, like, polite or, like --
24  polite about it, professional about it?
25      A.   No, no.

Page 29

1       Q.   Okay.  Tell me more.
2       A.   No.  Nick basically kind of -- he kind of
3   had a chip on his shoulder a lot.  He was rude.  He
4   was rude.  But, I mean, I didn't -- you know, I just
5   took it as I'm new, you know what I mean.  But he
6   had an attitude.
7       Q.   Did he raise these concerns directly to
8   you in person?
9       A.   Yeah, we were all in a room together.
10      Q.   Who else was there, do you recall?
11      A.   Keith Harris was there, Nick, Keith
12  Preston was there, Mark Wilson was there.  And it
13  was another employee, I forget his name, he was
14  there.  I'm not sure if Rasheen Cruz was there at
15  the time.  That's who I can recall.
16      Q.   Okay.  And this meeting where Nick was
17  somewhat rude about COVID safety issues, this was
18  sort of at the beginning of your tenure as Register
19  of Wills?
20      A.   Yeah, it was at the beginning.  Because
21  when I came on, I came on, like, January the -- I
22  think it was the 5th.  Then the government got shut
23  down, like, three weeks later.  And then, like, two
24  or three weeks after that, we were back open
25  virtually.

NICHOLAS BARONE v
TRACEY L. GORDON and CITY OF PHILADELPHIA                    TRACEY L. GORDON

Page 30

1  Q.  Yeah.
2  A.  And so after that then we started
3  gradually started coming in.  Because we needed --
4  you know, we needed attorneys eventually.  But we
5  had to stay close.  So they work -- I think they
6  were, like, the last ones to come in.  Because the
7  lawyers wasn't allowed to come in to get the
8  records, so they were the last one.  So when he
9  called the -- when he called for the meeting, I
10 recall that it had a lot to do with safety.
11 Q.  All right.  And, again, his specific
12 complaints about safety were reasonable, but his
13 delivery of the message to you was perceived by you
14 somewhat rude and disrespectful?
15 A.  I think so, yes.
16 Q.  Did you ever go over that with him?
17 A.  Yeah, I -- yeah, I -- not privately.  I
18 just said, could you tone it down.
19 Q.  Oh, you said that when the other folks
20 were still around?
21 A.  I said -- yeah.  I said, let's talk.  Tone
22 it down, Nick.
23 Q.  And did he?
24 A.  Mm-hmm.
25 Q.  Okay.

Page 31

1        MR. HATCHETT:  You have to say "yes" or
2  "no".
3        THE WITNESS:  Yes.
4        MR. GOSLEE:  Thanks.
5  BY MR. GOSLEE:
6  Q.  Was there any other incidents like that
7  where Nick, you recall, specifically spoke to you in
8  a rude or disrespectful way or was that a one-time
9  occasion that you recall?
10 A.  That was just a one-time occasion.
11 Q.  Okay.  What was the standard -- in terms
12 of your time as Register of Wills in Philadelphia,
13 what was the standard procedure for handling
14 disciplinary issues or insubordination,
15 insubordination issues at the Register of Wills?
16 A.  When I got there, there weren't any.
17 Donatucci was like you're gone.  There were no job
18 descriptions, there were no salary, there was no
19 what-you-call-it, evaluations.  There were no --
20 there was no communication with employees.  The
21 office was filthy.  It had -- the archives were --
22 which it probably still is.  A lot of archives is
23 probably -- are going to be lost.  I went down
24 there, the papers was everywhere.  The morale was
25 low with the staff.  It was who was connected and

Page 32

1  who wasn't.  It was what department was the
2  in-department and what departments nobody cared
3  about.  It was -- the morale was pretty low.
4  Q.  Okay.  So when you took over as the
5  Register of Wills, as far as you could tell, there
6  was no standard procedure for handling
7  insubordination or disciplinary issues with
8  employees?
9  A.  None.
10 Q.  Okay.  And did you --
11 A.  You just got fired.
12 Q.  You just got fired.  Did you then
13 implement some standard procedures for handling
14 disciplinary and insubordination issues?
15 A.  We were beginning the process of it.  We
16 were supposed to meet with the Law Department and
17 then COVID happened.  We were supposed to meet with
18 them monthly and then COVID happened, and then we
19 never had any communication with them.  And then we
20 also was supposed to meet with the Union.  And
21 because I believe our staff wasn't paying into the
22 Union.  Because it was FOP.  Because that was a big
23 deal, too.  They didn't really have any time.  So we
24 didn't have anything basically to establish, you
25 know, how we could do disciplinary things.

Page 33

1  Charmaine was in the process of putting together
2  procedure.  We had none.
3  Q.  Okay.  And it sounds like, when you took
4  over, you began the process of setting up procedures
5  for handling employment discipline, but maybe never
6  finished that process because of COVID?  Did I
7  understand that correctly?
8  A.  Yes.  Well, we were supposed to go over
9  procedures with the Law Department, but the Law
10 Department pretty much we -- like, once COVID shut
11 down, the whole city shut down.  We were just
12 basically working because we turned the office and
13 made it essential.  Because lawyers are calling
14 because people were dying and they needed the
15 paperwork.  And people was panicking and needed to
16 get married.  And we pretty much start -- we figured
17 out that because we're a Quaker state, that we could
18 actually marry people under the Quaker law.  So we
19 were the only office in the country, probably the
20 world, that was actually marrying.  We married close
21 to 700 people during COVID because of Quaker
22 marriage.  We did it virtually.  We was the first to
23 do everything virtual.
24 Q.  That's interesting.
25 A.  We trained most of the counties virtually.

Page 34

1  When all the counties was shut down in Pennsylvania,
2  Philadelphia was the only county that remained open
3  during COVID.  We were the first to -- and they
4  continue to do it now.  We were the first to do
5  virtual hearings and now they keeping it now.  So it
6  was a trying time.
7      Q.   I understand.
8      A.   And people were really -- you know, people
9  were nervous.  They were scared and they were
10 concerned.  So when they called me down there, you
11 know, I seen the condition.  I was, like, yeah, make
12 sure everybody had their desk, make sure everybody
13 has their shield.  We were the first equipped
14 offices with the shield, the plexiglass, as you
15 would call it.
16     Q.   All right.  In terms of policies and
17 procedures for employment or employees issues,
18 including discipline, as Register of Wills, you
19 would have been the person with the authority to set
20 how the -- set the policies and procedures for how
21 the office would operate; is that fair?
22     A.   Yes, I would approve it.
23     Q.   Right.
24     A.   I would definitely approve how the
25 policies, you know, went.  I wouldn't put them

Page 35

1  together.
2      Q.   You wouldn't be the person necessarily
3  putting them on paper, but they eventually would
4  come up to you and you would have to approve or
5  disapprove --
6      A.   Yes, I would.
7      Q.   -- the operational policies of the office?
8      A.   Yes.
9      Q.   All right.  You mentioned that the Law
10 Department was going to be involved with setting
11 some of these policies and procedures.  Was this to
12 ensure that, whatever the procedures were, that they
13 complied with the law?
14         MR. HATCHETT:  Objection to the form of
15     the question.  Ms. Gordon, I'll just remind
16     you, in answering his question or anything
17     regarding the Law Department, don't discuss any
18     conversations with anyone that you would have
19     had regarding at the Law Department.
20         THE WITNESS:  Okay.
21         MR. HATCHETT:  Do you understand?
22         THE WITNESS:  Yes.
23 BY MR. GOSLEE:
24     Q.   Let me reask the question with that.
25 Without disclosing any actual specific

Page 36

1  communications that you had with any lawyers in the
2  Law Department, was the -- were you -- was the Law
3  Department's involvement with setting potential
4  policies and procedures with the Register of Wills
5  office meant to ensure that those policies and
6  procedures complied with the law?
7      A.   We didn't even get to that point.  We were
8  just discussing -- we were just going over
9  procedures.  Because we were under the impression
10 that, according to, you know, the state law, we have
11 a right to hire, fire and discipline.  So we was
12 under the -- I forget the rule.  And so when we
13 organized our administration, and we were told to
14 decrease -- we had to decrease our budget.  So we
15 had to lay people off.  And then it came a problem
16 with the FOP, became a problem.  And so that is when
17 I recognized -- realized that, what are the
18 procedures, you know.  So we never got chance to --
19 we never got chance to, you know, finalize any
20 procedures.
21     Q.   All right.  Let me ask this question.  At
22 the time Nick was terminated, were there any
23 procedures in place at the Register of Wills for how
24 to handle termination of employees?
25     A.   I don't believe so.

Page 37

1      Q.   At the time Nick was fired, were there any
2  procedures in place for how to handle employee
3  discipline or insubordination?
4      A.   I don't recall.  I'm not sure.
5      Q.   When you made the decision to fire Nick,
6  did you follow any sort of procedures in terms of
7  making that decision?
8      A.   I let him go because he refused work.
9      Q.   Yeah, I get that.  I'm asking just a
10 slightly different question.  Were there -- I
11 understand that he refused to do work.  But were
12 there any specific procedures or policies that you
13 were following when you made the decision to go
14 ahead and fire him?
15     A.   Yeah.  On the job description that -- our
16 job description, if you refuse to do your work,
17 you'll be asked -- then you'll be let go.
18     Q.   Did you memorialize in writing anywhere
19 your decision to fire Nick?
20     A.   No.
21     Q.   Do you know if anyone within the Register
22 of Wills office memorialized the decision to fire
23 Nick?
24     A.   I believe Charmaine Collins put it in
25 writing that he was -- you know, we were letting him

NICHOLAS BARONE v
TRACEY L. GORDON and CITY OF PHILADELPHIA                          TRACEY L. GORDON

Page 38

1  go.
2       Q.   Did she put in writing why he was being
3  let go for being insubordinate?
4       A.   I don't know.  I don't recall what she put
5  in writing.
6       Q.   Okay.  Do you recall anyone sharing with
7  you a written report that said Nick Barone is being
8  terminated for being insubordinate on this date or
9  time or anything along -- like that?
10      A.   I don't recall.
11      Q.   Would it be your expectation that someone
12 within the Register of Wills office would have
13 memorialized why Nick was being fired?
14      A.   Repeat the question.
15      Q.   Would it have been your expectation that
16 somebody on your staff in the Register of Wills
17 office would have memorialized why Nick Barone was
18 being terminated?
19      A.   Not necessarily.
20      Q.   Okay.  When you say not necessarily, do
21 you mean that it was not a requirement within the
22 Register of Wills office for the reason an employee
23 was being terminated to be memorialized in writing?
24      A.   I let Charmaine Collins handle how to put
25 it in writing.

Page 39

1       Q.   Okay.  Got it.  So from your perspective
2  --
3       A.   From an HR perspective.  Because I
4  wasn't -- I'm not HR, so I don't know how she would
5  put it in writing.
6       Q.   She's the HR expert and she would -- and
7  you would delegate to her the responsibility for how
8  she would record the reason why Nick was fired and
9  actually effectuating his firing?
10      A.   I wouldn't delegate it to her, she would
11 do it.
12      Q.   Okay.  It was your expectation --
13      A.   I just -- I just -- okay, go ahead.
14      Q.   Go ahead.
15      A.   I just called -- I called her and said,
16 terminate Nick because he's refusing to do work.
17      Q.   Okay.  Got it.  So Nick refused to do
18 work, and you found out from either Mark Wilson or
19 Tom Campion and you made the decision to fire him,
20 correct?
21      A.   Yes.
22      Q.   And then the next step would have been
23 that you would have called Charmaine Collins and
24 told her, Nick's refusing to do work, please
25 terminate him?

Page 40

1       A.   Yes.
2       Q.   And would you have told her the fact that
3  Nick was refusing to do work or would you have just
4  said terminate Nick?
5       A.   I told her Nick refused to do work and let
6  him go.
7       Q.   Okay.  You specifically -- you
8  specifically recall telling Charmaine, Nick's being
9  insubordinate, he's refusing to do work?
10      A.   Yes.
11      Q.   Okay.  And we're kind of full circle here.
12 Was it your examination that Ms. Collins would have
13 recorded that somewhere, that Nick was refusing to
14 do work and thus was being terminated?
15      A.   I don't know how Charmaine checks her
16 records.  I don't know how -- I don't know what she
17 typed up.  I don't know how she kept her records,
18 so, no.
19      Q.   Okay.
20      A.   She -- I left that up to Charmaine.
21      Q.   Okay.
22      A.   To put it in writing because she knows --
23 she would have knew how to put it in writing.
24      Q.   You don't recall telling Charmaine
25 specifically, hey, make sure you write down why

Page 41

1  Nick's being fired somewhere?
2       A.   No, I didn't.  No.  No.
3       Q.   Did you tell anyone else in the office why
4  Nick was being fired, other than Charmaine?
5       A.   Yeah, I told Emilio.
6       Q.   Okay.  What did you tell Emilio?
7       A.   I told him we let Nick go because he's
8  refusing to do work.
9       Q.   And did Emilio say anything in response to
10 that?
11      A.   Okay.
12      Q.   Okay.  He didn't push back and/or object
13 to you firing him?
14      A.   No.
15      Q.   How about Charmaine, did Charmaine object
16 to you firing Nick?
17      A.   No.
18      Q.   Okay.  You told Emilio, you told
19 Charmaine.  Did you tell anyone else why Nick was
20 being fired?
21      A.   No.
22      Q.   Do you know if anybody told Nick why he
23 was being fired?
24      A.   Charmaine should have.
25      Q.   Yeah, but --

Page 42

1    A.   But I don't know if she -- I don't know.
2  I'm not sure what she told Nick.
3    Q.   Okay.  Understood.  It would be your
4  expectation, though, if Nick was being fired for
5  refusing to do work, that Charmaine would have told
6  him that?
7    A.   Charmaine was the HR.  She's the one that
8  let's people know when they're terminated.
9    Q.   Okay.  How about my specific question was,
10  was it your expectation that Charmaine would say,
11  Nick, you're being terminated and here's why?
12    A.   Normally she usually -- I don't -- I'm not
13  sure how she terminates people.  I can't -- I
14  can't -- I don't know -- I don't know how Charmaine
15  terminated people.
16    Q.   Okay.  As the Register of Wills in
17  Philadelphia, within that office, you would have had
18  the authority to set policies for hiring and firing,
19  correct?
20    A.   As a Register, yeah, yeah.
21    Q.   But as I understand your testimony,
22  because of COVID and some other issues, at the time
23  Nick was fired, you had not yet established any
24  policies to be followed when employees were
25  terminated?

Page 43

1    A.   I don't recall if we had finished up.
2  Because there weren't any.  So we were in the midst
3  of, you know, figuring out job descriptions,
4  figuring out disciplinary, how it -- how we -- that
5  was Charmaine job.
6    Q.   At the time you left office -- by the time
7  you left office, did you -- had you completed
8  policies and procedures for how to handle employee
9  discipline or employee termination?
10    A.   I'm not sure.  I'm not sure.  I'm not sure
11  if we completed policies.  I just was so busy doing
12  everything else, I left that toward -- I left that
13  to my Deputy of HR.  That's what Charmaine job was.
14    Q.   Okay.  We talked about Charmaine, we
15  talked about Emilio.  Did you recall anyone else
16  within the office of Register of Wills that had any
17  complaints or concerns about Nick being terminated?
18    A.   Complaints about Nick, no.  No one came
19  and told me that they had any complaints about Nick
20  being terminated.
21    Q.   Okay.  Prior to this incident of
22  insubordination -- let me back up for a second.
23  Kind of going back to the start of this deposition.
24  I think the incident of the insubordination was the
25  event that triggered you to fire Nick, but you had

Page 44

1  some other concerns about the behavior or the
2  efficiency of the Archives Department generally,
3  correct?
4    A.   Yes.
5    Q.   Okay.  But in terms of Nick specifically,
6  other than his -- at least one occasion where he was
7  not getting along with Mark Wilson, there were no
8  other instances that come to mind in terms of him
9  being subordinate or in need of employee discipline;
10  is that correct?
11    A.   Well, Nick?
12    Q.   Yeah.
13    A.   Um, no.
14    Q.   Okay.  What year did you begin as
15  Register?
16    A.   2020.  January 2020.
17    Q.   Okay.  That's when you took office?
18    A.   Mm-hmm.
19    Q.   Is it an elected position?
20    A.   Yes.
21    Q.   Is it a four-year term?
22    A.   Yes.
23    Q.   Okay.  At the time you ran for office, did
24  you understand what the responsibilities and
25  functions of the Register of Wills were under

Page 45

1  Pennsylvania law?
2    A.   Not all of them.
3    Q.   At the time you ran for office -- it's not
4  a law school exam.  Just trying to get a sense.
5    A.   No, no.
6    Q.   At the time you ran for office, what did
7  you understand the responsibilities and the function
8  of the Register to be?
9    A.   I didn't understand a lot about the
10  office.
11    Q.   Okay.
12    A.   I didn't have any -- you know, I didn't --
13  no one did.  No one knew it exist, except lawyers.
14    Q.   Yeah.
15    A.   No one knew the Register of Wills office
16  existed.  And I guess that's why he served 40 years.
17    Q.   He being Mr. Donatucci?
18    A.   Yeah, Honorable Ron Donatucci.
19    Q.   Okay.  After you became the Register, did
20  you over time learn more about the responsibilities
21  and functions of the office of the Register?
22    A.   Absolutely, yes.
23    Q.   Okay.  Let me ask a question, partly just
24  to educate me.  Where does the office of the
25  Register of Wills derive its power from, like, a

NICHOLAS BARONE v
TRACEY L. GORDON and CITY OF PHILADELPHIA                                    TRACEY L. GORDON

Page 46

1  constitution, a statute, a local charter, do you
2  know?
3       A.   The state.  The state office.  It's just
4  budgeted.  It's budgeted through the City.
5       Q.   As the Register of Wills, you were -- were
6  you -- was that a municipal office, or a state
7  office, or a county office, if you know?
8       A.   It is considered a state office, but the
9  budget comes through the City.
10      Q.   Okay.  But the actual job responsibilities
11 or powers vested in the Register, do you know where
12 those come from in terms of --
13      A.   The state constitution.
14      Q.   The state constitution?
15      A.   Mm-hmm.
16      Q.   And when you took office and you inherited
17 or you became a Register, did you educate yourself
18 as to what the state constitution said about the
19 roles and responsibilities and functions of the
20 Register?
21      A.   Mm-hmm.  As much as I could, yes.
22      Q.   All right.  And, again, I'm not interested
23 in any conversations you had with lawyers.  But were
24 there any legal texts or documents you relied upon
25 in determining sort of the source and the scope of

Page 47

1  your authority as the Register?
2       A.   Repeat the question.
3       Q.   Sure.  And, again, with the caveat that
4  I'm not interested in any conversation had with an
5  attorney.
6       A.   Right.
7       Q.   Were there any legal texts or documents
8  that you relied upon in determining what the scope
9  and the source of your authority were as the
10 Register of Wills?
11      A.   Um...
12           THE WITNESS:  Can I ask --
13           MR. HATCHETT:  If you need clarification,
14      you can ask for clarification.
15           THE WITNESS:  Okay, yeah.
16 BY MR. GOSLEE:
17      Q.   You want me to ask it a slightly different
18 way?
19      A.   Yeah.
20      Q.   All right.  So when you became Register,
21 do you recall there being a time when you were like,
22 okay, I gotta read -- I gotta read some documents to
23 learn exactly what it is I'm supposed to do and what
24 my power of authority is as the Register?
25      A.   Yeah, I took courses.  Not courses, but I

Page 48

1  belong to an association.  Register of Wills
2  Association, which is a state association that I
3  would go up and they would give us -- you know, they
4  would train us and give us documents on, you know,
5  the new laws and, you know, just information in
6  regards to our powers.
7       Q.   Okay.  Let's drill down there for second
8  then.  What did you understand your powers to be as
9  the Philadelphia Register of Wills?
10      A.   Just, you know, I had a power to issue
11 executive orders, of course, issue marriage
12 licenses.  Off the top of my head, I don't...
13      Q.   That's what you remember right now?
14      A.   Yeah.
15      Q.   Okay.  Did you report -- when you were the
16 Register of the Will, did you report to anyone
17 within the Philadelphia municipality?
18      A.   Only time I had to report to someone is
19 counsel to get approval of the budget.
20      Q.   Budget approval?
21      A.   Mm-hmm.
22      Q.   And who did you submit budget approvals
23 to?
24      A.   To the Finance Department.
25      Q.   Okay.  But other than that, you didn't

Page 49

1  report to, like, the Mayor or City Council or
2  anything like that in doing your job as the Register
3  of the Will?
4       A.   No.
5       Q.   I guess, a somewhat obscure office on
6  trying to figure out exactly how to operate?
7       A.   Yeah, it's a little office.  It's kind of
8  obscure.  But we still have to get approval from
9  budget, we still have to testify.  You know, we have
10 to testify in front of City Council for them to
11 support our budget.
12      Q.   Okay.  But as far as you recall, other
13 than the budget issue, you were not subordinate to
14 anybody else within the Philadelphia municipality?
15      A.   No.  Not that I know of, no.
16      Q.   And, obviously, this is kind of redundant.
17 Or maybe that's not the right word.  But within the
18 rural office -- within the Register of Wills itself,
19 you were not subordinate to within anyone within
20 that office as Register?
21      A.   No.
22      Q.   Okay.  You were -- sort of as Register,
23 you're sort of, like, top of the pyramid, so to
24 speak?
25      A.   Yes.

Page 50

1    Q.   Okay.  And I think we talked about this
2  before.  As the Register of Wills, you would set
3  policy for how the office would run?
4    A.   Yeah.  I -- yeah, I created different
5  policies.  You know, I changed around the
6  departments.  I created job descriptions.  I had
7  some professionals come in and help me create job
8  descriptions because they never had them.  I began
9  -- we began performance appraisals.  Yeah, pretty
10  much.
11    Q.   Okay.  Operationally you didn't need to
12  get approval from anyone within the city government
13  in terms of how the office would run, including, for
14  instance, getting job descriptions and those sorts
15  of things?
16    A.   No.
17    Q.   I think you had testified in some other
18  cases.  I'm not gonna go over too much detail.  You
19  had hiring and firing ability as the Register of
20  Wills?
21    A.   Yeah, the right to hire, fire and
22  discipline.
23    Q.   Okay.  You didn't need to get approval
24  from the Mayor or City Council in deciding who to
25  hire for what position?

Page 51

1    A.   No.
2    Q.   You didn't need to get approval from the
3  Mayor, City Council or anybody else if you decided
4  to terminate someone?
5    A.   No.
6    Q.   Okay.  For instance, like, Nick, you
7  terminated Nick.  You didn't need to get approval
8  from anyone in deciding to terminate Nick, that was
9  just a decision you had the authority and power to
10  make?
11    A.   Yes.
12    Q.   Obviously, we're here because Nick filed a
13  lawsuit.  You're obviously aware of that?
14    A.   Mm-hmm.
15    MR. HATCHETT:  Remember to keep your --
16    THE WITNESS:  Yes.
17    MR. HATCHETT:  -- responses audible.
18    THE WITNESS:  Yes.
19    MR. HATCHETT:  Thank you, Ms. Gordon.
20  BY MR. GOSLEE:
21    Q.   Other than filing a lawsuit, as far as you
22  know, was there any procedure within the
23  municipality for Nick to challenge your termination
24  decision?
25    A.   Was there any what?

Page 52

1    Q.   Was there any sort of procedure within the
2  municipality of Philadelphia itself for Nick to have
3  challenged your termination decision?
4    A.   Not that I know of.
5    Q.   There was no person or group within the
6  municipality that could have overturned your
7  decision to terminate Nick?
8    A.   Not that I know of.
9    Q.   Okay.  I'm gonna go over some documents
10  with you.  I think it might be a good time to take a
11  short break --
12    A.   Okay.
13    Q.   -- maybe for you.
14    MR. GOSLEE:  You want to do a five-minute
15  break?
16    MR. HATCHETT:  It's fine.  The only thing
17  is, you said you needed a break at 5:15.
18    THE WITNESS:  Yeah, I do.
19    MR. HATCHETT:  Okay.
20    MR. GOSLEE:  Why don't we take a
21  five-minute break now and then we'll get
22  started.
23    THE WITNESS:  I probably -- it's only
24  gonna take me five minutes.  I just gotta
25  replenish, um, my --

Page 53

1    MR. GOSLEE:  That's fine.  Why don't we
2  take a break right now and then -- well,
3  actually, let's go off the record for a second.
4    THE VIDEOGRPAHER:  Going off the record at
5  approximately 4:39 p.m.
6                - - -
7    (A discussion was held off the record.)
8                - - -
9                (A short break was taken.)
10                - - -
11    THE VIDEOGRPAHER:  We're back on the
12  record at 4:45 p.m.
13  BY MR. GOSLEE:
14    Q.   Ms. Gordon, I'm gonna hand you what I'll
15  mark as Exhibit No. 1.
16    A.   Thank you.
17                - - -
18    (Exhibit-1 was marked for identification.)
19                - - -
20    MR. GOSLEE:  For the record, this is a
21  document produced by the defense in this case,
22  DEFENSEB02256.
23  BY MR. GOSLEE:
24    Q.   My first question, Ms. Gordon, is simply,
25  have you seen this document before?

NICHOLAS BARONE v
TRACEY L. GORDON and CITY OF PHILADELPHIA                                    TRACEY L. GORDON

Page 54

1    A.    No.
2    Q.    Do you know what it is?
3    A.    **Looks like a performance evaluation.**
4    Q.    Have you seen this sort of document before
5    while in your position as Register of Wills?
6    A.    Yes.
7    Q.    Do you know who -- do you know what the
8    purpose of this document is?
9    A.    **Employee performance evaluations.**
10   Q.    Do you know who created this evaluation
11   form or template?
12   A.    Charmaine Collins.
13   Q.    Okay.  So this is something Ms. Collins
14   would have made during your tenure as Register of
15   Wills?
16   A.    Yes.
17   Q.    And, by the way, Charmaine, did she start
18   at the Register at the same time as you?
19   A.    Yes.
20   Q.    Was she one of the people you hired?
21   A.    Yes.
22   Q.    Okay.  I'm looking at the top of this
23   document.  The top row on the far left it says Nick
24   Barone.
25   A.    Yes.

Page 55

1    Q.    And then if you follow that all the way
2    over to the right it says, Review Date, 12-2-21.  Do
3    you see that?
4    A.    Yes.
5    Q.    And then in that right-hand column toward
6    the bottom it says -- at the very bottom it says,
7    evaluation completed by.  Do you see that?
8    A.    Yes.
9    Q.    There's the name Tom Campion?
10   A.    Mm-hmm.  Yes.
11   Q.    And Tom was Nick's supervisor, correct?
12   A.    Yes.
13   Q.    All right.  And, at some point,
14   Mr. Campion was injured or stopped serving as
15   supervisor due to injury.  It looks like, at this
16   time, December of '21, he's still in that position?
17   A.    Yes.
18   Q.    Was it Tom's responsibility, as the
19   supervisor, to complete sort of the employee
20   evaluations?
21   A.    Yes.
22   Q.    Do you recall Tom sharing this employee
23   evaluation about Nick?
24   A.    No.
25   Q.    Would it have been your custom and

Page 56

1    practice as the Register to have reviewed employee
2    evaluations such as this one?
3    A.    No.
4    Q.    Okay.  Would anybody within the Register
5    of Wills, other than Tom Campion, have reviewed this
6    employee evaluation?
7    A.    **Charmaine Collins, the HR.**
8    Q.    And it looks like this specific employee
9    evaluation for Nick is being completed in December.
10   Was it the practice of the Register's office to
11   complete these evaluations at year end?
12   A.    Yes.
13   Q.    All right.  And at the bottom there,
14   appears to be Nick Baron's signature.  Do you see
15   that?
16   A.    Yes.
17   Q.    Were employees expected to review and sign
18   these evaluation forms?
19   A.    Yes.
20   Q.    Okay.  And it's dated 12/22/21.  Do you
21   see that?
22   A.    Yes.
23   Q.    All right.  I'm gonna go back up to some
24   of -- the row where it says, Performance Factors.
25   Do you see that?

Page 57

1    A.    What number?
2    Q.    It is Row 1, two, three.  Row 4.
3    A.    Okay.
4    Q.    In four it says, Performance Factors.  Do
5    you see that?
6    A.    Oh, yeah.  I see that, yes.
7    Q.    And then there's, like, a performance
8    rating key directly above that.  Do you see that?
9    A.    Yes.
10   Q.    All right.  The first performance factor
11   on here is quality of work.  Do you see that?
12   A.    Yes.
13   Q.    Accuracy, neatness, and completeness of
14   work, ability to meet department's standards with
15   regard to quality.  Do you see that?
16   A.    Yes.
17   Q.    And, again, this is something that
18   Charmaine Collins would have directed?
19   A.    Yes.
20   Q.    Next to that it says, Circle Appropriate
21   Ratings.  And there's some letters, U, NI, ME, EE.
22   Do you see that?
23   A.    Yes.
24   Q.    And I'm not gonna go over those because
25   there's a key above.  But the ME appears to be in

Page 58

1  bold.  Do you see that?
2      A.   Yes.
3      Q.   Do you understand why that ME is in bold?
4      A.   It says meets expectations.
5      Q.   Right.  I read this as the ME in bold
6  means that Nick met expectations.  Are you reading
7  that the same way?
8      A.   Yes.
9      Q.   Okay.  Would you have any reason to have
10 disagreed with Tom Campion's conclusion that Nick
11 met expectations with respect to the first
12 performance factor, the quality of work?
13     A.   Repeat the question.
14     Q.   Do you have any reason to disagree with
15 Tom Campion's conclusion that Nick met expectations
16 with respect to the first performance factor,
17 quality of work?
18     A.   No.  I mean, he's a supervisor.  He works
19 with him.  So, no, I wouldn't know.  This is -- no.
20     Q.   I understand.  You would have no reason to
21 disagree with this ranking about quality of work
22 from Mr. Campion as of December of 2021?
23     A.   No.
24     Q.   The next one, the next performance factor,
25 No. 2, is, Quantity of Work.  Do you see that?

Page 59

1      A.   Yes.
2      Q.   And it reads, amount of work produced,
3  compared with the requirements of the position.  Do
4  you see that?
5      A.   Yes.
6      Q.   And, again, it appears to say that or
7  indicates that Mr. Barone meets expectations.  Do
8  you see that?
9      A.   Yes.
10     Q.   And you would have no reason to disagree
11 with Mr. Campion's assessment that, as of
12 December 2021, Nick Barone met expectations with
13 respect to the quantity of work performance factor?
14     A.   No.
15     Q.   Next one down, Work Habits.  Do you see
16 that?
17     A.   Yes.
18     Q.   And, again, meets expectations.  Do you
19 see that?
20     A.   Yes.
21     Q.   And, again, you would have no reason to
22 disagree with this conclusion from Tom Campion?
23     A.   I -- no -- actually, I disagree.  He's a
24 supervisor, no.
25     Q.   And this is somewhat redundant.  As a

Page 60

1  lawyer, I have to sort through the record.
2      A.   No, you can keep going.
3      Q.   Yeah, okay.  And I apologize.
4      A.   That's okay.
5      Q.   No. 4, Dependability/Initiative.  Do you
6  see that?
7      A.   Yes.
8      Q.   All right.  Mr. Campion appears to have
9  indicated that Nick Barone met expectations as
10 December of 2021, agree?
11     A.   Yes.
12     Q.   And you would have no reason to disagree
13 with that assessment?
14     A.   No.
15     Q.   Attendance, No. 5, also says meets
16 expectations.  Do you see that?
17     A.   Yes.
18     Q.   You would have no reason to disagree?
19     A.   No.
20     Q.   No. 6 is, Interpersonal Abilities.  Says,
21 exceeds expectations.  Do you see that?
22     A.   Yes.
23     Q.   And interpersonal abilities, courtesy,
24 tact, self-control, patience, professionalism and
25 discretion in dealing with fellow employees and the

Page 61

1  public, do you see that?
2      A.   Yes.
3      Q.   Now, I'm assuming you would disagree with
4  Mr. Campion about this rating for Mr. Barone; is
5  that fair?
6      A.   Well, I can't -- I can't -- this is
7  Mr. Campion's evaluation, not mine.
8      Q.   That's fair.  You did say earlier that
9  Mr. Campion did complain about Nick frequently,
10 especially about Nick and Mark.  I'm sorry.  Yeah,
11 Nick and Mark not getting along.
12     A.   Yeah, he used to complain.
13     Q.   Would you have expected that he would have
14 put exceeds expectations for interpersonal
15 abilities, given that Mr. Campion would often
16 complain about Nick and his conduct?
17     A.   I guess I would have to see all of the
18 evaluations to see if they all look like this.
19     Q.   All meaning, all of Nick's evaluations?
20     A.   No, all of the employees.  All -- all --
21 all of his subordinates.
22     Q.   Is it -- I don't have all -- and I'll tell
23 you, I don't have all of the other subordinates
24 evaluations.
25     A.   I mean, I don't -- you know, I can't...

Page 62

1    Q.   Let me ask you a better question.
2    A.   Yeah.  Because I wasn't a direct
3  supervisor over them, so I can't --
4    Q.   I understand.
5    A.   I can't get into Tom Campion's head on why
6  he put this here.  Now, I wouldn't evaluate Nick
7  because Nick wasn't directly under me.  I'm just
8  saying, you know, on occasions that -- few occasions
9  that I was around him, you know, he just was, like,
10  a little bit on edge.  But that doesn't mean that he
11  wasn't all these things to Tom Campion.
12    Q.   Well, here's why I asked the question and
13  let me ask it this way.  You had said a couple times
14  earlier in the deposition that Tom Campion would
15  complain about Nick's performance.  Did I understand
16  that correctly?
17    A.   No.  I said that Tom Campion complained
18  that Nick refused to deliver -- you know, he refused
19  to deliver the mail.  He refused to come to City
20  Hall and he would say that Nick and Mark just didn't
21  get along.  This is in passing.
22    Q.   Okay.
23    A.   I don't know if we want to put that on
24  paper.
25    Q.   Right.

Page 63

1    A.   I would have to see what he put on paper
2  for the other ones.
3    Q.   Well, let's finish up with this one.  At
4  the bottom it says, provide relevant comments in the
5  following space.  Use additional sheets if
6  necessary.  Do you see that?
7    A.   Yes.
8    Q.   Says, Nick is the point person in Archives
9  and meets expectations in that capacity.  Do you see
10  that?
11    A.   Yes.
12    Q.   Now, I know that you did not complete this
13  evaluation form.  I know that you cannot get
14  yourself into Tom Campion's head.  Nevertheless,
15  given that Tom has complained -- had complained to
16  you in the past that Nick was not doing his job, was
17  not delivering records and that would sometimes have
18  disagreements with Mark, it is surprising to you
19  that he concluded that Nick is the point person in
20  Archives and meets expectations in that capacity?
21    A.   No, it's not surprising.
22    Q.   Why not?
23    A.   I'm just not surprised.  I don't know why.
24  I'm -- you know, I don't -- you know, people want to
25  give people negative evaluations.

Page 64

1    Q.   This is -- what Mr. Campion wrote here,
2  though, that Nick is the point person and he meets
3  expectations in that capacity --
4    A.   Mm-hmm.
5    Q.   -- that is inconsistent with Mr. Campion's
6  discussions with you, where he would complain about
7  Nick's performance and his relationship with Mark
8  Wilson?
9    A.   Yeah.  Not discussions, but he would
10  discuss with Keith Harris and they would come and
11  say Nick -- and I don't even know if it was, like,
12  over and over they didn't get along.  And then he --
13  somebody told me, I don't know how it got there,
14  that Nick refused to deliver mail to the office.  He
15  just refuses not to do it, that's all.  He didn't
16  come and tell me over and over, but he just was
17  like, you know, Nick is refusing to deliver mail.
18    Q.   Okay.  And that's different than when you
19  learned that Nick was refusing to deliver records,
20  and that's when you terminated him.  Are we talking
21  about two separate things here?
22    A.   Yeah.  When they came -- I had heard a lot
23  of complaints down there.  And they was like, Nick
24  just said he's refusing to deliver mail, he's just
25  refusing.

Page 65

1    Q.   Yeah.
2    A.   So, you know, I was like, okay, he don't
3  want to do his work, he don't want to do his job
4  that we hired him for, then he's terminated.
5    Q.   Yeah.  Let me ask you this question about
6  that.  Maybe I asked before and you answered and I
7  forgot.  When you made the decision to terminate
8  Nick and you told Charmaine, was there, like, any
9  span of time between when you made the decision to
10  terminate Nick and when you actually effectuated the
11  termination?
12    A.   It was that day.
13    Q.   It was that day?
14    A.   It was that day.
15    Q.   Okay.  All right.  So if Nick was
16  terminated on January 6th or January 7th, this
17  review would have been prior to the incident where
18  Nick was insubordinate and refused to deliver mail?
19    A.   When was Nick terminated, the date?
20    Q.   I'll represent to you that there's an
21  e-mail that says January 6th the decision was made,
22  but the official termination, we'll look at it, was
23  January 7th.  But it's your testimony that you
24  pretty much fired Nick the same day or close to that
25  he refused to deliver mail; is that right?

NICHOLAS BARONE v
TRACEY L. GORDON and CITY OF PHILADELPHIA                                    TRACEY L. GORDON

Page 66

1      A.    Yes.
2      Q.    Okay.  All right.  We can set this
3  document aside.  Just keep it close.  I'll hand you
4  what I'll mark as Exhibit No. 2.
5                        - - -
6      (Exhibit-2 was marked for identification.)
7                        - - -
8  BY MR. GOSLEE:
9      Q.    And, again, this is a document produced by
10  the defense in this case.  Here you go, ma'am.
11      A.    Mm-hmm.
12      Q.    For the record, this a document produced
13  by the defense, Bates No. DEFENSEB00411.  It's an
14  e-mail exchange that was produced in this case.  I'm
15  directing your attention, Ms. Gordon, to the e-mail.
16  Toward the bottom of the page, there's an e-mail
17  from Charmaine Collins to you, Cc'ing Shariff
18  Roseboro, and the date is January 6, 2022.  Do you
19  see that?
20      A.    Yes.
21      Q.    The date is January 6, 2022, and the time
22  is 11:40 a.m.  Do you see that?
23      A.    Yes.
24      Q.    Do you recall receiving this e-mail,
25  ma'am?

Page 67

1      A.    I don't recall, but it came to me.  Yeah,
2  I recall this e-mail.
3      Q.    Okay.  And we talked about Tracey Gordon.
4  Who is Shariff Roseboro?
5      A.    She was assistant -- assistant --
6  Charmaine's assistant.
7      Q.    Okay.  And the subject line of this e-mail
8  at 11:40 a.m., on January 6th, it says, Reason Code.
9  Do you see that?
10      A.    Yeah.
11      Q.    Now, Charmaine's e-mail does not mention
12  Nick.  But if you look at the top of the page, she
13  wrote, Nick was notified of his termination.  Do you
14  see that?
15      A.    Yes.
16      Q.    Is this first e-mail towards the bottom,
17  is it your recollection that this is -- that this is
18  related to Nick Barone?
19      A.    Yes.
20      Q.    All right.  She wrote -- Ms. Collins wrote
21  to Register, I checked the two possible options for
22  coding the separation -- for coding the separation
23  are.  So let me read that again because I mangled
24  it.  I checked the two possible options for
25  coding the separation are, and there's two bullet

Page 68

1  points.  Do you see that?
2      A.    Yes.
3      Q.    Layoff and -- is the first bullet point.
4  An exempt assignment complete is the second.  Do you
5  see that?
6      A.    Yes.
7      Q.    Do you know what she's referring to here?
8      A.    No.
9      Q.    Do you know what these codings are for the
10  separation?
11      A.    No.
12      Q.    Were those the only two options for coding
13  Nick's separation?
14      A.    I'm not sure.
15      Q.    Let me back up.  I'm being presumptuous.
16  Was there a system in place where, if you terminated
17  an employee, you were supposed to put a code in for
18  the reason why that termination occurred?
19      A.    I'm not sure.
20      Q.    Okay.  Do you recall asking Charmaine
21  Collins in response to this e-mail why there were
22  only two options, layoff and exempt assignment
23  incomplete?
24      A.    No.
25      Q.    Okay.  Ms. Collins goes on to write, since

Page 69

1  you're not sure if when you might want to backfill
2  the position, I recommend using option two.  To
3  confirm, I will proceed with completing the
4  separation at the end of the day tomorrow.  Do you
5  see that?
6      A.    Yes.
7      Q.    Now, exempt assignment complete, what did
8  you understand that code to mean?
9      A.    I don't recall.
10      Q.    Did you know at some point and you don't
11  remember now?
12      A.    I don't remember.  I don't even remember
13  this e-mail.  I don't remember the second part.
14      Q.    The second part being what?  I'm sorry.
15      A.    Register, I check the two possible options
16  for coding the separation.
17      Q.    This e-mail at 11:40 a.m., on January 6th,
18  you don't remember this?
19      A.    I mean, I don't remember the opt -- I
20  don't know what the options are.
21      Q.    Okay.  You remember the e-mail generally
22  what the specific coding options are, you don't
23  remember sitting here now?
24      A.    Right.
25      Q.    Okay.  Whatever the second bullet point

Page 70

1  means, it looks like at 12:38 p.m., on January 6th,
2  the middle e-mail, it looks like you agreed to
3  option No. 2.  Do you see that?
4      A.   Yes.
5      Q.   Okay.  And then the next day, January 7,
6  2022, Ms. Collins writes, Nick was notified of his
7  termination.  His accounts and badge have also been
8  deactivated.  He said okay to inform Tom at this
9  time.  Do you see that?
10     A.   Yes.
11     Q.   First question is:  Do you know why
12 Ms. Roseboro was cc'd on this e-mail chain?
13     A.   Because that's her assistant.  She always
14 cc's her assistant.  Probably because she had to get
15 the badge or something.  Because Charmaine was
16 remote so she cc'd -- she probably -- I don't know
17 why.
18     Q.   Okay.
19     A.   I'm just speculating that she would cc her
20 assistant to let her know probably because she had
21 to get the badge.
22     Q.   Yeah.  So it's not surprising to you to
23 see Shariff Roseboro?
24     A.   Oh, no.  No.
25     Q.   That January 7th e-mail from Charmaine, it

Page 71

1  ends with, is it okay to inform Tom at this time.
2  Do you know what she's talking about?
3      A.   Yeah.  Let Tom know that he was let go.
4      Q.   Tom being Tom Campion?
5      A.   Yes.
6      Q.   Okay.  Did you ever talk to Tom Campion
7  about Nick being terminated?
8      A.   Not that I can recall.
9      Q.   Okay.  Did Charmaine, in fact, tell Tom
10 that Nick was being terminated, if you know?
11     A.   I believe.  I don't know.
12     Q.   Okay.
13     A.   I don't know.
14     Q.   You weren't part of that conversation?
15     A.   No.
16     Q.   Okay.  You can set that document aside.
17 I'm gonna hand you what I'll mark as Exhibit No. 3.
18                    - - -
19     (Exhibit-3 was marked for identification.)
20                    - - -
21 BY MR. GOSLEE:
22     Q.   For the record, this is a document, again,
23 been produced by the defense in this case.  Bates
24 ranges is DEFENSEB84 through 99.  And I'm gonna
25 spend a few minutes on this document, and also about

Page 72

1  the e-mail on the front page, Ms. Gordon.  But you
2  can take the time to look through it when you want.
3  But whenever you're ready, let me know, I'm gonna
4  ask you a couple questions.
5      A.   I looked through them.
6      Q.   Okay.  Can you turn to the first page
7  please, the e-mail?
8      A.   Mm-hmm.
9      Q.   Appears to be an e-mail from Emilio Di
10 Gregorio to yourself, dated January 6, 2022, and the
11 time is 7:18 p.m.  Do you see that?
12     A.   Yes.
13     Q.   All right.  And the e-mail says, Good
14 evening, Ms. Gordon.  Attached are the requested key
15 swipe reports for Archives.  Do you see that?
16     A.   Yeah.
17     Q.   And the attachments at the top have a
18 series of names, Christopher Guest, Mark Anthony
19 Wilson, Nicholas Barone, Tom Campion.  Do you see
20 that?
21     A.   Mm-hmm.
22     Q.   All right.  Have you seen this e-mail
23 before?
24     A.   No.
25     Q.   Do you recall receiving this e-mail from

Page 73

1  Emilio Di Gregorio?
2      A.   I don't recall.
3      Q.   Do you know why he is sending you swipe
4  reports for Archives?
5      A.   Yeah.  Because I asked him to send me
6  swipes because we were getting so many complaints
7  about Archives.  And I wanted to make sure that they
8  were actually showing up for work.  Because I'm
9  wondering why we keep getting complaints of work not
10 being completed and we gotta keep sending people
11 down there to find archives when we got five guys
12 down there.
13     Q.   All right.  You testified in a few other
14 cases, including Mr. Campion's case.  Do you recall
15 giving testimony in Mr. Campion's case?
16     A.   Do I recall what?
17     Q.   Giving testimony.
18     A.   Oh, giving testimony, yeah.
19     Q.   All right.  In Mr. Campion's case, you
20 testified that you asked Emilio to pull employee
21 swipe records to compare them to the sign-in and
22 sign-out sheets.  Do you recall that testimony?
23     A.   Yeah.
24     Q.   Okay.  The date on this e-mail from Mr. Di
25 Gregorio is January 6th --

NICHOLAS BARONE v
TRACEY L. GORDON and CITY OF PHILADELPHIA                    TRACEY L. GORDON

Page 74

1    A.    Mm-hmm.
2    Q.    -- the time is 7:18 --
3    A.    Mm-hmm.
4    Q.    -- p.m., correct?
5    A.    Yes.
6    Q.    Now, we looked at, just a moment ago, the
7  previous exhibit was an e-mail from Charmaine
8  talking about the coding for Nick's separation. And
9  that was earlier in the day on January 6th, around
10 11:40 a.m. Do you recall that?
11   A.    Um, yeah. I mean, I...
12   Q.    It's there. You can look at it now.
13   A.    Yeah.
14   Q.    Okay. Do you know why Mr. Di Gregorio is
15 sending these archive reports, especially for Nick
16 Barone -- I'm sorry. The swipe card reports for
17 Nick Barone after the decision was already made to
18 terminate him?
19   A.    **Because I had requested these swipes a lot**
20 **previously because of all the complaints. And it**
21 **takes a while for them to get them. You have to**
22 **request swipes. It takes a few weeks. It takes a**
23 **while. You don't just go in and go in there and**
24 **pull it, you gotta request it from somewhere from**
25 **the City.**

Page 75

1    Q.    Okay. Your recollection is you had
2  requested these documents some time before?
3    A.    Yeah.
4    Q.    And coincidentally they came at the same
5  date --
6    A.    Yeah.
7    Q.    -- Nick was terminated?
8    A.    Yeah, yup.
9          MR. HATCHETT: Objection to the form of
10         the question.
11 BY MR. GOSLEE:
12   Q.    And the Campion -- have you seen your
13 transcript in the Campion case? Have you had a
14 chance to look at that or read that?
15   A.    **Yes, I read it.**
16   Q.    In the Campion case, you testified that
17 you decided to request swipe records as part of a
18 defense to litigation. Do you recall giving that
19 testimony?
20   A.    **Yes, but that wasn't -- yes, yes, yes.**
21   Q.    Was that something different than these
22 swipe reports that you were referring to?
23   A.    **Yes.**
24   Q.    What swipe reports were you referring to,
25 when you gave that testimony in the Campion case?

Page 76

1    A.    **That was something that I was talking to**
2  **my lawyers about.**
3    Q.    Okay. And I'm not interested in any
4  conversation had with your lawyers?
5    A.    Okay.
6    Q.    I'll show you your transcript.
7    A.    Okay.
8    Q.    All right. And we can just go through it.
9    A.    But it wasn't -- okay.
10                         - - -
11   (Exhibit-4 was marked for identification.)
12                         - - -
13 BY MR. GOSLEE:
14   Q.    I'll hand what I'll mark as Exhibit No. 4,
15 which is a copy of the transcript in the Campion
16 matter. I'm not gonna tell you to look through and
17 read this one, don't worry. I can direct you to
18 Page 89 of your deposition.
19         MR. HATCHETT: Ms. Gordon, just for
20         reference today, these transcripts have
21         numbers. If you're referred to a number,
22         that's a particular sentence. A "Q" stands for
23         question, and "A" stands for answer.
24         THE WITNESS: Okay.
25

Page 77

1  BY MR. GOSLEE:
2    Q.    Are on you on Page 89, ma'am?
3    A.    Yes, I am.
4    Q.    Starting on Line 7.
5    A.    Mm-hmm.
6    Q.    "Question: Did Mr. Campion ever complain
7  about you pulling him -- the time punches of him or
8  any of his employees, other employees?"
9          "Answer: No."
10         "Did he ever complain about you
11 pulling the swipe records of him or any of his
12 employees?"
13         "Answer: No."
14         "Did you ever pull the swipe records
15 for him or any other of his employees?"
16         "The answer is: I told Emilio to
17 pull all their swipe records and compare them to the
18 sign-in sheets. Sign-in sheet -- sign-in and out
19 sheets. But that was after they were gone. I
20 never -- during their time, I never recall asking
21 them to pull anybody's swipe records."
22         "Well, why did you do that?"
23         "Question: Well, why did you do
24 that?"
25         "Answer: Why did I pull the swipe

NICHOLAS BARONE v
TRACEY L. GORDON and CITY OF PHILADELPHIA                    TRACEY L. GORDON

Page 78

```
 1   records?"
 2              "Question.  Yeah."
 3              "Answer:  Because I wanted to see why
 4   the work wasn't getting done."
 5              "Question:  And that was after they
 6   were all separated?"
 7              "Answer:  Yeah, yeah.  I asked -- I
 8   had -- I -- with my attorneys, I was like, pull the
 9   swipe record, you know, and see, you know, where
10   they were, were they even showing up for work when
11   they said they were showing.  Pull the swipe
12   records."
13              "Question:  Why would you do that if
14   they were terminated?"
15              "Answer:  I decided to do that
16   because I felt it would be part of the defense to
17   show that, you know, were they showing up for work.
18   Was they -- was they -- you know, that's -- you
19   know, I just based on this decision that we were
20   having problems with them.  They never could do
21   their work, you know.  We wasn't getting any work.
22   I wanted to see -- give to my attorneys and see if
23   they even -- cause it's performance based, were
24   they -- maybe they would perform better if they
25   showed up."  Do you see that?
```

Page 79

```
 1       A.   Mm-hmm.
 2       Q.   Did I read that mostly correctly?
 3       A.   Mm-hmm.
 4       Q.   Gonna go the next page.  Just a couple
 5   other lines, beginning on Line 4.
 6            MR. HATCHETT:  Ms. Gordon, for the record,
 7       your last two responses, did you mean them to
 8       be "yes" or "no"?
 9            THE WITNESS:  Yes.
10   BY MR. GOSLEE:
11       Q.   Line 4 on Page 91.
12       A.   Okay.
13       Q.   "Question:  Okay.  So you only did that in
14   defense of this litigation, not before?"
15              "Yeah, I never asked anybody to
16   pull -- I -- not that I can recall that I..."
17              "You have no reason for doing that?"
18              "Right.  No reason for pulling
19   anybody's swipe records.  I had -- I never got any
20   complaints about -- I never got any complaints about
21   them not showing up.  I never got any complaints
22   about -- so, no, I never asked them to pull any
23   swipe records from anybody down at Archives that I
24   could recall."  Did I read that correctly?
25       A.   Yes, you read it correctly.
```

Page 80

```
 1       Q.   All right.  Does this refresh your
 2   recollection at all, ma'am, as to --
 3       A.   Um --
 4       Q.   Let me --
 5       A.   No, I -- listen, I would get in -- so I
 6   don't remember.  But I did ask Emilio to pull their
 7   swipe records because I kept getting complaints of
 8   their not doing work.  And I'm like, how you working
 9   eight hours a day and everyday Emilio's coming in my
10   office saying that they're not doing work.  So I'm
11   like, pull their swipe rec -- are they even showing
12   up.  So that's why I asked to pull the swipe
13   records.
14              If I asked before then, I -- so maybe
15   I misunderstood the question, but I -- I've asked
16   Emilio, but I don't remember when I asked him to
17   pull the swipe record -- the swipe records.  I don't
18   know.  I just know that I asked him to pull the
19   swipe records.  If this is when I asked him, it's
20   because I'm thinking they not showing up for work.
21   I'm like, what time are they coming in to work, you
22   know, because it's complaints.  I had heard
23   complaints from Keith.  He went down there one day
24   and nobody was there, you know.  He went down there
25   and they said Mark says he has to pick up his kids
```

Page 81

```
 1   or he has to take his kids to school, so Mark will
 2   come to work at 12:00.  So I was like, well, pull
 3   they swipe records and we'll see.
 4       Q.   Okay.  Based on --
 5            MR. HATCHETT:  I'm sorry.  I'm gonna ask
 6       for a break for the witness --
 7            THE WITNESS:  Yeah.
 8            MR. HATCHETT:  -- before your next
 9       question.
10            THE WITNESS:  I gotta get to my car.
11            MR. GOSLEE:  Oh, right.
12            THE WITNESS:  Remember.
13            MR. GOSLEE:  Sorry about that.  I
14   apologize.
15            THE WITNESS:  That's okay.
16            THE VIDEOGRPAHER:  Going off the record at
17       5:17 p.m.
18                   - - -
19            (A short break was taken.)
20                   - - -
21            THE VIDEOGRPAHER:  We're back on the
22       record at approximately 5:32 p.m.
23   BY MR. GOSLEE:
24       Q.   All right, Ms. Gordon.  You don't have
25   that much longer.  I did ask, and I got of kind lost
```

Page 82

1   through break.  The question I had for you was,
2   when -- why did you request swipe reports for
3   employees, including Nick Barone?
4        A.   Again, because there was so much egregious
5   complaints I was like, are these guys even showing
6   up for work.  Pull the swipes, let's see if they
7   showing up for work.
8        Q.   In the transcript that I read a portion to
9   you in the Campion case, you seem to suggest that
10  you did it as a part of defense to litigation.  Do
11  you stand by that testimony?
12       A.   That, too, yes.
13       Q.   And, again, dialing back to Mr. Barone
14  himself, you don't recall receiving any specific
15  complaints that he was not showing up to work; is
16  that fair?
17       A.   No.  I wasn't -- no, I didn't get any
18  specific complaints about anybody, including Barone,
19  not showing up to work.  I just was assuming, if you
20  got four, five guys down there and everyday your
21  Deputy is coming, telling that they're frustrated
22  because they have performance issues, they're not
23  doing the work, lawyers are complaining because they
24  need the archives, and I'm getting complaints -- I
25  can't even walk in the door without Wayne Perry

Page 83

1   frustrated because he can't do his work because he
2   can't get the archives.
3        Q.   You mentioned a Deputy complaining.  Who
4   are we talking about?
5        A.   Emilio Di Gregorio.
6        Q.   Okay.  Fair enough.
7        A.   Because they would complain -- that was
8   the chain.  They would go to Emilio and Emilio would
9   normally solve the problem by going down there
10  himself, climbing on the ladders, digging and
11  finding them sitting right there.
12       Q.   Yeah.  Okay.
13       A.   Every last one of the files that they said
14  they couldn't find, he would find in seconds.
15       Q.   Okay.  Did you ever ask Emilio
16  specifically about Nick Barone's performance?
17       A.   No.
18       Q.   Have you seen Emilio's deposition
19  transcript that was taken in this case?
20       A.   I have it, but I don't think I read the
21  entire deposition.
22       Q.   Would it surprise you if in that
23  deposition transcript Emilio was complimentary about
24  Nick Barone and his work ethic?
25       A.   No, it wouldn't surprise me.

Page 84

1        Q.   Why not?
2        A.   Politics maybe.
3        Q.   Say more about that.  What do you mean?
4        A.   I'm out of office now.  People looking out
5   for themselves.
6        Q.   Okay.  Did you have a chance to take a
7   look at the swipe reports for Nick Barone when you
8   received them via e-mail on January 6th?
9        A.   I didn't look at any of the swipe reports.
10       Q.   What did you do with them?
11       A.   I never looked at them.  I don't even
12  remember getting them.
13       Q.   Okay, yeah.  Slightly different question.
14  I understand you don't remember looking at them.  Do
15  you remember --
16       A.   I don't even remember receiving them.
17       Q.   Okay.  Fair to say then that there's
18  nothing in the swipe reports of Nick Barone that
19  would suggest to you that he was not showing up
20  consistently and on time for work?
21       A.   I didn't look at the swipe reports.
22       Q.   Okay.  I'm gonna hand you what I'll mark
23  as Exhibit No. 5.
24                   - - -
25       (Exhibit-5 was marked for identification.)

Page 85

1                   - - -
2   BY MR. GOSLEE:
3        Q.   Again, document produced by the Defendant
4   in this case.  Bates No. DEFENSE00014.  Have you
5   seen this document before, ma'am?
6        A.   No.
7        Q.   Having -- looking at this, this appears to
8   be the Termination Letter for Nick Barone?
9        A.   Yes.
10       Q.   Date is January 7, 2022.  Do you see that?
11       A.   Yes.
12       Q.   Do you know who drafted this Termination
13  Letter?
14       A.   Charmaine Collins.
15       Q.   Would you have reviewed or approved that
16  letter before being given to Nick?
17       A.   I don't remember receiving this letter.
18       Q.   Okay.  Would it --
19       A.   And this is a stamp signature.
20       Q.   Okay.  What's the significance of that to
21  you, that it's a stamp signature?
22       A.   Well, I didn't -- the significance is, I
23  didn't draft the letter.  And I didn't see this
24  letter.  If I would have seen it, I would have told
25  her to sign it.

Page 86

1   Q.   Okay.  That's not your -- that's a stamp,
2   that is not your signature?
3       A.   Yeah, that's a stamp signature.  Yeah.
4       Q.   It would not have been your practice to
5   review termination letters that Ms. Collins would
6   send out to employees?
7       A.   No.
8       Q.   You trusted that, whatever she needed to
9   put in the letter would be sufficient?
10      A.   Yes.
11      Q.   Okay.  I'm not gonna spend a tremendous
12  amount of time in the letter.  I will say there's a
13  bullet point, the last bullet point, says, Pension.
14  Do see that?
15      A.   Yes.
16      Q.   Says, once separated, you will receive
17  notification from the Board of Pensions regarding
18  your options.  Do you see that?
19      A.   Yes.
20      Q.   Do you know what the Board of Pensions are
21  or is, I guess I should say?
22      A.   I just know it's a Board of Pensions.  I
23  don't -- yeah, I know what the Board of Pensions is.
24      Q.   What is it?
25      A.   It's the Board of Pensions.

Page 87

1       Q.   What does it do, if you know?
2       A.   They have your records.  They have your
3   records of time that you accrue for your pension.
4       Q.   Was Nick eligible for a pension?
5       A.   I'm not sure.  I wouldn't have that
6   information.
7       Q.   If Nick was eligible for the pension, do
8   you have an understanding of how his termination
9   could potentially impact that termination?
10      A.   I'm not sure of his pension situation.
11      Q.   Understood.  If he was eligible for
12  pension, how the termination could potentially
13  impact that pension?
14      A.   Oh, yeah.
15      Q.   How would his termination impact his
16  pension, if he was so eligible?
17      A.   I don't know because I don't know how many
18  years service he's done.
19      Q.   Okay.  Would termination -- if you know,
20  if Nick was eligible to receive a pension, would his
21  termination negatively impact the amount or the time
22  when he could receive a pension?
23      A.   I'm not sure.
24      Q.   Did you consider at all the impact on
25  Nick's pension when you made the decision to

Page 88

1   terminate him?
2       A.   No, I didn't.  I just considered that he
3   refused to do work.
4       Q.   Okay.  I read this letter.  I don't see
5   anywhere in this letter where a reason was given for
6   Nick's termination, do you?
7       A.   No.
8       Q.   You testified earlier, though, that it
9   would be your expectation that Charmaine Collins
10  would have told Nick why he was being fired?
11      A.   Yeah.  But I don't know why and I don't
12  know why it's not in that letter.  I didn't deal
13  with HR.  I didn't deal with HR.  That was
14  Charmaine's job.
15      Q.   I understand.  But HR was under you and
16  reported to you as the Register of Wills, yes?
17      A.   Yes, she did.  But I -- once, you know, it
18  got to termination, I didn't -- she handled all of
19  that.
20      Q.   You're certain, though, that you told
21  Charmaine why you were firing Nick, yes?
22      A.   Absolutely.
23      Q.   If she testified otherwise, that would be
24  incorrect?
25          MR. HATCHETT:  Objection to the form of

Page 89

1   the question.  You can respond, Ms. Gordon.
2          THE WITNESS:  Yes, I told her why.
3          MR. GOSLEE:  I'll give you this objection
4   here, if you don't want to reraise it.
5   BY MR. GOSLEE:
6       Q.   If Ms. Collins testified that you did not
7   give her a reason as to why you were firing Nick,
8   you would disagree with that testimony?
9       A.   Absolutely.
10      Q.   Okay.  You can set that aside, ma'am.  Do
11  you know who Keasha Trawick is?
12      A.   Yes.
13      Q.   Am I pronouncing that right?
14      A.   Mm-hmm.  Yes.
15      Q.   Who is Keasha Trawick?
16      A.   She's used to be a former employee of the
17  Register of Wills.
18      Q.   Was your relationship with her strictly
19  professional or did you have a friendship with her?
20      A.   I had a friendship with her and a
21  professional relationship, both.
22      Q.   She submitted an Affidavit -- Sworn
23  Declaration, actually, in the Mark Wilson case.
24  Have you had an opportunity to see that Declaration?
25      A.   Yes.

NICHOLAS BARONE v
TRACEY L. GORDON and CITY OF PHILADELPHIA                    TRACEY L. GORDON

Page 90

1   Q.  Okay.  I'll show it to you.  We'll mark it
2   as Exhibit No. 6.
3                    - - -
4        (Exhibit-6 was marked for identification.)
5                    - - -
6   BY MR. GOSLEE:
7       Q.   This is the Affidavit you have previously
8   seen that was filed in the Mark Wilson matter.
9            MR. HATCHETT:  I'll just place a standing
10  objection --
11          THE WITNESS:  You asked me a question?
12          MR. HATCHETT:  No.  I just want to place a
13  standing objection on the record regarding any
14  questions concerning this document to this
15  witness.
16          MR. GOSLEE:  What's the objection, legal
17  objection?
18          MR. HATCHETT:  Well, it depends on the
19  questions that are asked.  There's some
20  information in here that Ms. Gordon may not
21  have any knowledge regarding it, so it would
22  call for speculation.  At least -- but that's
23  why it's a standing objection, depending on the
24  question that you ask.  I don't want to go
25  question by question and interrupt your

Page 91

1   deposition.
2           MR. GOSLEE:  Okay.  I just wanted to make
3   sure that there was no specific objection that
4   I could deal with, but it sounds like you're
5   just concerned about potential speculation or
6   lack of knowledge and knowledge; is that fair?
7           MR. HATCHETT:  That's fair.
8           MR. GOSLEE:  Okay.
9   BY MR. GOSLEE:
10      Q.   All right.  I'm gonna go through this
11  quickly for -- was there anything you saw in this
12  Affidavit that you disagreed with?
13      A.   Yeah.
14      Q.   Okay.  What jumps out at you as something
15  you disagree with, with respect to this Affidavit?
16      A.   No. 5.
17      Q.   Okay.  Anything else?
18      A.   Six, 7, 8, 11, 14.
19      Q.   Okay.  I just want to go quickly through a
20  couple of these.  Paragraph 2 she wrote, I began my
21  work with the City when Tracey Gordon was beginning
22  her campaign to be elected Register of Wills.
23  Because I had been a personal friend of Tracey
24  Gordon's dating back 30 years when we were in
25  college, I volunteered to be Tracey Gordon's

Page 92

1   campaign Treasurer.  Do you see that?
2       A.   Yup.  Yes.
3       Q.   Was Ms. Trawick, in fact, your campaign
4   Treasurer?
5       A.   Yes.
6       Q.   And, in fact, were you friends for 30
7   years dating back to college?
8       A.   Off and on, yes.
9       Q.   Did you have any sort of falling out with
10  your relationship with Ms. Trawick after becoming
11  Register of Wills?
12      A.   I wouldn't say falling out, but I had some
13  concerns with some medical issues that she wouldn't
14  address.
15      Q.   Okay.  Any medical issues that would
16  impact her cognitively or ability to tell the truth?
17      A.   Yeah.  She had an addiction to -- I forget
18  the -- Percocet.  She had an addiction.  Because she
19  had anxiety.  So I was really -- and drinking.  So I
20  was really concerned about that as a personal
21  friend.
22      Q.   And did she -- and I'm not trying to delve
23  too much into her personal life.  But were you
24  concerned about that potential addiction at the time
25  you hired her as campaign manager or some time

Page 93

1   later?
2       A.   Both.  Because she -- she was having --
3   she has -- she have issues -- she had issues with,
4   um, uh, anxiety.  So she was taking -- she wouldn't
5   go to the doctor, she would just take illicit pills
6   for it.  And she wasn't supposed to drink, so that
7   makes her a lot nervous.  So, yeah, I -- yeah, I had
8   some concerns about my friend.
9       Q.   Okay.  Did you have concerns about her
10  ability to run your campaign?
11      A.   No.
12      Q.   Looks like she was hired.
13      A.   She was a volunteer.
14      Q.   With respect to the campaign?
15      A.   Yes.
16      Q.   Okay.  Paragraph 3 says, I was then hired
17  directly by the City of Philadelphia.  My official
18  title was Executive Administrator to the Register of
19  Wills.
20      A.   Yes.
21      Q.   You hired her for that position?
22      A.   Yes.
23      Q.   Did you have any concerns about her health
24  or addiction when you hired her for that position?
25      A.   No, because she wasn't drinking.  She

NICHOLAS BARONE v
TRACEY L. GORDON and CITY OF PHILADELPHIA                          TRACEY L. GORDON

Page 94

1   stopped.
2        Q.   Okay.
3        A.   And it didn't impede in the beginning on
4   her work.  It didn't impede on it.  So, you know, it
5   just...
6        Q.   Okay.
7        A.   You know, she has anxiety.  And I wasn't a
8   doctor or anything like that.  I was concerned about
9   it, you know, but, you know, she seemed to have it
10  under control.
11       Q.   Okay.  Would it be fair to say that, at
12  the time she became your campaign Treasurer and the
13  time that you hired her as the Executive
14  Administrator to the Register of Wills, at that
15  time, would it be fair to say that you did not have
16  any concerns about her ability to do her job or be
17  truthful and honest as a result of her addiction?
18       A.   At the time that I hired her, I always had
19  concerns with somebody that has addiction problems
20  and personal problems.  She had personal problems.
21  Her mother lived with her and did it together.  Her
22  mother was highly addicted.  So I -- she -- she had
23  -- she had stress problems.
24       Q.   I understand.  Did you have any concerns
25  about, at the time you hired her now at a Register

Page 95

1   of Wills, did you have a concerns that her addiction
2   would impact or impede or ability to do her job?
3        A.   No, I didn't.  No, as long as she didn't
4   drink.
5        Q.   Okay.  And how did she perform in terms of
6   her job with the Register of Wills?
7        A.   I never got any complaints from her
8   supervisor.
9        Q.   Did she report to you or did she report to
10  somebody else?
11       A.   She reported to somebody else.
12       Q.   Okay.  During the time --
13       A.   She didn't -- she was supposed to report
14  to, at the time, my Chief of Staff.  But she
15  expressed that my former Chief of Staff was, like,
16  really making her anxious, so I just let her stay
17  over in Inheritance Tax.  And she seemed to like it
18  there.
19       Q.   Okay.  And who was your former Chief of
20  Staff?
21       A.   It was Regina Hairston.
22       Q.   Okay.  So, as far as you recall, during
23  the time you were the Register of Wills, you did not
24  receive any complaints from Keasha Trawick's
25  supervisor as to her performance; is that fair?

Page 96

1        A.   Not in the beginning.
2        Q.   At some point, did you receive complaints
3   about her performance while you were the Register?
4        A.   Well, not performance, but the fact that
5   she wasn't coming to work.
6        Q.   Okay.
7        A.   She was missing a lot of time.
8        Q.   When did you start receiving those
9   complaints?
10       A.   That was right close to she -- when she
11  resigned, right around that time.
12       Q.   Okay.  Do you recall when she resigned?
13       A.   No.
14       Q.   Did she tell you why she was resigning?
15       A.   Yeah.
16       Q.   What did she say?
17       A.   Well, we recommended that she take a leave
18  of absence for medical.  She -- at first she
19  recommended she wanted to take a leave of absence
20  for medical to take care of her mother.  Because her
21  mother was addicted and, you know, she was concerned
22  that her mother, you know, was losing her purse,
23  was, you know, falling in the streets.  Like, she
24  just was really nervous about that.  So originally
25  she was supposed to -- she had -- she was supposed

Page 97

1   to take a leave of absence because of her situation
2   with her mother.  And then after that, she didn't
3   take it.  We were like -- you know, we expected she
4   was -- she had gave Charmaine a date and then she
5   just stopped coming to work.  And one day I was
6   concerning about her.  I went over to her house and
7   she didn't really look good.
8        Q.   Do you recall when this was, what year?
9        A.   So it was in 2023.  Yeah, around --
10  around, yeah, 2023.  Like, in April.  March or
11  April.  Yeah, March or April.  Because we hadn't
12  heard from her.  She didn't call in.  And the thing
13  about the office is, you know, some -- you know,
14  they knew that we were close so they wouldn't -- you
15  know, they would come to me and say, hey, is Keasha
16  all right, she's not -- or I would walk by and not
17  seeing her saying is Keasha in.  And she -- you
18  know, I went by her house and, um, she just -- she
19  was having an anxiety attack.
20       Q.   Was that shortly before or around
21  the time she resigned, if you know?
22       A.   Yeah.
23       Q.   Did she ever tell you why she resigned?
24       A.   No.  But we were recommending that she go
25  on medical leave so she can get -- get herself

NICHOLAS BARONE v
TRACEY L. GORDON and CITY OF PHILADELPHIA                         TRACEY L. GORDON

Page 98

1    together and take care of her mother, and she didn't
2    want to do the medical leave.
3        Q.    Who was recommending that, you and who
4    else?
5        A.    And HR.
6        Q.    Charmaine Collins?
7        A.    Mm-hmm.
8        Q.    And your recollection is that you and
9    Charmaine recommended medical leave both so she
10   could take care of her mother?
11       A.    Well, she recommended.  She went to
12   Charmaine and me.  At first she recommend and I
13   agreed.  I said, yes, take a leave of absence, take
14   care of your mom.  Because she -- she had set it up
15   with Charmaine and everything.  She was supposed to
16   leave and everything.  And then, um, uh, she changed
17   her mind.
18       Q.    Meaning, she didn't take the leave?
19       A.    Right.
20       Q.    Right.  But, as you recall it, she wanted
21   to take a leave or suggested that she takes a leave
22   so she could take care of her mother?
23       A.    And herself, yes.
24       Q.    Did she say that to you, I want to take
25   care of myself?

Page 99

1        A.    No, she said she wanted to take care --
2    yeah.  Her -- yeah.  Because she was just -- like,
3    she was nervous, shaking.  And she was really
4    nervous about getting a phone call that they was
5    gonna find her mother dead.  So that was taking a
6    toll on Keasha and we could all see it.
7        Q.    Okay.
8        A.    So she exhausted all her time.  And, you
9    know, I was like, hey -- I recommended -- yeah,
10   won't you take a leave of absence.  Take a medical
11   leave of absence so you can take care of yourself
12   and your mother.
13       Q.    Okay.  And then she -- at some point, she
14   resigned?
15       A.    Yeah.
16       Q.    Did you speak to her again after she
17   resigned?
18       A.    A few times, yeah.
19       Q.    Do you know why she resigned?  Did she
20   tell you why?
21       A.    No, she didn't tell me why she resigned.
22   Actually, we all were shocked.  We thought she was
23   gonna take the medical leave that she was prepared
24   for.
25       Q.    When you say we, you're talking you and

Page 100

1    Charmaine?
2        A.    Me, Charmaine and her direct supervisor.
3    She had told us that she was gonna go on medical
4    leave.
5        Q.    So after she resigned, you've talked to
6    her a few times, is your recollection?  I'm not
7    holding you to a specific number.
8        A.    I haven't talked to her -- I don't believe
9    I even talked to her after she resigned.  Because I
10   was upset with her.  Because I was like, why quit.
11   Take the medical leave, Keasha, you need the money.
12       Q.    Fair to say you never talked to her about
13   what's in this sworn Affidavit?
14       A.    Oh, never.
15       Q.    No?
16       A.    I was told -- no.
17       Q.    Okay.  Looking at No. 5, in this Affidavit
18   is one of the paragraphs you said you disagreed
19   with.  There were often campaign -- well, why don't
20   you tell me what you disagree with.
21       A.    Because I never put -- applied pressure
22   for any of the employees at the Register of Wills to
23   contribute to my campaign ever.
24       Q.    Okay.
25       A.    As a matter of fact, I made sure that I

Page 101

1    had Ethics Board from the state come down and talk
2    to them about political activities.  And we sent out
3    letters every month.  I mean, every -- during
4    political time.  Because it was a political office.
5    Because it's politicians that work in the office.
6    And --
7        Q.    Politicians, meaning, like, the Register
8    of Wills?
9        A.    No, like, committee people and ward
10   leaders.  Elected officials worked in Register of
11   Wills.
12       Q.    Okay.
13       A.    That's the only office in the City that
14   could actually be involved in political activity and
15   be elected.
16       Q.    Right.
17       A.    And run for offices without having to
18   resign.
19       Q.    The guys in the records department,
20   though, Mark Wilson, Nick Barone, they were not
21   politicians as far as you know, correct?
22       A.    I don't -- I don't think so.  But Mark did
23   worked campaigns.
24       Q.    He worked on your campaign?
25       A.    And he worked on other campaigns, too.

NICHOLAS BARONE v
TRACEY L. GORDON and CITY OF PHILADELPHIA                        TRACEY L. GORDON

Page 102

1   Q.   Okay.  All right.  You said that you asked
2   for the Board of Ethics to come down and talk to
3   people who worked in the office?
4       A.   Absolutely, yes.
5       Q.   When did that happen, what year?
6       A.   The first -- very first year.  Right
7   before COVID hit.  I had them, like, the first week
8   that I got -- that I was in the office I had them
9   come down to talk to them and talk to the employees
10  and let them know, hey, you know, he's here, ask any
11  questions you want about politics, anything that you
12  need to ask, and then he will clarify -- he would go
13  over the ethics book with them.
14      Q.   Who was it, do you recall the name?
15      A.   I forgot his name.
16      Q.   Were there specific employees that you
17  were concerned about in terms of --
18      A.   Everybody.
19      Q.   You wanted everyone --
20      A.   But mainly me, my protection.  I was
21  really concerned about Tracey Gordon.  So I wouldn't
22  get caught up and be in the news for political
23  pressures or doing campaign and being political, you
24  know, while we're on the job.  So I specifically did
25  that to clarify so no one would feel like they were

Page 103

1   pressured to do anything.
2       Q.   Okay.  And to make sure everyone knew that
3   they were not pressured to do anything politically,
4   including potentially contributions to your
5   campaign?
6       A.   Anything.  Anything political.  Anything.
7       Q.   All right.
8       A.   Anything.  Talking to, um, um, um -- it's
9   people in there that actually worked on campaigns.
10  And people there actually ran for office while they
11  were working there.  So I wanted to make it clear
12  that you are not to be using this office for your
13  political endeavors, that's why.
14      Q.   Do you think, sitting here today, that you
15  did an effective job of separating your
16  responsibilities as Register of Wills from your
17  campaign activities?
18           MR. HATCHETT:  Objection to the form of
19      the question.  You can respond.
20           THE WITNESS:  Yes.
21  BY MR. GOSLEE:
22      Q.   You kept those two spheres completely
23  separated?
24      A.   Absolutely.
25      Q.   Okay.  Do you know why -- I know you're

Page 104

1   not Keasha Trawick and I know you can't get inside
2   of her brain.  But sitting here now, do you have any
3   reason as to why she would suggest that you
4   frequently applied pressure to employees to
5   contribute to your campaign?
6       A.   Maybe she's disgruntled.
7       Q.   Did she ever express to you that she was
8   disgruntled?
9       A.   Yeah.
10      Q.   Tell me about that, when she expressed
11  that she was disgruntled to you.
12      A.   She is disgruntled because she -- I felt
13  that she should take a medical leave to get herself
14  together.  Because she was at the end.  She was a
15  mess.  She wasn't even coming to work everyday.
16      Q.   Okay.
17      A.   She was real nervous, she was shaking.
18  She, you know, couldn't hold her papers.  And, you
19  know, they looked in -- through her desk and they
20  came to me later and said she had all kinds of
21  paperwork that she was hiding that she didn't
22  complete.  The employees coming to me, they going to
23  do it now after -- and said a check, you know, from
24  a lawyer that we was looking to -- for, for months,
25  was sitting in the bottom of her draw.

Page 105

1       Q.   Right.
2       A.   Because she, you know, probably was hiding
3   it because she, you know -- because they shared
4   work.  So she didn't -- she probably hid it, you
5   know.  I don't know why she hid it.
6       Q.   That was after the fact, that was after
7   she had left?
8       A.   Yeah.  That was after, yes.
9       Q.   But you hired her for her position at the
10  Register, correct?
11      A.   Absolutely, I hired her, yes.
12      Q.   You think she might have been disgruntled
13  that you suggested that she take medical leave?
14      A.   Listen, I personally felt as a friend and
15  as her boss, I've seen things.  Like, she need --
16  you need to go get yourself together mentally,
17  medically and take a medical leave and come back.  I
18  recommended that.  Sometimes people don't want that
19  recommendation like that, you know.
20      Q.   When you recommended that to her, did she
21  seem upset and agitated by the recommendation?
22      A.   At first she didn't because she had
23  agreed.  She had agreed.  She was setting it up.
24  She had a date and everything.
25      Q.   Did you have concerns -- when you made

NICHOLAS BARONE v
TRACEY L. GORDON and CITY OF PHILADELPHIA                                    TRACEY L. GORDON

Page 106

1   that recommendation that she take medical leave, did
2   you have concern performance concerns?  Did you have
3   any concerns that she was not able to perform her
4   job at an adequate level?
5        A.   I didn't have performance concerns.  I had
6   concerns about her health.
7        Q.   Right.
8        A.   Her physical and mental health.
9        Q.   Right.
10       A.   The girl is very smart.  She's a college
11  graduate.  She -- she's at the top of her game,
12  that's why I hired her.
13       Q.   Yeah.
14       A.   You know, I hadn't seen Keasha for years,
15  like, 30 years.  We went to college together, but we
16  haven't seen each other for 20 years and -- until
17  Facebook.  And I -- of course, you know, I had a
18  beer bucket -- what you call it.  I needed a
19  Treasurer and I knew she was good with numbers.  She
20  was an accountant.  That's what she majored in.
21  And, um, I was, like, hey, would you help volunteer
22  for me.
23       Q.   College graduation and when you hired her,
24  had you seen her or had any relationship with her in
25  that gap?

Page 107

1        A.   No.
2        Q.   So when she said that you guys were
3   friends for 30 years, that's technically true, but
4   it wasn't a continuous 30 years?
5        A.   Right.
6        Q.   All right.
7        A.   She threw it around a lot.  But I wouldn't
8   say anything.  But I hadn't seen Keasha since 1998.
9   We graduated in '94.  From 1998 up until I ran, I
10  seen her one time from 1998 until 2019.
11       Q.   Okay.  Like, when Ms. Trawick -- from what
12  you know of her, when Ms. Trawick is healthy, she's
13  smart and competent; is that fair?
14       A.   Absolutely.
15       Q.   Not with standing your disagreements with
16  this Affidavit, in your experience, she had also
17  been honest?
18       A.   I don't see why she wouldn't be.
19       Q.   I'm saying, in your experience in knowing
20  her, setting aside what's -- I know you disagreed
21  what's in this Affidavit.
22       A.   Yeah, because it's false.
23       Q.   I understand.  I understand your
24  perspective on that.  I'm not gonna fight you on it.
25  I'm just saying, not withstanding what she wrote in

Page 108

1   this Affidavit, in your experience, as a friend of
2   Ms. Trawick and going to college with her and
3   knowing her for years, in your experience, would it
4   be fair to say that she had been honest as far as
5   you could tell?
6        A.   Yeah.  I guess, yes.
7        Q.   Okay.  And so I'm just about done with
8   this document mercifully.  But you're --
9        A.   I'm not because this is all...
10       Q.   Right.  But -- and I know --
11            MR. GOSLEE:  Ms. Gordon, just answer the
12  question.
13            THE WITNESS:  Yeah.
14  BY MR. GOSLEE:
15       Q.   I know you're not Ms. Trawick and I know
16  you can't get into her brain.  But the best you
17  figure it, she may have included this false
18  information about you pressuring employees to
19  contribute because she was upset that you suggested
20  she take medical leave?
21       A.   No.  Upset, as she put that, her friend,
22  Mr. Wilson, who they all considered -- it was like,
23  this is our inner circle, why did you let him go.
24       Q.   Yeah.
25       A.   So did you see this, she said, she wasn't

Page 109

1   notified.  She wasn't -- you know, because we all
2   started together.  You know, so it was no one left
3   but me and her.
4        Q.   So you think --
5        A.   From the team.
6        Q.   All right.  So in terms of the universal
7   potential reasons she might have said you were
8   pressuring employees, she could have been upset with
9   you about suggesting medical leave or she might have
10  been upset that you fired her friend, Mark Wilson?
11       A.   Yeah, our friend.
12       Q.   Is that all you can think of at this
13  moment?  Is there anything else?
14       A.   Yeah.
15       Q.   Okay.  By the way, Ms. Trawick was she
16  also friends with Nick Barone, if you know?
17       A.   She didn't even know Nick Barone.
18       Q.   She didn't know Nick.  Okay.
19       A.   I don't even know if she ever seen him.
20       Q.   All right.  You can set that document
21  aside.  I'm gonna show you what I'll mark as Exhibit
22  No. 7.  I'll be very brief with this one.
23                 - - -
24       (Exhibit-7 was marked for identification.)
25                 - - -

NICHOLAS BARONE v
TRACEY L. GORDON and CITY OF PHILADELPHIA                    TRACEY L. GORDON

Page 110

```
 1  BY MR. GOSLEE:
 2      Q.   Exhibit No. 7, Ms. Gordon, is a one-page
 3  Memo that was produced by the Defendant in the case.
 4  The Bates number is DEFENSEB02054.  Do you recognize
 5  this document, ma'am?
 6      A.   Yes.
 7      Q.   What are we looking at here?
 8      A.   This is a Memo that was sent to all staff
 9  for -- at the time, for anybody that was running for
10  office.
11      Q.   And the date on this Memo is December 8th
12  of 2022.  Do you see that?
13      A.   Yes.
14      Q.   And it looks like that's Charmaine
15  Collins's signature at the bottom?
16      A.   Yes.
17      Q.   Who drafted this document?
18      A.   Charmaine did.
19      Q.   Do you know why, why she drafted this
20  document?
21      A.   Well, this document -- it should be three
22  more of these.  We send them out every year.
23      Q.   Yeah, there's a couple.  Yeah.
24      A.   Okay.
25      Q.   I'm just showing you this particular one.
```

Page 111

```
 1      A.   Like I told you before, I didn't want
 2  anybody to feel like -- we did it mainly because
 3  people were running for office.  And I didn't want
 4  to get no news coming in that somebody was running
 5  for office and working at the same time.  Because it
 6  was COVID at the time and it was a slippery slope.
 7  Because people were running for office and they was
 8  working remote.  And it was, like, word, like,
 9  people saying, you know, well, when are you getting
10  your petitions when you're supposed to be at work.
11  So we had to be real careful.  Because I didn't
12  want -- because it's a small world here in
13  Philadelphia.  So I was always trying to avoid the
14  news.  So, yeah, this was just a reminder.
15      Q.   And the first bullet point gets to that
16  point campaign on Register of Wills time is strictly
17  prohibited.  If I hear your testimony correctly,
18  that was your effort to remind employees who may
19  have political aspirations, you gotta separate your
20  job at the Register from your political activities,
21  yes?
22      A.   Yes.
23      Q.   And you were also mindful of separating
24  those two spheres as well?
25      A.   Absolutely.
```

Page 112

```
 1      Q.   The second bullet point, solicitation on
 2  Register of Wills time strictly prohibited.  Is
 3  that -- what does that mean, solicitation, financial
 4  solicitation?
 5      A.   Anything.
 6      Q.   Okay.
 7      A.   Don't talk about it on the job.  I was
 8  told by Ethics that you -- we were allowed to tell
 9  an employee -- you know, tell an employee step out
10  and take a break and then say, hey, you know, here's
11  a, um -- you know, here's a flyer, the Register of
12  Wills was having something.  But absolutely not.
13  And that's why I put it in writing.
14      Q.   Right.
15      A.   So if anybody got caught doing this, I
16  didn't approve it.
17      Q.   And you, obviously, personally knew that
18  solicitations, as the Register of Wills, you knew
19  personally would be inappropriate, yes?
20      A.   That's why I put this Memo out.
21      Q.   Right.  And you knew from the Ethics, the
22  Ethics Board, that, if you, as the Register of
23  Wills, went and solicited from your employees
24  donations for your political campaign, you would
25  have known that was inappropriate?
```

Page 113

```
 1      A.   That's why this was put out.
 2      Q.   The answer to the question is, yes?
 3      A.   Absolutely.
 4      Q.   All right.  You can set that aside.  I'm
 5  gonna hand you what I'll mark as No. 8.
 6                    - - -
 7      (Exhibit-8 was marked for identification.)
 8                    - - -
 9  BY MR. GOSLEE:
10      Q.   This is an Affidavit, again, from the
11  Wilson -- I should say Declaration from the Wilson
12  matter from Thomas Campion.  Have you seen this
13  document before, ma'am?
14      A.   Yes.
15      Q.   I'll ask you some similar questions I
16  asked you with respect to Ms. Trawick's declaration.
17  Is there anything in here that you disagree with?
18      A.   Definitely No. 5.
19      Q.   Five and all the bullet points underneath
20  there; is that right?
21      A.   Yep.
22      Q.   Okay.  You ready?
23      A.   I been ready.
24      Q.   I'm sorry.  You disagree with what's in
25  No. 5, including the bullet points.  Anything else
```

NICHOLAS BARONE v
TRACEY L. GORDON and CITY OF PHILADELPHIA                     TRACEY L. GORDON

Page 114

1  in here that you disagree with?
2      A.   Yes.  Five and all the bullet points under
3  that, 6, 7.  Anything Tom Campion, I disagree with.
4      Q.   Do you have any personal concerns about
5  Mr. Campion's propensity for the truth?
6      A.   Disgruntled employee.
7      Q.   Okay.  Anything else?  What was he
8  disgruntled about?
9      A.   Well, he was disgruntled that we took his
10 power away because he couldn't supervise.  He could
11 not supervise.
12     Q.   Yeah.  And he's got -- sorry.  I
13 interrupted you.
14     A.   He couldn't supervise.
15     Q.   Okay.  And he's got his own litigation
16 going.  We don't need to get into that now.
17 Focusing on Paragraph 4, though, for a moment.  He
18 wrote, both Wilson and Barone performed their jobs
19 very well.  They were well-liked and worked hard.
20 They had no disciplinary concerns.  But they both --
21 they were both terminated in or about mid-2022.  Do
22 you see that?
23     A.   Yeah.
24     Q.   And you had a little chuckle there.  What
25 was that about?

Page 115

1      A.   Did you get all the reports from the HR
2  documentation, and that they weren't doing the work?
3      Q.   There's documentation that Nick Barone
4  wasn't doing work?
5      A.   Archives, including Nick Barone, were not
6  doing the work.
7      Q.   So --
8      A.   That's why -- that's why they -- that's
9  why we let them go.  It wasn't -- it had nothing
10 with campaigning.  First of all, I didn't even know
11 they didn't contribute.  I never knew.  I never
12 asked, you know.  It's plenty of people that didn't
13 contribute still working there right now, why didn't
14 they get terminated.  They were terminated because
15 they didn't -- they had performance issues.
16     Q.   So --
17     A.   This not coming from me because I don't
18 work with them.  This is coming from Wayne Perry,
19 the supervisor, Jermaine Curry, a supervisor, and
20 Emilio De Gregorio, who was Chief Deputy.
21     Q.   Okay.  I want to focus on Nick Barone for
22 a second, though.  You had said earlier that your
23 recollection was that Tom Campion had complained
24 about Nick often both fighting with -- or
25 disagreeing with Mark about some issues, but also

Page 116

1  refusing to deliver --
2      A.   I didn't say often.  I said he complained
3  that Nick and Mark didn't get along with one another
4  and they had some issues.  I didn't say often.
5      Q.   You're right.  I think you said just one
6  occasion?
7      A.   I didn't say often.  And I said they gave
8  me, personally, attitude one time, which I, you
9  know.
10     Q.   That was not -- the attitude he gave you
11 the one time, that was not one of the bases for you
12 firing him?
13     A.   No, no.  I fired him, again, because he
14 refused to do his work.
15     Q.   Right.  And that he refused to deliver
16 records or mail when he was requested?
17     A.   Yeah, his work.  Yes.
18         MR. HATCHETT:  I'm sorry, Counsel.  I just
19     have to -- Ms. Gordon.
20         THE WITNESS:  Yes.
21         MR. HATCHETT:  I know we've been going at
22     this for a little bit.  But the stenographer
23     can only take down one question -- I'm sorry.
24     Question, answer, or one person speaking at a
25     time, all right.  Just try to be mindful of

Page 117

1      that.
2          THE WITNESS:  Okay.  Sorry about that.
3  BY MR. GOSLEE:
4      Q.   With respect to refusal to do work, which
5  I think you said you believe that Mr. Campion, if he
6  was still there, was the one that made the
7  complaint.  Mr. Campion doesn't seem to reference
8  that at all in Paragraph 4, do you know why?
9      A.   No, I don't know why.
10     Q.   And, in fact, I think you said that
11 Mr. Campion -- was it Mr. Campion that recommended
12 that Nick be terminated?
13     A.   No, I never said that.
14     Q.   Okay.  He just said, Nick's not delivering
15 mail, is refusing to do it and that was the decision
16 you made?
17     A.   Yeah.  He just said he refused to do his
18 work.
19     Q.   Do you have any reason -- or do you have
20 any reason -- strike that.  So when Mr. Campion
21 wrote in Paragraph 4 of his declaration that, both
22 Wilson and Barone performed their jobs well, they
23 were well-liked and worked very hard, they had no
24 disciplinary concerns, that is inconsistent with
25 your recollection because Mr. Campion told you that

Page 118

1  Nick was refusing to deliver records; is that right?
2      A.   This was -- he put this in writing after
3  he got fired?
4      Q.   Are you suggesting that he did that
5  because he was disgruntled, that he said that -- are
6  you suggesting that Mr. Campion included Paragraph 4
7  because he was disgruntled about getting fired?
8      A.   Yes, I believe.  I believe he was a
9  disgruntled employee.
10     Q.   Okay.  Is there anybody that you can name
11  in the office, besides Mr. Campion, that would
12  support your position that Nick had difficulties
13  with his relationship with Mark Wilson and refused
14  to deliver records?
15     A.   Not the disgruntled employees.
16     Q.   Well, I ask that -- and I'm not trying to
17  give you a hard time.  But we've deposed --
18     A.   I'm not.  And I'm telling, that's -- you
19  right now nobody's gonna do it right now because I'm
20  not there as an elected official, and they don't
21  want to lose their jobs and their livelihood.
22     Q.   Who would -- who in the Register of Wills
23  office would be concerned about losing their job and
24  livelihood if they testified that Nick refused to
25  deliver records?

Page 119

1      A.   Everybody.
2      Q.   Who?
3      A.   Everybody at the Register of Wills.  This
4  is, like, a political -- you know, it's a political
5  environment.  People don't want to get involved in
6  this.  But you have testimony from Wayne Perry
7  saying that it was a disaster down there.  You have
8  that testimony.  You also have in Charmaine files
9  where, you know, we had to keep going down there and
10  because it was a disaster down there.  You have
11  testimony from Emilio coming to me telling me that,
12  hey -- this was after Nick went.  He said, we need
13  to just let them all go.  I wouldn't know that.  I'm
14  not their direct supervisor.  They said Tom could
15  not supervise.  He -- it was just a mess.  Like, it
16  was everyday.  Like, everyday they were coming in
17  there telling me that it was a mess down there.
18  They weren't doing their work.  They -- you know,
19  they didn't care.
20              Wayne Perry, one of my top
21  supervisors, which he will testify -- or maybe he
22  already testified.  He even said he was gonna quit
23  if we didn't do something about Archives because he
24  couldn't do his work.  Milly -- Emilio was
25  frustrated, my Chief Deputy, because he had to go

Page 120

1  down there to do their work that we're paying them
2  to do.
3              This had nothing to do with the
4  campaign.  This had to do with work product, okay.
5  Tax paying dollars.  That's what I was concerned
6  with.  I was more concerned with effectiveness and
7  efficiency in my office.  That's how I ran it.  I
8  wasn't, like, you know -- I was laid back, you know.
9  But we had to make sure that those lawyers, when
10  they came in, they got their records.
11          MR. HATCHETT: Ms. Gordon.
12          THE WITNESS: Yes.
13          MR. HATCHETT: I'm sorry.  I thought you
14  were finished.  Go ahead.
15          THE WITNESS: No, I'm finished.
16          MR. HATCHETT: I just want to remind you
17  that, to the best you can, just answer the
18  question being posed.
19          THE WITNESS: All right.
20  BY MR. GOSLEE:
21     Q.   I think the question -- and I appreciate
22  your response.  I think the question I originally
23  asked, is there anybody, either currently working at
24  the Register or previously working at the Register,
25  that would or could support your position that Nick

Page 121

1  had personal difficulties with Mark Wilson and
2  refused to deliver records when requested?
3      A.   That works there now?
4      Q.   Or previously worked there.  Anybody.
5  Frantically anybody in the world that you know that
6  would have any information about that, that Nick
7  refused to deliver mail or had difficulties.
8      A.   Yeah, I think.  But I doubt he would
9  testify.  They're not gonna -- they're not gonna --
10  they're not gonna jeopardize their job, so, no.
11     Q.   Yeah, and I get --
12     A.   They're not gonna jeopardize their job.
13     Q.   And I come back to this question.  Nick's
14  not a politician, as far as you know, right?
15     A.   It don't matter.  We work in a
16  political -- that was a political haven.
17     Q.   Do you think the job that he occupied,
18  though, in the Records Department of Archives, you
19  would consider that to be a potentially political
20  position?
21     A.   All of those jobs over there were
22  political appointments.
23     Q.   Including Nick?
24     A.   Everybody.  Donatucci hired everybody.
25     Q.   Do you know why Donatucci hired Nick?  Do

NICHOLAS BARONE v
TRACEY L. GORDON and CITY OF PHILADELPHIA                    TRACEY L. GORDON

Page 122

1  you believe that as political?
2       A.   No, no.  I don't know why he hired him.
3  But everybody, that's how they hired them.  They get
4  referrals.  That's how -- it's always been run that
5  way.  And they always had -- you know, they always
6  supported campaigns.
7       Q.   The employees always supported campaigns
8  in the past?
9       A.   Yeah, they supported Donatucci.  That's
10 how I learned that Donatucci used to raise twice a
11 year.
12      Q.   All right.  And so based on your
13 knowledge, employees donating to the Register of
14 Wills was something that occurred prior to you being
15 Register of the Will?
16      A.   It was routine.
17      Q.   Okay.
18      A.   And legal.
19      Q.   What's the basis of your knowledge about
20 the legality of that?
21      A.   Because the state told him we could -- you
22 could be political.  That's one office that you
23 could actually be political.  You could actually --
24 you could actually -- off the job you can actually
25 run for office, you can work on people campaign, you

Page 123

1  can participate and you can donate to people
2  campaign without it having any political penalty.
3       Q.   Do you have any basis of -- do you have
4  any knowledge of -- Mr. Donatucci was the previous
5  Register?
6       A.   Yes.
7       Q.   And I think you had testified that, it's
8  your understanding that he would expect his -- the
9  employees of the Register office to donate to his
10 campaign?
11      A.   Well, they just had two fundraisers a year
12 and that's what I adopted.
13      Q.   Okay.  All right.  And I just want to make
14 sure I can close this loop with respect to Nick
15 himself.  He's not a politician, as far as you know,
16 meaning, he's never run for office?
17      A.   (Witness nods.)
18      Q.   Yes?
19      A.   Oh, I don't know if he ever ran for
20 office.  I don't know.
21      Q.   Okay.  Do you --
22      A.   I don't even know if he was a committee
23 person or not.
24      Q.   Okay.  Do you have any knowledge -- okay.
25 And that's a good way of handling it.  Do you know

Page 124

1  whether he's ever held any political office or
2  occupied any position of political power, meaning
3  Nick Barone?
4       A.   No, I don't know anything about Nick.
5       Q.   Okay.  You had an e-mail address while you
6  were the Register?
7       A.   Yes.
8       Q.   Do you recall Mr. Campion or any other
9  employees ever e-mailing you complaints about other
10 employees?
11      A.   They wouldn't send the complaints for me,
12 no.
13      Q.   They would send it for Charmaine Collins?
14      A.   Or their supervisor.
15      Q.   Okay.  Do you recall receiving any
16 complaints about specific employees from Charmaine
17 or other supervisors via e-mail?
18      A.   I don't recall my e-mails, all my e-mails,
19 no.
20      Q.   Okay.
21           MR. GOSLEE:  All right.  Why don't we take
22 a quick break.  I might be done.  Want to go
23 over my notes.
24           THE VIDEOGRPAHER:  Going off the record at
25 approximately 6:24 p.m.

Page 125

1                -- -- --
2           (A short break was taken.)
3                -- -- --
4           THE VIDEOGRPAHER:  Back on the record at
5  6:28 p.m.
6  BY MR. GOSLEE:
7       Q.   All right.  We've been going for three
8  hours now.  We've now completed the warmup of the
9  deposition.  Are you ready for the real deposition
10 to get started.
11      A.   Ha, ha.  Don't say that.
12      Q.   I'm joking, obviously.  All right.  We
13 have been going for a while.  You gave me a lot of
14 testimony about Nick Barone and the circumstances in
15 which he was fired.  Do you have any other
16 information or facts you would like to add as to why
17 the circumstances -- as to why Mr. Barone was fired?
18      A.   No.
19      Q.   Have you now told me everything in your
20 knowledge as to why Mr. Barone lost his job?
21      A.   Yes.
22           MR. GOSLEE:  Okay.  All right.  With that
23 then, I don't have any further questions.  And
24 I do appreciate your time, especially at this
25 late evening.  Thank you.

NICHOLAS BARONE v
TRACEY L. GORDON and CITY OF PHILADELPHIA                                    TRACEY L. GORDON

Page 126
```
 1          MR. HATCHETT:  Ms. Gordon, I'll ask that
 2      you don't discuss your deposition testimony
 3      with anyone.  Okay.
 4          THE WITNESS:  Okay.
 5          THE VIDEOGRPAHER:  This deposition is
 6      ending at 6:29 p.m.
 7                    - - -
 8   (Videotaped Deposition concluded at 6:29 p.m.)
 9                    - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 127
```
 1          C E R T I F I C A T E
 2
 3          I hereby certify that the proceedings and
 4   evidence noted are contained fully and accurately in
 5   the notes taken by me in the deposition of the above
 6   matter, and that this is a correct transcript of the
 7   same.
 8
 9
10
11
12
13
14          Tisa R. Francis
15          Tisa R. Francis,
16          Professional Court Reporter
17
18          (The foregoing certification of this
19   transcript does not apply to any reproduction
20   of the same by any means, unless under the
21   direct control and/or supervision of the
22   certifying reporter.)
23
24
25
```

106:14,15,16 107:3,4 108:3

**yup**  75:8 92:2