# EXHIBIT I



Transcript of the Testimony of

**CHARMAINE COLLINS**

November 13, 2024

**NICHOLAS BARONE**

*v*

**TRACEY GORDON and THE CITY OF PHILADELPHIA**

Reliable Court Reporting

Phone – 215-563-3363

Fax – 215-563-8839

www.reliable-co.com

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

NO. 2:23-cv-02821-MSG

- - -

| | |
|---|---|
| NICHOLAS BARONE | :CIVIL ACTION |
| Plaintiff | : |
| v. | : |
| TRACEY GORDON, individually,: | |
| and THE CITY OF | : |
| PHILADELPHIA | :DEPOSITION OF |
| Defendants | :CHARMAINE COLLINS |

-----------------------

**COPY**

T R A N S C R I P T of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before Amanda Brooks, a Professional Court Reporter and Notary Public, taking place at The Law Offices Of Cohen Placitella & Roth, 2001 Market Street, Suite 2900, Philadelphia, Pennsylvania, on Wednesday, November 13th, 2024, commencing at approximately 10:02 a.m. Eastern time pursuant to notice.

Page 2

```
1  APPEARANCES:

2

3  MATTHEW A. CAPACETE, ESQUIRE

4  COHEN PLACITELLA & ROTH

5  2001 Market Street

6  Suite 2900

7  Philadelphia, Pennsylvania 19103

8  888-394-0962

9  MCapacete@CPRLaw.com

10 Counsel for The Plainitff

11

12 JAHLEE J. HATCHETT, ESQUIRE

13 MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN

14 2000 Market Street

15 Suite 2300

16 Philadelphia, Pennsylvania 19103

17 215-575-2780

18 JJHatchet@MDWCG.com

19 Counsel for The Defendants

20

21 Also Present:

22 Mitch Berger, videographer

23

24
```

Page 3

```
1                    INDEX

2

3  WITNESS                          PAGE

4  CHARMAINE COLLINS

5

6

7

8  EXAMINATION

9      By  Ms. Capacete          6

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 4

```
1        - - - - - - -

2              EXHIBITS

3

4  MARKED     DESCRIPTION                    PAGE

5  P-1        E-mail                         19

6  P-2        E-mail                         37

7  P-3        E-mail                         53

8  P-4        Employee Performance Evaluation 54

9  P-5        E-mail                         58

10 P-6        E-mail                         67

11 P-7        E-mail                         80

12 P-8        E-mail                         82

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 5

```
1         - - -

2              By agreement of counsel, the

3  signing, sealing, filing and certification

4  of the within deposition were waived and

5  all objections, except as to the form of a

6  question, were reserved until the time of

7  trial.

8         - - -

9              (CHARMAINE COLLINS, having been

10 first duly sworn, was examined and testified as

11 follows:)

12         - - -

13              THE VIDEOGRAPHER:  We are now on

14 the record.  My name is Mitch Berger and I

15 am a videographer for Reliable Reporting.

16 Today is November 13th, 2024.  The time is

17 approximately 10:02 a.m.

18              This video deposition is being

19 held at 2001 Market Street, Philadelphia,

20 Pennsylvania.  It is being taken in the

21 matter of Nicolas Barone versus Tracey

22 Gordon and City Of Philadelphia.  It is

23 filed in the U.S District Court for the

24 Eastern District Of Pennsylvania.  The
```

Page 6

1       deponent is Charmaine Collins.
2              Would counsel please identify
3       themselves for the record?
4              MR. HATCHETT:  Jahlee Hatchett on
5       behalf of The City Of Philadelphia, on
6       behalf of the defendants.  I'm
7       representing Ms. Collins for the
8       deposition today.
9              MR. CAPACETE:  Matt Capacete, on
10      behalf of plaintiff, Nick Barone.
11             THE VIDEOGRAPHER:  Thank you.  Our
12      court reporter is Amanda Brooks, also from
13      Reliable.  And she will now swear in the
14      witness.
15             - - -
16             (CHARMAINE COLLINS, having been
17      first duly sworn, was examined and testified as
18      follows:)
19             - - -
20             EXAMINATION
21             - - -
22   BY MR. CAPACETE:
23      Q.  All right.  Good morning, Ms. Collins.
24      A.  Good morning.

Page 7

1       Q.  I don't know that I introduced myself
2    actually, which I'm embarrassed about.  My name is
3    Matt.  I represent Nick Barone.
4       A.  Nice to meet you.
5       Q.  Thank you for being here.
6       A.  Yes, sure.
7       Q.  I know you have been deposed twice in
8    somewhat related matters, I think on March 8th and
9    September 12th; does that sound correct?
10      A.  Yes.
11      Q.  I'll give you just a little bit probably
12   the same instructions you have got.  You are doing
13   a good job so far.  Just answer out loud.  Let me
14   finish my question and I'll let you finish your
15   answer, so that we can make sure there is a
16   complete transcript; is that fair?
17      A.  Yes.
18      Q.  I'm going to be asking you about
19   conversations or discussions you have had, related
20   to all of this.  I'm not asking about
21   conversations you have had with counsel.
22          So if that's Jahlee or if we get close to
23   folks at like the solicitor's office or something,
24   we may have a discussion.  But if I'm asking you

Page 8

1    questions, I'm not asking for that stuff.  So if
2    it comes to mind, particularly about Jahlee's
3    office, you can just omit that, okay?
4       A.  Okay.
5       Q.  I am not going to ask you to guess for
6    stuff.  I may ask you to estimate time.  And I may
7    try to work through some stuff with you, okay?
8       A.  Okay.
9       Q.  All right.  So --
10             MR. HATCHETT:  I'm sorry.  Can I
11      give the witness one instruction?
12             Ms. Collins, to the extent that
13      there are any objections, particularly
14      from me, I'm going to instruct you right
15      now, unless I tell you not to answer,
16      assume that you can answer, okay?
17             THE WITNESS:  Yes.
18             MR. HATCHETT:  Thank you.
19   BY MR. CAPACETE:
20      Q.  Ma'am, where do you currently work?
21      A.  I'm an IT, HR IT consultant.
22      Q.  Are you a consultant for any specific
23   agency, company, organization, anything like that,
24   or is it freelance?

Page 9

1       A.  It's for an agency.
2       Q.  Which one?
3       A.  I would prefer not to -- not to say.
4       Q.  Is it a private agency?
5       A.  Yes.
6       Q.  You are no longer with The City Of
7    Philadelphia?
8       A.  No longer with The City.
9       Q.  Okay.  I don't think I need to find out
10   the actual agency.  But is it at all related to
11   Tracey Gordon?
12      A.  Not at all.
13      Q.  Okay.  You did, however, work for The City
14   for a number of years; is that correct?
15      A.  Yes.
16      Q.  Would you walk me through just generally,
17   you know, Register Of Wills, over DA, just general
18   timeline of your employment with The City?
19      A.  Sure.  I started with The City in January
20   of 2020.  I initially worked at the Register Of
21   Wills office.  I was hired as the HR deputy, under
22   Tracey Gordon's administration.
23          I worked in that office until last
24   October, at which time I moved over to the DA's

1  office.  And I was at the DA's office until the
2  end of August of this year.
3       Q.  When you joined the Register Of Wills
4  office, did you have any relationship with
5  Ms. Gordon before that?
6       A.  No, I did not.
7       Q.  Was that at the beginning of her
8  administration?
9       A.  Yes.
10      Q.  Did you stay through the entirety of her
11 administration?
12      A.  No.  I left in October.  Her
13 administration ended that December, I believe.
14 Her term ended.  I'm sorry.  In December.
15      Q.  My understanding is you have many, many
16 years of HR experience; is that fair to say?
17      A.  Yes.
18      Q.  That extends before your work with The
19 City Of Philadelphia; is that fair?
20      A.  Yes.
21      Q.  About how many years total would you say
22 you have as an HR specialist?
23      A.  Almost 20.  18, 20, give or take.
24      Q.  And I understand you were -- you have a

1  degree from Drexel; is that fair?
2       A.  Yes.
3       Q.  And are you currently in school?
4       A.  I'm not enrolled at the moment.  I was
5  attending Temple, working on an MBA, but I am not
6  actively enrolled at the moment.
7       Q.  Okay.  Would you -- so in -- strike that.
8  What was your role at the Register Of Wills office
9  when you worked there?
10      A.  I oversaw all HR operations for the
11 office.  So soup to nuts.
12      Q.  Would you tell me a little bit about what
13 HR operations involved?  Generally.  You don't
14 have to do too much.
15      A.  Sure.  Lots of administrative work, so
16 payroll processing, benefits, dealing with day-to-
17 day employee issues, related to their data and
18 information, and their status, processing any
19 changes, salary changes, position changes.
20          But updating job descriptions, supporting
21 with any departmental employee relations issues
22 that might arise, maintaining employee files,
23 processing new hires, processing terminations.
24      Q.  So you said processing new hires.  Did you

1  have any decision-making power as far as hiring?
2       A.  Not for the most part, no.  Most of the
3  hires were confirmed by Tracey Gordon, the
4  Register Of Wills.
5          During my time there, there was only one
6  position that we actually posted for.  It was a
7  finance director role, where we kind of did
8  traditional recruiting.  We posted it, posted the
9  job.  And resumes came in.  And we reviewed and
10 selected an employee.
11          But outside of that role, all of the hires
12 were selected from -- via the Register.
13      Q.  So decisions as to specifically who to
14 hire was with Ms. Gordon?
15      A.  Correct.
16      Q.  How about with firing -- or let me ask.
17 So did you have any decision-making power as to
18 who to terminate at the Register Of Wills?
19      A.  The register decided on terminations.
20      Q.  So it was the register, who had decision-
21 making power to fire individuals?
22      A.  Yes.
23      Q.  Was there any sort of other position
24 within the Register Of Wills office that also had

1  that power?
2       A.  No.  The register was the ultimate
3  decision-maker, regarding terminations.  Depending
4  on the situation, she might seek input from her
5  senior staff.  But she was the final say.
6       Q.  Was the register the ultimate decision-
7  maker as to all employment decisions?
8       A.  Can you expound on what you mean by all
9  employment decisions?
10      Q.  Sure.  So was the register, meaning
11 Ms. Gordon, the ultimate decision-maker in both
12 hiring, firing, suspending individuals,
13 substantial decisions as to employment?
14      A.  Yes, yes.
15      Q.  So as the HR director -- is that fair --
16 is that a fair description of your title?  I'm
17 sorry if I --
18      A.  Yes.  They used the deputy, but it's
19 equivalent.
20      Q.  What would you like me to refer to?
21      A.  Director is fine.
22      Q.  Okay.  As the HR director at the Register
23 Of Wills office -- first of all, were you holding
24 that position all the way through from January

1 2020 to October 2023?

2    **A. Yes.**

3    Q. In that role, were you familiar with the

4 different departments of the Register Of Wills

5 office?

6    **A. Yes.**

7    Q. You were familiar with the archives'

8 department?

9    **A. Yes.**

10    Q. Did you know Nick Barone?

11    **A. Yes.**

12    Q. How often would you interact with Nick?

13    **A. Not often. The archives was located --**

14 **department was located in another building. I**

15 **would see him intermittently if he was at the**

16 **building maybe once, once or twice a week when he**

17 **came to the building to deliver files. Once,**

18 **maybe like -- not -- maybe once a week.**

19    Q. Employees of the Register Of Wills office,

20 are they city employees?

21    **A. Technically, yes.**

22    Q. What do you mean by that, technically?

23    **A. The Register Of Wills is an elected**

24 **office. There are a handful of what they call row**

1 offices, that are elected offices that sit under

2 The City Of Philadelphia umbrella or on their

3 platform or on their payroll.

4      But some of the -- there are some

5 stipulations that don't apply to elected offices

6 in the same way that they do to other city

7 departments.

8      So for example, the Register Of Wills

9 adheres to the State Ethics Code versus The City

10 Of Philadelphia ethics code. It's just one kind

11 of distinction. The Register Of Wills office is a

12 little bit more autonomy to as far as terminations

13 and hires and terminations than some of the other

14 city offices. So yes.

15    Q. What are some of the other -- I think you

16 said row offices?

17    **A. The sheriff's office, city counsel.**

18 **Because those are all the offices where people**

19 **have to run. The DA's office. Those are all**

20 **elected offices. And I'm not sure of all of the**

21 **nuances that makes them different. But I do know**

22 **that the elected offices are kind of in a**

23 **different category than like The Water Department,**

24 **or you know, other city departments.**

1    Q. Were you familiar with -- strike that. In

2 2021, when it came to the area of the Register Of

3 Wills, was Tracey Gordon the ultimate decision-

4 maker?

5    **A. Yes.**

6    Q. Ms. Gordon would set policies for the

7 Register Of Wills office at that time?

8    **A. When you say "set policies," can you --**

9    Q. Internal policies as to how the office

10 would operate. Were those decided by Ms. Gordon?

11    **A. Each department had a department head,**

12 **manager, supervisor, deputy. But any major policy**

13 **or operational changes would normally be funneled**

14 **out to her for, you know, approval, yes.**

15    Q. Were there any other sort of governmental

16 bodies or agencies or individuals, who had

17 oversight over Ms. Gordon's day-to-day decision-

18 making?

19    **A. No, not to my knowledge.**

20    Q. How about as far as employment decisions,

21 were there any of those groups that had oversight

22 as to her decisions?

23    **A. No.**

24    Q. Is that, as far as you understand, the

1 same for all of those row offices?

2    **A. Yes. I think that is one of the big**

3 **distinctions. The row offices have an HR, you**

4 **know, point person, and for hires.**

5      **So Tracey wanted to hire someone. Then we**

6 **could hire that person directly without having to**

7 **put them through The City's HR process, the**

8 **central HR process for The City.**

9    Q. Is the same true of terminating an

10 employee?

11    **A. Yes. From a system standpoint, we use the**

12 **same system to actually process the -- you know,**

13 **the changes, but we wouldn't have to kind of vet**

14 **any decisions through the central -- city central**

15 **HR department.**

16    Q. So the Register Of Wills office uses sort

17 of the infrastructure to manage -- or to implement

18 its decisions?

19    **A. Yes. And I --**

20    Q. Go ahead.

21    **A. I was just going to say, obviously, there**

22 **was something extraordinary or, you know,**

23 **unorthodoxed from a processing standpoint that**

24 **would be flagged, because the central HR**

Page 18

1 department had to actually approved those changes
2 in the system, so if something odd came up, then
3 they would question it, but --
4      Q.  Are you able to give an example of what
5 you are thinking of as far as an odd example?
6      A.  So if we were entering a salary increase
7 for an employee in a coordinator role at a salary
8 that really was, you know, higher than the typical
9 coordinator, then that would raise a flag for
10 central finance and central HR, and we would have
11 to provide justification, you know, before they
12 would process that.
13      Q.  The hiring or termination of a single
14 individual, is that something that would be
15 flagged?
16      A.  Yes.  But again, it would only be flagged
17 if the coding was, you know, atypical or there was
18 some other, you know, date -- very technical, you
19 know, stuff that would -- might raise a flag if
20 appropriate.
21           MR. CAPACETE:  Makes sense.  I
22           want to look at -- I want to mark this as
23           P-1.  You can use the bates numbers if you
24           would like.

Page 19

1           - - -
2           (Whereupon, P-1 was marked for
3 identification.)
4           - - -
5 BY MR. CAPACETE:
6      Q.  Ms. Collins, I'm going to hand you P-1.
7 Take a look at that.  Have you ever seen that
8 before?
9      A.  Yes.  I created it.
10      Q.  Was this created specifically for the
11 Register Of Wills office?
12      A.  Yes.
13      Q.  I just want to walk through this a little
14 bit, see if we can figure out.  And I'm going to
15 ask you some questions about it.
16      A.  Sure.
17      Q.  Was this approved by the register,
18 Ms. Gordon?
19      A.  Yes.
20      Q.  On the first page -- or I'm sorry.  Page-
21 2, I guess it is.  On Defense-B 00709 at the
22 bottom; do you see that?
23      A.  Yes.
24      Q.  It says, "The employee handbook was

Page 20

1 created to provide employees with written
2 information pertaining to the employment policies
3 and procedures of the Register Of Wills office."
4      Is this document the employment policies
5 and procedures of the Register Of Wills office
6 that is referred to in that sentence?
7      A.  Yes.
8      Q.  The third paragraph there, it says, "The
9 Register Of Wills office is committed to serving
10 the public in our capacity as an agency of The
11 City Of Philadelphia."
12      Is that in any way different, meaning
13 agency -- is that classification in any way
14 different than what we have already discussed or
15 is that just sort of a summary of it?
16      A.  It's just a summary, summary of it.  And
17 just to provide a little bit of context, when I
18 came on board, there was a handbook.  My
19 predecessor had been in the role for about 18
20 years.  And the handbook that they had was
21 outdated.
22      So I took that handbook, took The City Of
23 Philadelphia, central HR department's handbook,
24 and just kind of like merged that information and

Page 21

1 updated it.
2      So I didn't start from scratch with an
3 empty template.  A lot of the language in the
4 booklet does come from existing documents that was
5 just updated.
6      Q.  What do you mean by it was an outdated
7 handbook, your predecessors?
8      A.  It was just old.  The format was old.
9 The -- some of the content was old.  Their
10 position was that no longer existed.  So it was
11 just outdated.
12      Q.  Did you need to get approval from The City
13 or anything like that to issue this handbook?
14      A.  No.
15      Q.  You said "no," right?
16      A.  No.
17      Q.  Sorry.
18      A.  I submitted it to The City, The City
19 Central HR Department, understanding that each
20 department under The City Of Philadelphia's
21 umbrella of 30,000 employees might have variations
22 in their handbooks and policies and procedures
23 that are departmental based -- departmentally
24 based, the central office points requested

Page 22

1 handbooks from each office.
2        So I submitted this to them at one point
3 or another for their main file.
4    Q. At the bottom, it says, "Administration."
5 And really just the last sentence here, it says,
6 "This team is responsible for ensuring smooth
7 daily operations, internal and external reporting
8 and compliance with applicable rules and
9 regulations for the organization."
10       The organization in this case would be the
11 Register Of Wills office?
12    A. Yes.
13    Q. Of what applicable rules and regulations
14 is referred to here, if you know?
15    A. Compliance with applicable rules and
16 regulations for the organization, the Register Of
17 Wills handled all of the probate for The City Of
18 Philadelphia, so any state, federal guidelines,
19 related to probating, financial reporting.  I
20 think it was just a general statement.
21    Q. It's not like there is a book of rules and
22 regulations that internally employees must follow
23 that this is referring to?
24    A. No.  This is referring to the general

Page 23

1 operations of the Register Of Wills, related to
2 the office's main function, which is probating --
3 processing marriage licenses for The City Of
4 Philadelphia.
5    Q. Is the register, herself, the one who
6 decides what those rules and regulations are
7 within her administration?
8    A. Not at all.  The Register Of Wills office
9 has been in existence for decades.
10       So when we came on board, it was already a
11 well-oiled machine from the standpoint of its
12 central function, which is to process the probate
13 for The City, and process all of the marriage
14 license applications for The City.
15       So the fundamental foundational rules and
16 regulations are -- were in existence long before
17 we came on board and we have long-term employees
18 who managed those key departments.
19       So she wasn't responsible for creating,
20 you know, probate policies or anything like that.
21    Q. Was she -- was Ms. Gordon the individual
22 who decided the actual implementation of the rules
23 and regulations, how to do so?
24    A. As the Register Of Wills, her input was --

Page 24

1 I mean she ran the office.  So her input was
2 paramount.
3        I imagine in operational decisions, but I
4 think the core functions, they are what they are.
5 So I would imagine if there were any specific
6 cases or instances where there needed to be
7 conversation or a decision made, that her input
8 was solicited and weighed heavily.
9        But again, the core functions were --
10 existed many, many decades before we came or her
11 administration began, so.
12    Q. Do you know where those rules and
13 regulations came from?  Meaning, like was it a
14 statute?  Was it just a longstanding tradition?
15 How did that come about?
16    A. I'm not sure.  The probate function, the
17 head of probate department, which again, is
18 the core.  All of the other departments are
19 ancillary to probates, which is the main
20 operational function of the office.  He was there
21 for 40 years, so you know.
22    Q. Who are you referring to as he?
23    A. Louis DiRenzo was the head of the --
24 probably still is there as the head of the probate

Page 25

1 department at the Register Of Wills.  And he had
2 been in that role or with the office for 40 years
3 when we arrived.
4    Q. So Mr. DiRenzo sort of had like
5 institutional knowledge?
6    A. Exactly.
7    Q. And that's sort of where these rules and
8 regulations flowed through?
9    A. I would image so.
10    Q. But as far as the day-to-day operations
11 and implementation of the tasks of the Register Of
12 Wills office, I think you said that Ms. Gordon's
13 decision-making was paramount; is that a yes?
14    A. Yes.
15    Q. Sorry.  I don't mean to be rude.  Okay.  I
16 want to talk about sort of some of the -- okay.
17 On Page-5 of that document, it's Bates Number-712,
18 there is a standards of conduct, ethics, and
19 integrity.
20       I think you have already mentioned this,
21 the Pennsylvania Public Official And Employee
22 Ethics Act, that was the state ethics statutes
23 that you were refer to go before, right?
24    A. Yes.

1    Q.  That applies in the same way to each
2  elected official within the city government; is
3  that fair to say?
4              MR. HATCHETT:  Objection to the
5        form of the question.  Your answer is
6        already out there.  Did you get it?
7              THE COURT REPORTER:  Yes.
8  BY MR. CAPACETE:
9    Q.  And just give Jahlee a moment, you know,
10  if we can pause if he needs to put an objection on
11  the record.
12        So that applies the same way as -- as far
13  as your understanding in HR and The City, like to
14  the sheriff, the city council that we have been
15  talking about as other row offices, right?
16    A.  Actually, I can't speak to other row
17  offices.  I know that the state ethics code
18  applied to the Register Of Wills.  I don't want to
19  speculate on the, you know, standards for other
20  offices.
21    Q.  You work for the district attorney's
22  office, right?
23    A.  Yes.
24    Q.  Did it apply equally to the district

1  attorney's office?
2    A.  I'm not sure actually.  I'm not 100
3  percent certain if the district attorney's
4  office -- it had to also adhere to The city Of
5  Philadelphia's ethics code.
6    Q.  Okay.  Move on to, if you can go to Page-
7  8.  I want to talk a little bit about this
8  Section-3, compensation and benefits.
9        There are a number of things here.  I
10  think the first one is employee pay.  That's
11  pretty straightforward.  I wanted to ask about
12  section-3.2, which -- I'm sorry -- is actually on
13  Page-9.  It's called Longevity pay.  Are you
14  familiar with what longevity pay is?
15    A.  Vaguely.
16    Q.  What is your understanding of it?
17    A.  That it is pay that is awarded to
18  employees based on their longevity.
19        As outlined here, I took this portion
20  from -- this is actually an outdated copy of our
21  handbook.  I look this portion from the city's
22  handbook and when I sent out the initially the
23  updated handbook, the first version, I was told --
24  informed that the Register Of Wills office did not

1  participate in longevity pay, and they hadn't for
2  many years under the prior Register Of Wills.
3        So I subsequently removed that section,
4  because I was told it didn't apply to us.
5    Q.  Who told you that?
6              MR. HATCHETT:  Ms. Collins, I'll
7        just -- if it involved conversations with
8        any attorneys or members from the law
9        department, I'll ask that you not discuss
10        the conversations.
11              However, to the extent that you
12        can provide an answer without the
13        divulging any conversations, you can do
14        that.  Do you understand what I'm saying?
15        THE WITNESS:  Yes.
16        MR. HATCHETT:  Okay.
17        THE WITNESS:  I actually don't
18        remember.  It might have been someone in
19        central -- the central HR department or
20        employees, who had been with the office
21        for a long time.
22              I think it was a few employees who
23        had been there for -- actually, I
24        apologize.

1              It was an employee, who worked in
2        the law department in our office, who had
3        been there for many, many years.  She said
4        we never did that.  So that's why I
5        removed it.
6  BY MR. CAPACETE:
7    Q.  Do you know who determines whether the
8  Register Of Wills office would participate in
9  longevity pay?
10    A.  Apparently, the Register Of Wills, because
11  I was told that the former prior Register Of
12  Wills, who had held the position for like four
13  decades before Tracey hadn't -- he did not allot
14  for that.
15    Q.  Is it fair to say that Ms. Gordon, within
16  her capacity as Register Of Wills, could have
17  participated in longevity pay, as to your
18  understanding?
19    A.  I don't think that is fair to say.  We
20  would have needed to review that, because it is --
21  if you see how it's outlined, if they hadn't been
22  instituting it, there might have -- there would
23  have been some work to go back and look at, okay,
24  "Who did we miss?"  "How many years?"

Page 30

1      So there might have been a retroactive
2 component to tackle if she were to look at that,
3 if she were to consider that, and it never came
4 up.  I never went to her and asked.  I was just
5 like, "Oh, we don't do that at the Register Of
6 Wills."  And I just took it out of the handbook.
7      Q.  I guess my question is, had she wanted to,
8 that could have been something that she
9 implemented at the Register Of Wills office?
10          MR. HATCHETT:  Objection to the
11      form of the question.  You can respond.
12          THE WITNESS:  I don't know.
13 BY MR. CAPACETE:
14      Q.  Do you know who else could have
15 implemented it?
16          MR. HATCHETT:  Objection to the
17      form of the question.
18          THE WITNESS:  So she is the
19      ultimate decision-maker.
20      So I guess, to answer your prior
21      question, I imagine she could have -- I
22      don't know whether she would have.  If she
23      wanted to raise the question, she would
24      have been the one to do it.

Page 31

1          But I just don't know whether or
2      not it would have been feasible for our
3      office, considering it had not ever
4      previously been done at the office, if
5      that makes sense.
6 BY MR. CAPACETE:
7      Q.  Section-3.3 says, "Deferred compensation."
8 Do you have an understanding as to what that is?
9      A.  Yes.
10      Q.  Tell me what your understanding of that
11 is.
12      A.  It's deferred compensation is just a
13 retirement plan that employees can opt to
14 participate in.
15      Q.  Is there a way for you to describe like
16 what a benefit -- what the benefit of it would be
17 versus not doing it or vice versa?
18      A.  The benefit of doing it is to supplement
19 your retirement -- for an employee to supplement
20 their retirement savings account.
21      All employees are required to participate
22 in The city pension program.  The city pension
23 program has set participation percentages and caps
24 out for a lot of employees at a certain salary

Page 32

1 amount.
2      So if employees wanted to put away
3 additional money for retirement, then the deferred
4 compensation plan would be the vehicle to do that.
5      Q.  So it's a way to supplement your
6 retirement or pension plan with The City?
7      A.  Yes.
8      Q.  Okay.  Let's talk about the pension plan.
9 It's on Page-11, bates numbered 718 and it's
10 Section-3.6.  Can you -- it says here, "All
11 permanent employees must be enrolled in the
12 pension plan."
13      Nick Barone was a permanent employee at
14 the Register Of Wills office in 2021, right?
15      A.  Yes.
16      Q.  Can you give me an overview.  I know you
17 said there were percentages and there is sort of
18 maybe like scheduling of how it works.  Can you
19 give me an overview of what that is?
20      A.  Not really.  The City's pension plan is
21 higher -- is run by a completely different
22 department.  And it is extremely complex.  And
23 there are a number of types of plans that
24 employees can participate in.

Page 33

1      And there is a lot of factors that goes
2 into the city pension plan.  So I would have to --
3 a lot depends on the plan that the employee is
4 participating in.
5      And that depends on the employee start
6 date.  So I can't provide a ton of information
7 outside of the fact that all employees are
8 required to participate in the plan, and it's a
9 percentage of your salary.
10      There is a schedule that is sent out at
11 the beginning of each fiscal year that lists plan
12 type and percentage to be contributed.  And yes,
13 if employees have questions about their plan, we
14 direct them to contact the pension department and
15 a counselor schedules a meeting with them to go
16 over their -- the specifics related to their plan.
17      Q.  So employees can opt to participate in
18 different levels of a pension plan; is that fair
19 to say?
20      A.  No.
21      Q.  Okay.  Explain to me what you -- I guess I
22 misunderstood.
23      A.  So --
24      Q.  Is it sort of like they are required to

Page 34

1 participate, but depending on their start date,
2 and their salary, they are sectioned off into
3 different areas?
4     A.   Yes.
5     Q.   Okay.  Okay.  Is there -- so the next
6 section is Retirement-3.7.  Is there a specific
7 age at which city employees were -- or employees
8 of the Register Of Wills office become eligible
9 for retirement?
10    A.   That is contingent upon the type of -- the
11 plan that their -- pension plan that they are
12 enrolled in.
13         So there are over a dozen pension plan
14 types under The City's pension program.  And each
15 plan type has specific -- you know, specific, just
16 details, related to itself.  An employee that is
17 enrolled in Plan-Y might be eligible to retire at
18 55, with some other caveats.
19         And then an employee that is enrolled in
20 Plan-J, the retirement age might be 62.  So it
21 really depends on the plan type.
22    Q.   So depending on the plan type, someone's
23 retirement age may be different than someone else
24 who is in a different bracket?

Page 35

1     A.   Yes.
2     Q.   Okay.  And when they reach retirement age,
3 is that when they are able to access their
4 pension?
5     A.   Not always.  Again, The City's pension
6 program is a very, very complex.
7         There are different options.  Some
8 employees, they have what you call a DROP Program,
9 where employees, you know, once they reach a
10 certain age or number of years of service, they
11 can enter a DROP to serve out a number, like
12 remaining years, and then become eligible to
13 retire.
14         But generally speaking, yes, when they
15 retire is when they are able to access the
16 pension.  You can't draw from the pension prior to
17 retirement.
18    Q.   If you are terminated from The City before
19 you reach like your retirement age, are you able
20 to receive your pension?
21    A.   That depends on the plan type and the
22 vesting period for the pension.  So if you are
23 not -- if you are participating in a plan that
24 has, you know, requires seven years of vesting,

Page 36

1 and you leave the city in five, then obviously,
2 you didn't meet the vesting schedules, so.
3     Q.   So I think I understand.  But can you just
4 explain to me what vesting period means?  Like,
5 it's -- if there is a requisite amount of years
6 you need to work with the city before you are
7 eligible for X pension?
8     A.   Correct, yes.  So a number of years
9 before -- and I think that's kind of -- that is
10 the rule for, I think, a lot of general retirement
11 plans, you know, 401Ks, et cetera.
12         You have to serve a number of years to be
13 fully vested or fully eligible to receive the
14 benefits related to the plan.
15    Q.   As far as the -- and be I know there is a
16 lot of documents scheduling.  But to your
17 understanding, as the HR director at the Register
18 Of Wills, was there anything unique or odd about
19 the vesting period or policy for employees at the
20 Register Of Wills?
21    A.   No, not at all.  The employees at the
22 Register Of Will, the pension program is run by
23 The City Of Philadelphia.  So we were, you know,
24 aligned to that.

Page 37

1         There weren't any -- anything specific to
2 the Register Of Wills, related to the pension
3 program.
4     Q.   So in discovery in this case, we received
5 a couple of memos, issued by you, from 2022,
6 regarding political involvement.  I'll show it to
7 you.  I just was prefacing.
8         MR. CAPACETE:  Can we mark this as
9 P-2?  Jahlee, I have a copy for you.  Just
10 so you are aware, there is like two
11 versions of this from a couple of days
12 apart.  They are just stapled.
13         MR. HATCHETT:  Okay.
14         MR. CAPACETE:  Thank you.
15                  - - -
16         (Whereupon, P-2 was marked for
17 identification.)
18                  - - -
19 BY MR. CAPACETE:
20    Q.   I'm handing you P-2.  There is two
21 documents there.  There is a memo, which looks
22 like it's issued from you on December 6th, 2022;
23 do you see that?
24    A.   Yes.

1    Q.  And then the next page is from December
2  8th, 2022; do you see that?
3    A.  Yes.
4    Q.  Do you remember issuing this memo?
5    A.  Yes.
6    Q.  Can you tell me about the circumstances,
7  what led up to this, what caused this to be
8  issued?
9    A.  The Register Of Wills, as an elected
10  office, or row office, one of the few offices, as
11  it kind of says in the first sentence, where
12  employees can run for office, without resigning
13  from their position, and other city departments,
14  employees are required to resign in order to run
15  for office.
16      So the register at one point or another
17  just wanted, because we had one or two employees,
18  who were looking to run for office, wanted to make
19  sure that everyone was clear on the perimeters,
20  related to doing that.
21    Q.  So this memo was issued at the direction
22  of Ms. Gordon?
23    A.  Yes.
24    Q.  Do you remember specifics about the

1  conversation or conversations leading up to the
2  issuance of either of these two memos?
3    A.  Yes.  As I stated, we had -- we were
4  coming up on an election cycle.  And we had one or
5  two employees, that we were aware would be seeking
6  office or looking to run for an elected position,
7  and there were general concerns around any
8  potential conflict with their positions at the
9  Register Of Wills.
10    Q.  What do you mean by concerns about
11  potential conflicts?
12    A.  The register wanted to make sure that
13  employees, who were running for office were
14  performing any activities related to that outside
15  of their hours or their position that at the
16  Register Of Wills.
17    Q.  Do you remember who those two employees
18  were?
19    A.  I remember one employee.  Her name was
20  Karima Yelverton.  And she was looking at running
21  for a judge position.  I don't remember who the
22  other person was.
23    Q.  Do you remember what the other position
24  was that the individual was running for?

1    A.  No.  And it might have been just grapevine
2  in our patronage office, and we have a lot of
3  people that hold -- like ward leader.
4      So there always was -- there was typically
5  a lot of scuttlebutt when we approached an
6  election cycle around employees potentially
7  running for office.
8      So I knew that one employee for sure.  I'm
9  not sure who the other person was or if it was
10  just speculation or rumor, based on talk in the
11  office.
12    Q.  Was there often issues with these sorts of
13  categories within the Register Of Wills office
14  around election time?
15    A.  Can you repeat the question?
16    Q.  Yeah, sure.  So these two documents.
17  Let's use the second one.  I think there is
18  additional bullet points here.  So like
19  campaigning on Register Of Wills time or
20  solicitation on Register Of Wills time, were those
21  sorts of incidents common at The Register Of Wills
22  office?
23    A.  Not to my knowledge or based on my
24  experience.  This was very specific to the

1  individual, who I mentioned running for office in
2  her role.  She worked very closely with the
3  Register Of Wills or Tracey.
4      And so there was a specific concern,
5  related to this person and how that might conflict
6  with the work that she did with the register.
7    Q.  In 20 -- I'm sorry.  Strike that.  So in
8  reading your previous testimony, I think from the
9  deposition on March 8th, you mentioned that you
10  were asked to contribute to Ms. Gordon's campaign;
11  do you remember that?
12    A.  Yes.
13    Q.  You were asked to contribute to
14  Ms. Gordon's campaign while at work; is that fair?
15    A.  I was asked to contribute via text
16  communication.
17      I don't remember when the texts were sent.
18  I received a lot of texts around the contributing.
19  So I don't want to speculate.  But they were
20  sent -- you know, they weren't sent in the middle
21  of the night.
22      But I just don't know for sure if they
23  were sent like before 5:00.  I don't remember, I
24  should say.

1    Q.  Yes.  Do you remember -- other employees
2  at the Register Of Wills office were asked to
3  contribute to Ms. Gordon's campaign as well,
4  right?
5    A.  Yes.
6    Q.  And I believe you testified previously
7  that you and others felt compelled to do so; is
8  that fair?
9    A.  Yes.
10    Q.  And I believe you testified it was Kisha
11  Trawick, who had approached you and these other
12  individuals; is that fair?
13    A.  Kisha Trawick is the one who sent out the
14  communication.  She did not approach me in-person.
15  But she was the one who -- you know, all the
16  communications came from her.
17    Q.  And the same is true for the other
18  individuals, as far as you know?
19    A.  No.  There was another individual, Keith
20  Harris, who also -- now, he approached people,
21  regarding contributing.
22    Q.  In what way?  Do you remember?
23    A.  He walked around the office and talked to
24  people.

1    Q.  Do you remember having conversations with
2  the people that Mr. Harris spoke with about those
3  interactions?
4    A.  Not directly.
5    Q.  What do you mean by "not directly?"
6    A.  So I had conversations with the HR
7  coordinator at the time and another deputy,
8  regarding the circumstance of contributing.
9        And I was informed from the HR coordinator
10  that employees had commented to her that they were
11  asked to contribute and just felt, you know, felt
12  uncomfortable or, you know, uneasy about it.
13    Q.  Who was that HR coordinator?
14    A.  Her name was Shariff Roseboro.
15    Q.  And this sort of practice or custom was
16  known at the Register Of Wills office at this
17  time?
18        MR. HATCHETT:  Objection to the
19      form of the question.
20        THE WITNESS:  Can you repeat the
21      question?
22  BY MR. CAPACETE:
23    Q.  Sure.  It wasn't a secret that Mr. Harris
24  was asking folks for contributions to Ms. Harris'

1  campaign that this time; is that fair to say?
2    A.  Yeah.  I don't know if everyone knew, but
3  it wasn't -- if he was walking around the office,
4  I don't think it was a secret, but I don't know if
5  he hit every employee, you know, in the office.
6    Q.  Did others in the office voice concern to
7  you about this practice?
8    A.  Keith Harris, himself, voiced a concern to
9  me about being asked to reach out to employees
10  about contributing.
11    Q.  And you said he was asked -- asked by
12  Tracey Gordon?
13    A.  Yes.
14    Q.  He told you that?
15    A.  Yes.
16    Q.  Did he tell you anything else specific
17  about those conversations?
18    A.  No.  He just contacted me one day and
19  stated -- you know, said he wanted to just have a
20  conversation off the record, and said that he had
21  been asked to go around to employees who hadn't
22  contributed yet to let them know that they hadn't
23  contributed and asked them to contribute.
24        And he said he did that.  And then he said

1  he was being asked again.  And he said if he felt
2  uncomfortable doing it the second time.  And I
3  told him, I said, "If you feel uncomfortable, then
4  you probably shouldn't."
5        You know, I didn't want to tell him what
6  to do.  But it was obvious to me like what he
7  should do or shouldn't do.  So yes, that was the
8  conversation.
9    Q.  I believe there was testimony related to a
10  list that Mr. Harris had.  Do you remember that?
11    A.  He said he had a list.  I didn't see a
12  list, myself.
13    Q.  What did he describe the list as being?
14  Like, was it a list of people who hadn't donated
15  yet?  Was it a list of --
16    A.  Yes.  It was a list of people that hadn't
17  donated yet.  I believe everyone -- not I believe.
18  she was using a website, ActBlue, I believe, or --
19  that's a political donation website.
20        And I imagine that you can run reporting
21  or out of that website to see who had contributed.
22  And our office wasn't huge.  So based on that, you
23  could probably easily surmise who hadn't
24  contributed.

1    Q.  And by "she," you mean Ms. Gordon?  She
2 was using ActBlue?
3    A.  That was the -- yes.  So when the text
4 messages to contribute or attend a fundraiser were
5 sent out, it had the link to the ActBlue website.
6 I think it was called ActBlue.  I'm not 100
7 percent sure.
8    Q.  And the contributions Ms. Gordon was
9 seeking was known throughout the office.  I think
10 you testified to that in March; is that fair to
11 say?
12    A.  Yes.
13    Q.  Do you know what Ms. Trawick's -- and
14 that's T-R-A-W-I-C-K -- do you know what
15 Ms. Trawick's role was at the Register Of Wills
16 office in 2021?
17    A.  She sat in the inheritance tax services
18 department.
19    Q.  So you say she sat there.  Are you unsure
20 of whether that was the department she worked for
21 or what her role was?
22    A.  That is the department she was assigned
23 to.
24    Q.  What was her function there?

1    A.  Technically, she worked on the inheritance
2 tax services team.  They received all of the --
3 that department received all of the tax payments
4 for -- from the city residents and processed
5 those, so.
6    Q.  So I'm hearing you say she technically
7 worked for inheritance tax, she sat with
8 inheritance tax.  Is there -- was there a
9 different function that she served, as you
10 observed?
11    A.  Yes.  I -- her role seemed to be -- was a
12 little bit more nuanced, where she acted as -- she
13 seemed to work on special projects or specific
14 assignments for the register, for Tracey.
15        I don't know the details, but I know that
16 her role was a little bit more nuanced than
17 inheritance tax services from what I observed.  So
18 some days she would be performing tasks for Tracey
19 that were outside of inheritance tax services.
20    Q.  And do you know of any of the special
21 projects or the tasks?  Can you think of any
22 examples?
23    A.  Not really.  Kisha was -- served on
24 Tracey's campaign team prior to joining the

1 office.  So that -- they had a pre-existing
2 relationship, working relationship.  So I'm not
3 sure.  I wasn't heavily involved in the political
4 side of operations.
5    Q.  Do you know whether any of those special
6 projects or tasks were campaign-related?
7    A.  Yes.  I would imagine so, because she was
8 sending out, you know, the fundraising
9 notifications.
10        I don't know when she did them.  I have no
11 knowledge of the timing of any of that.  But she
12 obviously was the point person for sending out the
13 communications around fundraisers and donations.
14 So I imagine some of that stuff was related.
15        MR. HATCHETT:  And Ms. Collins,
16        I'll just remind you, if you need to
17        approximate certain things, that's totally
18        fine.  Just let us know.
19        But to the extent that you have to
20        speculate or guess, try to refrain from
21        doing so.
22        THE WITNESS:  Okay.  All right.
23        Sorry.
24

1        MR. HATCHETT:  There is nothing to
2        be sorry about.
3 BY MR. CAPACETE:
4    Q.  And I'll explore, you know, to see if
5 there is foundation.  That is sort of what we are
6 talking about.  But let's -- oh, I'm sorry.  I
7 know we already moved on from the -- sort of the
8 HR benefits and all of that stuff.
9        I'm just curious.  So if an employee is
10 terminated from a job in The City, and they
11 reapply to the city, do they have to disclose that
12 they have been previously terminated?
13    A.  The records exist.  So if an employee
14 reapplies to a position at some point, even if
15 they don't disclose it, once their social security
16 number is inputted, that prior employment history,
17 including any, you know, separation reason would
18 be like available to the HR.
19    Q.  So if you are a Register Of Wills'
20 employee that's terminated at some point, and you
21 applied to a different department within the city,
22 the person who was looking to potentially hire you
23 would have access to the reason for your
24 termination; is that fair to say?

Page 50

1     A.  Yes.  I take that -- I take that back.
2  The person that is looking to hire might not have
3  immediate access.
4         So like the front line hiring manager
5  might not have access to that information --
6  wouldn't have access to that information, I'll
7  say.  But once a hire, if they are going to be
8  rehired, once that processing -- you know, once
9  they are entered into the system, that information
10  would come up.
11        Or once it -- we -- the hiring manager
12  became aware that they are prior employee, that
13  information could, you know, okay, did they leave
14  on good terms?  Like, that information would
15  naturally flow.
16        But an interviewing hiring manager
17  wouldn't immediately have access to that
18  information, if that makes sense.
19     Q.  It does.
20     A.  Yes.
21     Q.  So the hiring manager would have access to
22  that before deciding whether to hire them though
23  at some point; is that fair to say?
24     A.  Yes.

Page 51

1     Q.  You already mentioned you knew Nick
2  Barone?
3     A.  Yes.
4     Q.  Was Nick considered a good employee at the
5  Register Of Wills?
6     A.  Yes.
7     Q.  Do you remember when he was hired?
8     A.  No.
9     Q.  Actually, I'm sorry.  I think he was hired
10  during Mr. Donatucci's administration, so.  Did
11  Nick have any disciplinary write-ups in his file,
12  to your knowledge?
13     A.  No.
14     Q.  Did he have any disciplinary action
15  documented in any way in his file, to your
16  knowledge?
17     A.  No.
18     Q.  Was he ever sent to you for any
19  disciplinary action?
20     A.  No.
21     Q.  Were there any reports that Nick was
22  insubordinate in any way during his employment
23  with the Register Of Wills office?
24     A.  No, not to my knowledge.

Page 52

1     Q.  Do you remember having any discussions
2  with anyone, including Ms. Gordon, that Nick was
3  being insubordinate?
4     A.  No.
5     Q.  Did you ever have any reason to believe
6  that Nick was unable to perform the essential
7  functions of his job?
8     A.  No.
9     Q.  Do you know who comes up with the list of
10  essential functions for an employee, like in
11  archives?
12     A.  Well, when I started at the Register Of
13  Wills, there were no job descriptions in
14  existence.  So we actually went through and
15  created job descriptions for each position in each
16  department.
17        So and that involved like meeting with
18  employees, meeting with supervisors to kind of
19  like pull that data together.
20     Q.  Coming up -- and I have I think one of
21  those descriptions at least as far as Nick, but
22  coming up with those descriptions, was that
23  something that was done internally at the Register
24  Of Wills office?

Page 53

1     A.  Yes.  I don't -- I'm not 100 percent
2  certain.  There might have been some old
3  descriptions on file, templates for some of the
4  positions that we used and met with employees and
5  supervisors to update, so.
6             MR. CAPACETE:  And I have -- can
7         we mark this as P-3?
8                  - - -
9         (Whereupon, P-3 was marked for
10  identification.)
11                  - - -
12  BY MR. CAPACETE:
13     Q.  I just handed you P-3.  And I think we
14  have been talking about this.  This is the records
15  clerk archives job description; is that fair to
16  say?
17     A.  Yes.
18     Q.  Looking through this -- and this is bates
19  numbered Defense-00048 through 41.  Flipping
20  through this, as far as you are aware, was Nick
21  incapable or unwilling or unable to do any of
22  these functions, skills, abilities, anything like
23  that?
24     A.  No.

Page 54

1   Q.  There has been testimony that at some
2  point there was like a fight between Nick and Mark
3  Wilson; do you have any memory of that?
4           MR. HATCHETT:  Objection to the
5       form of the question.  You can respond.
6           THE WITNESS:  No.
7  BY MR. CAPACETE:
8   Q.  If that had happened, is that something
9  that would go to the HR department for like
10  reporting?
11   A.  If that had happened, and it was
12  reported -- it should have been reported -- then
13  yes.  It would have been documented within HR.
14  But that was not reported to HR.
15           MR. CAPACETE:  I have here what
16       I'm going to mark now as P-4.
17           - - -
18           (Whereupon, P-4 was marked for
19  identification.)
20           - - -
21  BY MR. CAPACETE:
22   Q.  And I'm going to hand you this.  P-4 is an
23  e-mail from December 21st, 2021; is that fair?
24   A.  The date, yes.

Page 55

1   Q.  And then you are copied on this e-mail; do
2  you see that?
3   A.  Yes.
4   Q.  Do you remember the circumstances of this
5  e-mail at all or receiving it, anything like that?
6   A.  Yes.  We instituted an annual evaluation
7  program or plan for employees to -- for uniformity
8  with other city departments, the Register Of Wills
9  had, you know, kind of routinely given employees
10  evaluation, so that was a part of that process and
11  communication.
12   Q.  Was this implemented at the direction of
13  Ms. Gordon, do you remember?
14   A.  It was -- it wasn't at her direction, per
15  se.  Evaluations is a very, very standard part of
16  any, you know, office and HR functions.
17           And it didn't exist.  So it's something
18  that I rose as an issue or something that we might
19  want to implement, and recommended it.  We talked
20  about it.  And she agreed.
21           And so we implemented it.  So she didn't
22  like, "We should do evaluations."  It was just one
23  of the standard functions that was missing from
24  the office when we came on board that she agreed

Page 56

1  we should -- we should implement.
2   Q.  Do you remember whose idea it was to start
3  doing these?
4   A.  It was mine.
5   Q.  Do you remember why?
6   A.  Because evaluations are important.
7   Q.  I'm wondering if there was a specific
8  triggering event.  That's all I'm asking.
9   A.  It's just the -- before we came on board,
10  the HR -- my position had been held by the same
11  person for many years.  The Register Of Wills
12  operates pretty atypically from other offices,
13  from a day-to-day HR standpoint, hiring people,
14  heavily patronage.
15           Any there weren't any job descriptions.
16  They never got -- employees never got evaluations.
17  Salaries were all over the place.  There was just
18  a lot from an HR standpoint that wasn't standard.
19  And we wanted to standardize some things and felt
20  like employees should be evaluated at some point
21  or another as a part of knowing whether or not
22  they are doing a good job.
23           So just something that I recommended.  And
24  she thought it was a good idea to do.

Page 57

1   Q.  It says here -- and this is an e-mail from
2  Tom Campion to the archives' employees; is that
3  fair to say?
4   A.  Yes.
5   Q.  It says here, "I have been directed to
6  complete, submit a written evaluation to staff by
7  the end of this calendar year."  Was that
8  conversation with you?
9   A.  I sent a communication out to all
10  employees, all department managers.  It was a
11  pretty expansive process.
12           So because supervisors had never conducted
13  employee evaluations, there was training.  There
14  were templates.  You know, there were guidelines
15  that were provided to the department supervisors,
16  who would be conducting the evaluations.
17           And then there was also e-mail
18  communications sent out to all employees to let
19  them know what was happening, why it was
20  happening.  So that was -- I had been directed.
21  That was per the communications that he had
22  received regarding evaluations.
23   Q.  Do you know whether this practice
24  continued after December 2021?  Like, did it keep

1 going yearly?

2     **A. The evaluations were -- yes -- implemented**
3 **to be an annual process.**

4               MR. CAPACETE: I have here I'll
5     mark as P-5.

6               - - -

7               (Whereupon, P-5 was marked for
8 identification.)

9               - - -

10 BY MR. CAPACETE:

11     Q. Is this the -- I'm just speaking about the
12 template as a whole right now. Is this the
13 template that you folks came up with for these
14 employment evaluations?

15     **A. Yes.**

16     Q. Is there anything -- I'm not saying -- I
17 don't mean like missing. Is there like another
18 page to this as far as you remember?

19     **A. No. This is the template pulled from**
20 **another city department.**

21     **Again, we weren't trying to reinvent the**
22 **wheel. We wanted it to be simple straightforward**
23 **as a first effort for all involved. There was**
24 **another form that was for employees to kind of**

1 like evaluate, themselves.

2     **So there was an employee evaluation form**
3 **that was also a part of the process.**

4     Q. Do you remember receiving these back from
5 departments? I know there is a bunch of
6 departments. But do you remember getting them
7 back?

8     **A. Yes.**

9     Q. Do you remember whether the employee
10 feed-back forms were attached to those or whether
11 you got them?

12     **A. For the most part, yes. I can't speak to**
13 **every single employee. But yes, we did request**
14 **them back. And most employees returned them.**

15     Q. Do you remember whether you received one
16 back from Nick Barone?

17     **A. No, I don't. If we did, it would have**
18 **been placed in his file.**

19     Q. And that would be alongside this?

20     **A. It would have been. Should have been.**

21     Q. I want to walk through this. I don't mean
22 for it to be tedious or anything like that. But
23 so the first section here is called -- Section-1
24 is quality of work; do you see that?

1     **A. Yes.**

2     Q. And it looks like on the right -- it's
3 kind of hard to see, because I don't think it's
4 like circled. It's emboldened. It says that Nick
5 Barone met expectations; do you see that?

6     **A. Yes.**

7     Q. Would you agree, based on this, that
8 Nick's quality of work met expectations?

9     **A. According to his supervisor, it did, yes.**

10     Q. Did you have any reason to disagree with
11 that at the time?

12     **A. I wouldn't have any reason, because I**
13 **didn't directly manage him. So it was a**
14 **supervisor's responsibility to assess performance.**

15     Q. And similarly, it says that Nick Barone's
16 quality of work met expectation, right? I'm
17 sorry. Quantity of work met expectations; is that
18 what it says?

19     **A. Yes.**

20     Q. And you don't have any reason to disagree
21 with that, right?

22     **A. No.**

23     Q. The next section says that Nick Barone's
24 work habits met expectations; do you have any

1 reason to disagree with that?

2     **A. No.**

3     Q. The next section, it says that Nick was
4 dependable and took initiative. It says he met
5 expectations when it came to dependability and
6 initiative; do you have any reason to disagree
7 with that?

8     **A. No.**

9     Q. The next section says Nick Barone's
10 attendance record met expectations; do you have
11 any reason to disagree with that?

12     **A. No.**

13     Q. I know this is tedious. I'm sorry.

14     **A. I'm not going to disagree with anything.**

15     Q. It says that Nick had no occurrences of
16 tardiness. Do you have any memory of him having
17 trouble with tardiness, lateness, anything like
18 that?

19     **A. No, not him specifically. I know at one**
20 **point there was a question around the arrival and**
21 **departure times for the department as a whole.**
22 **But nothing specific to him.**

23     Q. It also says that he had no occurrences of
24 non-medically certified sick days. First of all,

Page 62

1  do you know what that means?  Non-medically
2  certified sick days?
3      A.  Yes.  If an employee calls out sick and
4  they do not provide a doctor's note, then it's
5  considered non-medically certified.  If an
6  employees calls out sick and they provide a
7  doctor's note, or if they have a medical
8  appointment, and they provide a doctor's note,
9  then it's considered certified.
10     Q.  So in this instance, you have no reason to
11 disagree that Nick had no non-medically certified
12 sick days; is that fair to say?
13     A.  I disagree with that.  This
14 supervisor's -- we weren't necessarily tracking
15 directly, because we would have had to pull system
16 reports to confirm which days were coded as sick
17 and which days were coded as certified sick.
18        So I am fairly certain that was just left
19 at zero.  I -- he called out on occasion just
20 sick.  I know for sure that he did.  Not a big --
21 not a problem.  But yes.  He definitely had, you
22 know, at least one or two days, where he just was
23 sick and couldn't come to work.
24     Q.  Fair to say that even considering that, he

Page 63

1  met expectations as far as attendance?
2      A.  Yes.  There was nothing excessive.
3      Q.  It says here that Nick exceeded
4  expectations with interpersonal abilities.  Do you
5  have any reason to disagree with that?
6      A.  No.
7      Q.  Was Nick courteous to you when you spoke
8  with him?
9      A.  Nick was lovely.
10     Q.  Okay.  And then it says here that Nick
11 Barone's personal disposition met expectations.
12 Do you see that?
13     A.  Yes.
14     Q.  Any reason to disagree?
15     A.  No.
16     Q.  I know I think you already sort of
17 testified to this.  Do you have any reports that
18 contradict any of these assessments that you are
19 aware of?
20     A.  No.
21     Q.  And this is dated December 22nd, 2021; do
22 you see that at the bottom?
23     A.  Yes.  I will just say, again, that there
24 was a question or a general concern, related to

Page 64

1  the whole department, regarding arrival and
2  departure times, especially coming out of Covid
3  with schedules being, you know, altered, but.
4      Q.  Do you remember, there has been testimony,
5  and there has been documents produced, that
6  archives employees, like badge swipe reports were
7  pulled; do you remember that at all?
8      A.  Yes.
9      Q.  Do you remember anything about Nick's, as
10 opposed to the other folks?
11     A.  No.  I actually did not look at the
12 reports.  I knew they were pulled by my colleague
13 and at the register's request.  I don't -- I don't
14 think I looked at them directly though.
15     Q.  Do you remember anyone commenting on
16 Nick's arrival times, as related to those swipe
17 reports?
18     A.  Not his specifically.  The conversation
19 around those reports were generalized to the whole
20 team, because they were in a separate building.
21 And just generally speaking, there was a question
22 around, "Okay.  It's hard to keep track of when
23 they are coming and going, because they are in a
24 different building," and you know, so.

Page 65

1      Q.  Was the colleague Emilio Di Gregorio?
2      A.  Yes.
3      Q.  Mr. Di Gregorio has testified that Nick's
4  were the most consistent scanning times; do you
5  have any reason to disagree with that?
6      A.  No.
7              MR. HATCHETT:  Objection to the
8         form of the question.
9              MR. CAPACETE:  You have the
10        answer, right?
11             THE COURT REPORTER:  Yes.
12             MR. CAPACETE:  Okay.
13 BY MR. CAPACETE:
14     Q.  Do you remember discussing the swipe
15 reports with Ms. Gordon at any point?
16     A.  I did not discuss them with her directly.
17     Q.  Do you remember hearing from anyone else
18 who did?
19     A.  No.  I know that Emilio pulled the swipe
20 reports.  And I didn't get in the weeds on kind of
21 what the data -- you know, what the data consisted
22 of.  I just knew that he was following up with
23 Tracey, regarding that piece.
24     Q.  So P-5, the performance review, do you

Page 66

1  remember receiving Nick Barone's performance
2  review specifically?
3      A.  Yes.  If it was in his file, I received
4  it.  I don't remember the day and time it was
5  submitted.  But I believe Tom submitted all of his
6  together.  I don't remember the exact day in time
7  they were submitted.  But if it was in his file, I
8  got it.
9      Q.  Do you remember discussing Nick Barone's
10 performance review with Ms. Gordon at any point?
11     A.  No.
12     Q.  Meaning you did not speak to her about
13 this report?
14     A.  No.
15     Q.  As far as you remember?
16     A.  No.
17     Q.  Did you discuss any other archives
18 employees performance reports with Ms. Gordon as
19 far as you remember?
20     A.  No.
21          MR. CAPACETE:  Mark this as P-6.
22
23
24

Page 67

1              - - -
2          (Whereupon, P-6 was marked for
3  identification.)
4              - - -
5  BY MR. CAPACETE:
6      Q.  I promise we are getting to the end.  I
7  know this is long.  I appreciate it.  All right.
8  I gave you P-6.  This is an e-mail from November
9  21st, 2021.  And it's from you to Tom Campion; is
10 that fair?
11     A.  Yes.
12     Q.  It says -- and this is about archives
13 daily sign-in sheets; do you remember implementing
14 those?
15     A.  Yes.
16     Q.  Do you remember the circumstances of
17 implementing that, you know, the reason why,
18 discussions, anything like that?
19     A.  Yes.  It was, again, tied to the general
20 concern or the overarching concern, related to the
21 team's arrival and departure times.
22          I believe there were just some -- maybe
23 some spot checks that were done.  I don't know who
24 or when.  But there was a concern that was raised

Page 68

1  around the team arriving at odd hours and leaving
2  at odd hours, so not working a full 7.5-hour day
3  or 8-hour day.
4          MR. CAPACETE:  One second.  Mitch,
5      are you still able to -- she just covered
6      the microphone.  I don't mean to.
7          THE WITNESS:  Oh, I'm so sorry.
8          MR. CAPACETE:  I know it's cold in
9      here.  I don't mean to.
10         THE VIDEOGRAPHER:  I'm sure it was
11     fine.
12         MR. CAPACETE:  Okay.  I'm sorry.
13         THE WITNESS:  Sorry about that.
14         MR. CAPACETE:  No, no, no.  You
15     are all good.  You are all good.  It is
16     cold in here.
17         THE VIDEOGRAPHER:  Can I stop you
18     for a second?
19         MR. CAPACETE:  Sure.
20         THE VIDEOGRAPHER:  Can we go off
21     the record?  I want to put in another
22     back-up tape.  We are now going off the
23     record at 11:13.
24

Page 69

1              - - -
2          (Whereupon, the following
3  discussion was held off the record.)
4              - - -
5          THE VIDEOGRAPHER:  We are back on
6      the record.  It's 11:17.
7  BY MR. CAPACETE:
8      Q.  We were looking at P-6.  Do you still have
9  that in front of you?
10     A.  Yes.
11     Q.  In the second paragraph, it says, "Please
12 meet with your team tomorrow morning, to inform
13 them of the new protocol for archives."
14         Was this a protocol that was generated
15 under Ms. Gordon's administration?
16     A.  Yes.
17     Q.  It also says, "Please scan and e-mail the
18 time sheet to Emilio and me at the end of each
19 day."  Do you remember whether you received these
20 reports for any period of time, any regularity?
21     A.  Yes.
22     Q.  Where would they have been kept?
23     A.  I saved the time sheets in a folder on my
24 desk in the office in my office.

Page 70

1    Q.  Were they maintained as far as you know,
2  like in a bigger file.  Did they go in
3  individual's files?
4    A.  I don't believe I moved them to individual
5  files.  I just kept them all together in a folder,
6  labeled archives time sheets.
7    Q.  Do you know whether -- this is going to be
8  weird language.  But do you know whether they were
9  archived -- not like in the sense of archives.
10  But like archived within The City at all?
11    A.  No, they weren't.
12    Q.  Okay.  Do you remember them just being
13  disposed of, anything like that?
14    A.  I did not dispose of them prior to my
15  departure.  So they would have been floating --
16  they would have been in my office.  I didn't move
17  or pack up files before I left, because they were
18  not specific.
19        You know, each time sheet had all of the
20  employees listed in order to file them.  We would
21  have had to create a copy for each person's file.
22  And I just never got around to it.  So I just kept
23  them all in that folder.
24    Q.  Do you remember seeing anything about Nick

Page 71

1  Barone's attendance that sits out to you?
2    A.  No.
3    Q.  You mentioned that this was made because
4  of sort of the arrival times and there were some
5  mix-ups at archives.  Is that a fair summary?
6    A.  Generally speaking, there were just
7  operational concerns with archives.  So there were
8  like -- that was the larger issue that we were
9  trying to address.
10        There were issues with the flow of
11  physical files from archives to City Hall, and
12  from City Hall, back to archives.  That whole
13  process was in question and needed to be reviewed
14  and revamped or refined.
15        So as a part of that, when there were
16  complaints, or concerns arose regarding the timing
17  for file delivery and stuff, that's how that came
18  up.  The wait a minute.  They are not even there.
19  Or you know, like so that was a part of the larger
20  issue.
21    Q.  The operational concerns, were any of
22  those specifically related to Nick Barone?
23    A.  No.
24    Q.  Do you remember whether he had any issues

Page 72

1  with bringing files to City Hall or taking them
2  from City Hall?
3    A.  Honestly, of the four or five employees on
4  the team, Nick was probably the most consistent of
5  that group.  So there weren't concerns specific to
6  him.
7    Q.  We talked earlier about the asking people
8  for contributions to Ms. Gordon's campaign and
9  that sort of stuff.  Do you remember us talking
10  about that?
11    A.  Yes.
12    Q.  Do you remember any discussion about
13  Nick's participation or lack of participation in
14  that?
15    A.  Yes.  Vaguely.
16    Q.  What do you remember about that?
17    A.  That he didn't contribute.
18    Q.  Who told you that?
19    A.  I don't remember.
20    Q.  Do you remember who it was discussed with
21  and in what context it was discussed?
22    A.  No.  I don't want to speculate.  I just
23  know that -- I don't want to speculate.  I don't
24  remember.

Page 73

1    Q.  Let me see if I can ask you some
2  questions.  Was Nick's name brought up in the
3  broader conversation about who didn't contribute?
4    A.  Not to me directly.  Indirectly, I know
5  that I heard mention of him being one of the
6  people that didn't contribute as well as another
7  employee in archives and, you know, a few other
8  people.
9        So it was indirect.  It was a small
10  office.  So there was always a ton of
11  conversation.  So indirectly, I did hear mention
12  of it.  I didn't know whether or not it was true.
13    Q.  And you don't remember who you heard
14  mention of it from?
15    A.  No.
16    Q.  Do you remember where you heard mention of
17  it?
18    A.  No.
19    Q.  Were you in the office?
20    A.  Yes.
21    Q.  And was that around November, December of
22  2021?
23    A.  I don't remember.  I don't remember.
24    Q.  So Nick was fired January 7th, 2022.  And

Page 74

1 I'm just trying to orient us here.  Do you
2 remember what -- how closely -- let me ask a
3 better question.  Nick was terminated January 7th,
4 2022.
5          Do you remember when, in relation to that
6 date, those -- you learned that he did not
7 contribute?
8     A.  There was a contribution date in December.
9 I don't remember the exact date.  But so the
10 contributions were kind of like attached to
11 attending a fundraiser or an event.
12          But in lieu of attending the event, there
13 was still kind of like the expectation or request
14 to contribute.  And there was a fundraiser, like
15 some event in December.
16          And I know that, that is why -- that's
17 where I heard some of the complaints from the HR
18 coordinator that employee shared with her, because
19 just the timing.  It was around the holidays.  And
20 people were like, "I don't have funds to
21 contribute now."
22     Q.  And that's when you remembered hearing
23 Nick's name brought up?
24     A.  Around -- it had to be around that time,

Page 75

1 because the event took place.  So it would have
2 been after I imagine.
3     Q.  Did you ever discuss that with Ms. Gordon?
4     A.  No.
5     Q.  Did you ever discuss any of those
6 contributions?
7     A.  No, no, no.
8     Q.  Did you participate in coming to the
9 decision to terminate Nick?
10     A.  No.
11     Q.  Were you part of the discussions leading
12 to that decision?
13     A.  No.
14     Q.  Did you recommend that Ms. Gordon should
15 fire Nick?
16     A.  No.
17     Q.  If Ms. Gordon said that you recommended
18 she fire Nick, would that be incorrect?
19     A.  That would be a lie.
20     Q.  If she said you were involved with the
21 decision to fire Nick, would that be a lie?
22     A.  That would be a direct lie.  Ms. Gordon
23 called me.
24          I believe if Nick was terminated on a

Page 76

1 Friday -- and this is just using it as an example.
2 She called me the day before and told me that his
3 last day was the next day.  "Nick's last day is
4 tomorrow.  Get it done.  And that's my final
5 decision.  And don't ask me any questions."
6          I remember that, because it was so -- it
7 was so matter of fact, that I was a little bit
8 taken aback.  And I said, "Okay.  Okay."
9          And I also remember specifically, when I
10 had to call Nick, because I think he had called
11 out sick that day.  I'm not 100 percent sure.  But
12 I know I talked to him over the phone.
13          And when I relayed the information to him,
14 he asked me -- he was like, "Why?"  He was
15 flabbergasted.  And he asked me, "Why."  And I
16 just remember specifically telling him that I'm
17 really sorry.  I don't have any other information.
18          So there is no way that she -- that I
19 recommended it or suggested it.  She called me and
20 told me to do it.
21     Q.  Were you surprised?
22     A.  Yes.
23          MR. HATCHETT:  Objection.  You can
24          answer.  You responded.

Page 77

1          THE WITNESS:  Sorry.
2 BY MR. CAPACETE:
3     Q.  Why were you surprised?
4     A.  Because I didn't -- there were no prior
5 conversations about Nick being terminated or there
6 being an issue with Nick to my knowledge.
7          Again, there were overarching issues with
8 the operations of archives.  But Nick, to my
9 understanding, was kind of like the strongest
10 person on that team.  So I just didn't expect
11 that.  So I was covering my --
12     Q.  Okay.  And to be clear, when Ms. Gordon
13 called you to inform you that tomorrow would be
14 Nick's last day, she didn't tell you any reason
15 why?
16     A.  No.  She told me not to ask her any
17 questions.
18     Q.  Was anybody else on the call?
19     A.  No.
20     Q.  If Ms. Gordon had asked you whether Nick
21 should have been fired that day, what would you
22 have said?
23          MR. HATCHETT:  Objection to the
24          form of the question.  You can respond.

Page 78

1          THE WITNESS:  She asked me if he
2     should be fired that day.
3              Well, she would have never asked
4     me.  Because -- but if she asked me, I
5     would have asked why.  Like, what is the
6     reason?  Why is there an issue.  Like,
7     that would have been my question.  Like,
8     "Did something happen?" is what I would
9     have asked.  And that's why she told me
10    not to ask her any questions I think, just
11    because, to kind of get away from that
12    whole conversation that would have likely
13    ensued.
14 BY MR. CAPACETE:
15    Q.  Did you ever learn why Nick was fired?
16    A.  No, not from her.  But again, there was a
17 lot of speculation and conversation around the
18 office, around the contribution piece that just
19 gossip and talk.
20    Q.  I'm sorry.  I didn't mean to cut you off.
21 Meaning, you heard in the office that the reason
22 he was fired was because he did not contribute to
23 her campaign?
24    A.  Yes.

Page 79

1    Q.  Do you remember who you heard that from?
2    A.  I don't.  That was a very chatty -- a
3 very, very chatty office.  People had worked there
4 for a long time.  There were a lot of close
5 relationships.  So I don't remember who.
6    Q.  Was it known throughout the office that
7 Nick was fired?
8    A.  I don't know if it was known throughout
9 the entire office.  People knew.  But I don't know
10 if everyone knew.
11    Q.  And you said it was chatty.  Were people
12 talking about it?
13    A.  I don't know that people were talking
14 about that.  Generally speaking, it was a small
15 office.  We had a lot of long-term employees.  So
16 information traveled very, very fast throughout
17 the office.
18    Q.  And do you remember whether the fact that
19 he was fired did reach folks in the office?
20    A.  I don't know.  I didn't talk to -- I
21 didn't talk to the employee population about it.
22 I interacted primarily on matters such as that
23 with the other senior staff in the office.
24        So I don't know who knew, because I didn't

Page 80

1 talk to everybody.  But the people immediately
2 close to me, Emilio, the other deputies that
3 worked in that -- the people -- the supervisors,
4 who worked directly with the archives department,
5 who needed to know, because they were directly
6 impacted, were aware.
7        So I had conversations with them.  They
8 needed to know, so.
9    Q.  Couple more minor things, and we'll be all
10 set.
11    A.  Yup.
12        MR. CAPACETE:  I'll mark this as
13    P-7.
14              - - -
15        (Whereupon, P-7 was marked for
16 identification.)
17              - - -
18 BY MR. CAPACETE:
19    Q.  I have handed you P-7.  Have you ever seen
20 this before?
21    A.  Yes.
22    Q.  Were you a part of drafting this letter?
23    A.  Yes.
24    Q.  Is it a form letter?  Is it something that

Page 81

1 was specifically come up with by Ms. Gordon.  I'm
2 just curious if it was like a stock letter or
3 something.
4    A.  It's a template that I created.  The
5 language was pulled from existing templates and
6 just my knowledge of what needed to be in it.  But
7 it was a template letter that we use for all
8 terminations, changing, dates, and names, and
9 like, you know, content to be specific to each
10 employee.
11    Q.  Do you remember any conversations
12 surrounding the generation of this letter with
13 Ms. Gordon?
14    A.  I am pretty sure that I asked her what his
15 separation reason should be, because she would
16 have needed to confirm that.  And I did not know.
17        And she confirmed that it was just an
18 assignment.  She asked what are the options, the
19 assignment is like complete, his job has ended.
20 So and that's not included in here.
21        But that's the conversation that I had
22 with her, regarding the letter, what his
23 separation should -- reason should be.
24

1          MR. CAPACETE:  And I have I think
2      a copy of that e-mail here.  This will be
3      P-8.
4                   - - -
5          (Whereupon, P-8 was marked for
6  identification.)
7                   - - -
8  BY MR. CAPACETE:
9      Q.  Is this the communication that you were
10  just describing about the reason code?
11      A.  Exactly, yes.
12      Q.  Okay.  I believe here, it shows, she said
13  to select exempt assignment complete.  What does
14  that mean?  You know, generally speaking?
15      A.  It's actually a code that we -- that is
16  used traditionally -- more traditionally used for
17  civil service positions, within the central HR
18  office.
19          For our purposes, it just translated to
20  it's an exempt position, and it's complete.  So we
21  used it loosely for that purpose.  I was told that
22  it's more specific to civil service employees
23  though.
24      Q.  Does this refresh your recollection as to

1  any other conversations you may or may not have
2  had, either with Ms. Gordon, or with any other
3  folks about Nick's termination?
4      A.  No.  I -- again, the only conversation
5  that I had with anyone prior to his termination
6  was the call that I got from Tracey the day
7  before, stating that his last day was the next
8  day.
9          And I mean I spoke to people afterwards,
10  but not prior to it.
11      Q.  So Emilio Di Gregorio said that you two
12  spoke; is that true?
13      A.  Yes.
14      Q.  Did you speak to anyone else that you
15  remember specifically about this?  Like, the
16  termination letter or the fact that you had just
17  done this?
18      A.  More likely than not, Shariff Roseboro,
19  who was copied on the e-mails, the HR coordinator.
20  I would have, you know, very likely spoken to her
21  about it, just because she was kind of like my
22  assistant and supported with processing to a
23  degree.
24      Q.  I believe at some point Nick was promoted

1  or transitioned from part-time to full-time; do
2  you remember that?
3      A.  Yes.
4      Q.  Was it that he was promoted or was it just
5  like some sort of other transitional phase?
6      A.  It's a status change.
7      Q.  Status change?
8      A.  Status change from a part-time to a full-
9  time employee.  Technically, it's a promotion,
10  because of, you know, more hours equals more
11  salary, benefits, et cetera.
12      Q.  Did his role at archives change with that
13  promotion?
14      A.  He worked more -- a few more hours.
15      Q.  Any like responsibilities?
16      A.  But the functions didn't change, no.
17      Q.  Okay.  And when Nick was terminated, he
18  was a full-time employee, right?
19      A.  Yes.
20      Q.  A permanent full-time is what he was
21  classified as?
22      A.  Yes.
23          MR. CAPACETE:  I just need a
24      minute to check my notes, but I think I am

1      pretty much done.
2          THE WITNESS:  Sure.
3          THE VIDEOGRAPHER:  We are now
4      going off the record.
5                   - - -
6          (Whereupon, the following
7  discussion was held off the record.)
8                   - - -
9          THE VIDEOGRAPHER:  We are back on
10      the record.  11:37.
11          MR. CAPACETE:  Thank you,
12  Ms. Collins, very much for being here.
13          THE WITNESS:  You're welcome.
14          MR. CAPACETE:  And your patience.
15  I have no further questions.
16          THE WITNESS:  You're welcome.
17  Thank you.
18          MR. HATCHETT:  I don't have any
19  questions, Ms. Collins.  Please just don't
20  discuss your testimony with anyone.
21          THE WITNESS:  I won't.
22          MR. HATCHETT:  Thank you.
23          THE VIDEOGRAPHER:  This completes
24      the deposition.  We are now going off the

Page 86

1    record at 11:37.
2             THE COURT REPORTER:  Would you
3    like a copy of the transcript?
4             MR. CAPACETE:  Yes.
5             MR. HATCHETT:  Yes.
6                  - - -
7             (Whereupon, the deposition
8    concluded at 11:36 a.m.)
9                  - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 87

1                  - - -
2         C E R T I F I C A T I O N
3                  - - -
4         I, Amanda Brooks, a court reporter and
5    commissioner of deeds, do hereby certify that the
6    proceedings and evidence are contained fully and
7    accurately in the stenographic notes taken by me
8    on Wednesday, November 13th, 2024, and that the
9    foregoing testimony was taken in shorthand by
10   myself and reduced to typing under my direction
11   and control and that this is a correct transcript
12   of the same.
13
14            *Amanda Brooks*
15            AMANDA BROOKS
16            Court Reporter
17            Commissioner of Deeds
18
19
20        (The foregoing certification of this
21   transcript does not apply to any reproduction of
22   the same by any means, unless under the direct
23   control and/or supervision of the certifying
24   shorthand reporter.)