# EXHIBIT J



Transcript of the Testimony of

**KEITH HARRIS**

November 26, 2024

**NICHOLAS BARONE**

*vs*

**TRACEY L. GORDON, et al.**

Reliable Court Reporting

Phone – 215-563-3363

Fax – 215-563-8839

www.reliable-co.com

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - -

| | |
|---|---|
| NICHOLAS BARONE, | : CIVIL ACTION. |
| Plaintiff, | : No. 2:23-cv-02821-MSG |
| vs. | : |
| TRACEY L. GORDON, individually, and CITY OF PHILADELPHIA, | : |
| Defendants. | : COPY |

- - -

Tuesday, November 26, 2024

- - -

       Videotaped Deposition of KEITH HARRIS, taken pursuant to notice, was held at COHEN, PLACITELLA & ROTH, P.C., Two Commerce Square, 2001 Market Street, Suite 2900, Philadelphia, Pennsylvania 19103, commencing at or about 10:48 a.m., before Tisa R. Francis, Court Reporter - Notary Public there being present:

- - -

Reliable Court Reporting
1650 Arch Street
Suite 2210
Philadelphia, Pennsylvania 19103
(215)563-3363

Page 2

```
 1   A P P E A R A N C E S:
 2
 3        COHEN, PLACITELLA & ROTH, P.C.
          BY:  MATTHEW A. CAPACETE, ESQUIRE
 4        Two Commerce Square
          2001 Market Street
 5        Suite 2900
          Philadelphia, Pennsylvania 19103
 6        (215)567-3500
          mcapacete@cprlaw.com
 7        Representing Nicholas Barone
 8
 9
10        MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN
          BY:  JAHLEE J. HATCHETT, ESQUIRE
11        2000 Market Street
          Suite 2300
12        Philadelphia, Pennsylvania 19103
          (215)575-2871
13        jjhatchett@mdwcg.com
          Representing Tracey L. Gordon and City of
14        Philadelphia
15
16
17
18
19
20
21
22
23
24   A L S O  P R E S E N T:
25   Deane Cartensen, Video Specialist
```

Page 3

```
 1                  I N D E X
 2   WITNESS                              PAGE
 3
 4   KEITH HARRIS
 5
 6   BY MR. HATCHETT                      5
 7   BY MR. CAPACETE                      7
 8   BY MR. HATCHETT                      27
 9   BY MR. CAPACETE                      48
10
11              E X H I B I T S
12   NUMBER         DESCRIPTION           PAGE
13   P-1            E-mail                14
```

Page 4

```
 1        THE VIDEOGRPAHER:  We are now on the
 2   record.  Today's date is November 26, 2024.
 3   The time right now is 10:48 a.m. Eastern
 4   Standard Time.
 5        This is the video deposition of Keith
 6   Harris in the matter of Nicholas Barone vs.
 7   Tracey L. Gordon and City of Philadelphia.  The
 8   Case No. for this matter is 2:23-cv-02821-MSG.
 9        This deposition is taking place with the
10   videographer appearing remotely.  All other
11   participants are attending in person.
12        My name is Deane Cartensen.  I'm the
13   videographer representing for Reliable Court
14   Reporting.  Will all counsel in the conference
15   please identify yourselves and state who you
16   represent, beginning with the questioning
17   attorney.
18        MR. HATCHETT:  Jahlee Hatchett, I
19   represent the Defendants in this matter.
20        MR. CAPACETE:  Good morning.  Matt
21   Capacete.  I represent the Plaintiff, Nick
22   Barone, in this matter.
23        MR. HATCHETT:  Counsel, before we get
24   started, can I just ask Mr. Harris a few
25   questions?
```

Page 5

```
 1        MR. CAPACETE:  Sure.
 2   BY MR. HATCHETT:
 3        Q.  Mr. Harris, good morning.  How are you?
 4        A.  I'm fine.  Good morning.
 5        Q.  We've met before in different capacities
 6   as part of depositions and lawsuits against Tracey
 7   Gordon and the City of Philadelphia, would you agree
 8   with that?
 9        A.  Yes.
10        Q.  As you sit here today --
11        THE VIDEOGRAPHER:  Sorry for interrupting,
12   sir.  I don't believe the witness has been
13   sworn in yet.
14        MR. HATCHETT:  That might be helpful.
15                       - - -
16        KEITH HARRIS, after having been first duly
17        sworn, was examined and testifies as follows:
18                       - - -
19        MR. HATCHETT:  Thank you.
20   BY MR. HATCHETT:
21        Q.  And, Mr. Harris, I was just asking you,
22   today as you sit here, are you under the influence
23   of anything that will prevent you from understanding
24   or participating in this deposition?
25        A.  No.
```

Page 6

1  Q. Okay. Mr. Harris, I just want to ask you,
2  you understand that you were previously employed by
3  the City of Philadelphia up until late this year.
4  Would agree with that?
5  A. Yes.
6  Q. And, at this point in time, you are
7  currently a state representative for the State of
8  Pennsylvania?
9  A. Yes.
10  Q. Okay. So no longer employed with the
11  City, right?
12  A. Correct.
13  Q. Mr. Harris, we do agree that, as part
14  of -- or do you understand, rather, as part of the
15  other lawsuits involving the City of Philadelphia
16  and Tracey Gordon, my office, Marshall Dennehey,
17  represented you in several different depositions
18  that you were participating in?
19  A. You represent me or the City?
20  Q. As part of -- so do you understand, as
21  part of a deposition, you have the right to have
22  counsel present to provide objections or take other
23  aspects on behalf of you being deposed, do you
24  understand that?
25  A. Okay. Yes.

Page 7

1  Q. And do you understand that I've previously
2  done that for you in different depositions?
3  A. Yes.
4  Q. All right. As you sit here today, it is
5  my understanding that you are declining my office
6  and me from representing you in this deposition; is
7  that accurate?
8  A. Correct.
9  Q. Okay. Do you also understand, prior to us
10  going on the record today, I explained to you what
11  my representation would consist of, and you
12  understand what I would be able to do for you as
13  part of the deposition?
14  A. Yes.
15  Q. Okay. And as a result of that
16  conversation, you're okay to go forward without my
17  representation in this deposition?
18  A. Yes.
19     MR. HATCHETT: Okay. Thank you,
20  Mr. Harris.
21  BY MR. CAPACETE:
22  Q. All right. Good morning, Mr. Harris.
23  A. Good morning.
24  Q. You and I spoke on the phone scheduling
25  this deposition, right?

Page 8

1  A. Yeah.
2  Q. I understand you've had your deposition
3  taken at least twice with matters relating to the
4  City of Philadelphia and the former Register of
5  Wills, Tracey Gordon; is that correct?
6  A. That's correct.
7  Q. Those two dates would be April 4, 2024 and
8  August 27, 2024. Does that sound correct?
9  A. If the record reflects that.
10  Q. Those where in the matters of Pat
11  Parkinson and Mark Wilson. Does that sound right?
12  A. Yes.
13  Q. Probably give you a very brief refresher
14  on the instructions. I'm sure you're familiar. All
15  your answers have to be out loud, verbal. Nods of
16  the head, shakes of the head I understand, but the
17  record will need to reflect a verbal answer. Okay.
18  A. Sure.
19  Q. If you don't remember something or you
20  don't know something, that's fine, just let me know.
21  Perfectly fine answer. I may follow up, but it's
22  not to -- you know, it's just to make sure I exhaust
23  the extent of your knowledge. Okay.
24  A. Correct.
25  Q. All right. So I -- in 2021, you were the

Page 9

1  Special Assistant to the Register of Wills, Tracey
2  Gordon; is that correct?
3  A. Yes.
4  Q. Under Ms. Gordon's administration, did you
5  hold any other positions or titles?
6  A. No. I just frequent other departments,
7  but I was still special assistance. You know, just
8  conflict resolution, stuff like that, like, in
9  different departments.
10  Q. Different departments within the Register
11  of Wills office?
12  A. Yes. Marriage license or marriage records
13  or could have been the Orphans Court. Not Orphans
14  Court, it was inheritance tax.
15  Q. Would Archives be one of those
16  departments?
17  A. I never sat in there. I've been there
18  occasionally just to...
19  Q. Understood. So you've gone to the
20  Archives Department as part of your job as a Special
21  Assistant --
22  A. Right.
23  Q. -- you just never held a position within
24  that department?
25  A. Numerous times, yeah.

Page 10

1  Q. Okay. Are you familiar with Nick Barone?
2  A. I am.
3  Q. Did you work with Nick Barone at the
4  Register of Wills office?
5  A. Not directly. You know, we had basketball
6  games as a department. So we, you know, was on the
7  court together. I've sat with him.
8  Q. Was he any good?
9  A. Yeah. He was excellent for a heavy guy.
10 Yeah, he got a killer jump shot.
11 Q. Yeah.
12 A. Yeah.
13 Q. So, I guess, it's fair to say you guys
14 both worked at the Register of Wills office at the
15 same time?
16 A. Yes.
17 Q. Did you ever go to Archives and interact
18 with Nick during your time there?
19 A. Yeah.
20 Q. Will you tell me a little bit about the
21 nature of why you would go to Archives during that
22 time?
23 A. Well, I've been there with the Register of
24 Wills, um, i.e., Tracey Gordon. And, you know, just
25 to -- so she would talk to them, sometimes

Page 11

1  discipline them. Or sometimes I would just go by
2  myself and just check, make sure, you know, things
3  are going smooth, wasn't any conflicts amongst --
4  amongst the employees.
5  Q. Do you remember ever disciplining Nick
6  Barone?
7  A. No.
8  Q. Do you remember Ms. Gordon ever
9  disciplining Nick Barone?
10 A. Yes.
11 Q. Tell me about that.
12 A. She didn't think the work was efficient
13 enough. Like, the transfer across certain some
14 departments as far as -- like, they were the Records
15 Department, which is called Archives. And they
16 would, you know, transfer -- take records to Orphans
17 Court, marriage license for copies or depositions
18 within a court system so for inheritance tax. Not
19 inheritance tax, Orphans Court.
20 Q. So was that a disciplinary action towards
21 Nick specifically or was it toward the department?
22 A. The department.
23 Q. Do you remember Ms. Gordon ever
24 specifically disciplining Nick Barone?
25 A. No, just it was the department in general.

Page 12

1  It was everybody. Mark Wilson, Tom Campion and
2  Chris -- I forget Chris last name.
3  Q. Would that be Chris Guest?
4  A. Yes.
5  Q. Do you remember any specific instances
6  where Mrs. Gordon talked about Nick Barone's
7  performance at Archives?
8  A. Not in particular. Not him personally.
9  Just the overall department she had just said, you
10 know, some names, you know.
11 Q. Did you ever talk to her about Nick Barone
12 specifically?
13 A. No.
14 Q. And I'm not just talking about
15 disciplinary action. Just generally speaking, did
16 the two of you ever discuss Nick Barone?
17 A. No.
18 Q. I've read your previous deposition
19 transcripts. And so I'm gonna try to be a little
20 efficient, not cover all the same ground, okay. I
21 believe in your past deposition testimony you
22 testified that Tracey Gordon asked you to solicit
23 campaign contributions from the employees at the
24 Register of Wills office; is that correct?
25 A. She did.

Page 13

1  Q. That would happen at work; is that
2  correct?
3  A. Yes.
4  Q. And would that be on behalf of Tracey
5  Gordon's reelection campaign?
6  A. I would say so.
7  Q. Did you -- you were the Special Assistant.
8  Did you also work for her campaign?
9  A. I did.
10 Q. Did you understand that, when she asked
11 you to solicit those campaign contributions, that it
12 was for the campaign?
13 A. Yes, but I would never do it.
14 Q. I think you testified that she -- you kept
15 telling her that she should not do it, meaning,
16 solicit campaign contributions from employees. And
17 you would tell her that she was putting people under
18 pressure. Does that sound correct?
19 A. That's correct.
20 Q. Do you remember individuals expressing to
21 you that they felt under pressure from this
22 solicitation?
23 A. Yes.
24 Q. Do you remember whether Nick Barone ever
25 told you that?

Page 14

1     A.   He said it.
2     Q.   So is it fair to say, that Nick Barone
3 felt pressure to donate to Ms. Gordon's campaign?
4         MR. HATCHETT:  Objection to the form of
5     the question.
6         THE WITNESS:  Yes.
7 BY MR. CAPACETE:
8     Q.   Do you know whether Nick ever donated to
9 Ms. Gordon's campaign?
10    A.   I never seen a list where anybody ever
11 donated.
12    Q.   Did you ever learn that he did or did
13 not --
14    A.   No.
15    Q.   -- with or without a list?
16    A.   I didn't.
17    Q.   I have --
18             - - -
19    (Exhibit P-1 was marked for identification.)
20            - - -
21 BY MR. CAPACETE:
22    Q.   And, sir, I just handed you -- I marked it
23 as P-1. Do you see that there?
24    A.   Okay.
25    Q.   And this is a text from Keasha Trawick to

Page 15

1 Ms. Gordon and yourself. Do you see that?
2    A.   Yes.
3    Q.   Sir, this text message says, Tracey asked
4 me to get the list of individuals that did not
5 contribute.
6    A.   Mm-hmm.
7    Q.   Do you remember receiving this text
8 message?
9    A.   I don't.
10    Q.   Do you remember whether you felt
11 comfortable receiving this text message or whether
12 you felt pressured to deal with these individuals on
13 this list?
14    A.   I always felt pressured. Yes, I felt
15 pressured.
16    Q.   And would it be fair to say you felt
17 pressured to solicit contributions from the
18 individuals that did not contribute?
19    A.   I felt pressure for her asking me. But I
20 would never do it because I knew it was unethical.
21    Q.   Would Ms. Trawick ask you to locate the
22 individuals that did not contribute and ask for
23 donations?
24    A.   No, she would say the same thing. She
25 felt like she -- she never -- she told me personally

Page 16

1 she never would give her the list.
2    Q.   Did Ms. Gordon ask for the list of
3 individuals who did not contribute?
4    A.   Yes.
5    Q.   Do you know whether Ms. Gordon ever
6 learned that Nick Barone had not contributed?
7    A.   I don't.
8    Q.   You never had a discussion with her about
9 that?
10    A.   No.
11    Q.   Now, we've heard testimony that there was
12 a list that existed in 2021. Would it be fair to
13 say that you felt pressured at that time as well to
14 solicit contributions from those who did not
15 contribute?
16    A.   Yes.
17    Q.   Were you aware that a list of individuals
18 that did not contribute to Ms. Gordon's campaign
19 existed in 2021?
20    A.   I've heard of it.
21    Q.   Where did you hear of it?
22    A.   I've heard it from Keasha.
23    Q.   And to be clear, your testimony is that
24 you did not ever see the list?
25    A.   Never seen it.

Page 17

1    Q.   Did you know whether Nick Barone was on
2 that list?
3    A.   I don't.
4    Q.   At the time, did you ever learn that Nick
5 Barone was on the list of individuals who had not
6 contributed to Ms. Gordon's campaign?
7    A.   No.
8    Q.   What was your relationship like with
9 Ms. Trawick?
10    A.   We had a cozy relationship.
11    Q.   Was it friendly, was it cordial?
12    A.   It was mostly friendly.
13    Q.   Did you find Ms. Trawick to be a competent
14 employee?
15    A.   She was.
16    Q.   We heard testimony from Ms. Gordon that
17 Ms. Trawick had trouble with drugs, that for some
18 reason affected her truthfulness, her
19 trustworthiness. Do you have an opinion on that?
20    A.   That was never confirmed.
21    Q.   Do you believe Ms. Trawick to be a
22 truthful person?
23    A.   I do.
24    Q.   Do you believe her to be a trustworthy
25 person?

Page 18

1   A.   Yes.
2   Q.   Was that true in 2021 as well?
3   A.   Yes.
4   Q.   And was that still --
5        MR. HATCHETT:  I'm sorry.
6        MR. CAPACETE:  Go ahead.
7        MR. HATCHETT:  I was gonna say, the
8   questions came in rapid succession.  I just
9   want to place an objection on the record to the
10  form of the last two or three questions
11  regarding Ms. Trawick's truthfulness.
12       MR. CAPACETE:  Sure.  No problem.
13  BY MR. CAPACETE:
14  Q.   Would that still be true today?
15  A.   I mean, we don't engage, but I would say
16  so.
17  Q.   Okay.  You never observed drugs or
18  anything like that affecting her work?
19  A.   Not at work.
20  Q.   So it's fair to say, Ms. Trawick's work
21  was no affected by any allegations of drug use?
22  A.   I don't believe so.
23  Q.   Did you ever hear about an incident
24  between Mark Wilson and Nick Barone fight or
25  anything like that?

Page 19

1   A.   No, not them two.
2   Q.   Did you ever hear any indent of Nick
3   Barone fighting with anyone at Archives?
4   A.   Not physical fight, but him and Tom
5   Campion had words.
6   Q.   Were those words able to be settled
7   amicably?
8   A.   Yes.
9   Q.   Did it affect Nick Barone's work
10  performance, as far as you know?
11  A.   I mean, the whole thing was volatile.  I
12  mean, I would go down there as a Special Assistant
13  and try to just, um, navigate through some
14  temperaments.  And, you know, they would, you know,
15  come together and -- and just have a peaceful
16  resolution.  And --
17  Q.   Go ahead.  I'm sorry.  I didn't mean to
18  cut you off.
19  A.   It just stems from pressure, like, you
20  know what I mean about, you know, um -- about work
21  being disseminated from one department to another,
22  you know.  And so Wayne was in charge of Orphans
23  Court.  So Tom, they didn't think that he moved fast
24  enough.  And then everybody in the department would
25  get caught up into that debacle, so it kind of was

Page 20

1   everybody felt so much pressure on them.
2   Q.   So the interactions that we talked about
3   between Nick and Tom, those were not unique to Nick;
4   is that fair to say?  Meaning, the other folks in
5   Archives had similar interactions with Mr. Campion?
6   A.   No.  Tom, he was the supervisor.  So just
7   everybody just felt pressure on, you know, the whole
8   department about, you know, information that's being
9   transferred to different departments, to City Hall.
10  Q.   And I think you said that Nick and Tom had
11  words that you helped amicably and peacefully
12  resolve, was that true or not?
13  A.   Not them two in particular, but just all
14  three of them, Chris, Nick and Mark, you know, with
15  Tom they felt pressure.  Because, you know, Tom was
16  a supervisor.  And they had to get the work to, you
17  know, whatever happened, you know, between that.  So
18  all of them would just get caught up into that.
19  Q.   So these incidents would be between all
20  the folks at Archives, not just Nick Barone; is that
21  fair to say?
22  A.   Yes.
23  Q.   You testified in August that Ms. Gordon
24  also asked you to walk around the office to solicit
25  contributions from people.  Do you remember

Page 21

1   testifying to that?
2   A.   Yes.
3   Q.   Is that still correct?
4   A.   Yes, it's correct.
5   Q.   You also testified that Ms. Gordon
6   solicited contributions from employees at the
7   Register of Wills office; is that still correct?
8   A.   Well, she would send people around.  Like,
9   she wouldn't do it herself.
10  Q.   Did she send -- who did she send around to
11  collect contributions?
12  A.   Uh, Keasha.  It was just paper, though.
13  It was just the flyer.
14  Q.   You testified previously that employees
15  felt like their jobs were on the line if they did
16  not donate; is that still true?
17  A.   Yes.
18  Q.   May I take from your deposition that you
19  understood employees at the Register of Wills office
20  to feel like their jobs were on the line if they did
21  not donate to the campaign?
22  A.   I insinuated that because they felt
23  pressured if they didn't.
24  Q.   That was your -- the understanding you
25  developed by talking to people?

Page 22

1  A. Assessment, yes. Mm-hmm, yes.
2  Q. And I believe you testified that some
3  people, some employees at the Register of Wills
4  asked you, am I going to get fired if I don't
5  donate?
6  A. Yeah.
7  Q. Sir, were you aware that Nick Barone was
8  fired on January 7, 2022?
9  A. The exact time, no.
10 Q. Do you remember learning that Nick Barone
11 had been fired?
12 A. Yes.
13 Q. Do you remember having any conversations
14 with Ms. Gordon about Nick Barone's firing?
15 A. I was very upset about it, yes.
16 Q. Tell me about the conversation you had
17 with her.
18 A. I asked her, I said, why did you -- you
19 know, I said, so you took me out of the conversation
20 between, you know -- during the process of your
21 contemplating being fired -- firing Nick. But he --
22 you know, and I said that I don't even believe Nick
23 even have a write-up and you would fire him, you
24 know what I mean, because, you know, he got caught
25 up into the debacles of office pressure and you

Page 23

1  would -- you know, why would you do that. And, you
2  know, so she was like, mind your business.
3  Q. By debacle of office pressure, are you
4  referring to the pressure to donate to Ms. Gordon's
5  campaign?
6  A. That's some of it, maybe. I would say
7  that's some of it.
8  Q. Did you ever learn that Nick Barone was
9  fired, at least for some part, related to his
10 refusal to donate to Ms. Gordon's campaign?
11 A. I mean, I don't think that was directly.
12 It was just everything together, maybe.
13 Q. Was one of those things that Nick Barone
14 did not donate to Ms. Gordon's campaign?
15 A. Perhaps.
16 Q. You said perhaps?
17 A. Mm-hmm.
18     MR. HATCHETT: You have to -- again, I
19     can't -- well, I won't instruct you. But for
20     purposes of the stenographer, we need an
21     audible answer, Mr. Harris.
22     THE WITNESS: I mean, it could have been
23     some of it. I mean, it's just the pressure of
24     the office -- it is the pressure of the
25     offices, procedures of disseminating

Page 24

1  information to the different various
2  departments within the Register of Wills in
3  City Hall and also contributions.
4  BY MR. CAPACETE:
5  Q. Contributions to Mr. Gordon's campaign,
6  right?
7  A. Yes. So everything just got convoluted
8  together.
9  Q. So may I take from your deposition that,
10 Mr. Barone's failure to contribute to Ms. Gordon's
11 campaign was one of the reasons for his termination?
12 A. I can't definitively say that.
13 Q. Okay. Did you ever talk to anyone about
14 that?
15 A. No.
16 Q. Did you have any discussion -- I think you
17 said you were taken out of the conversation. Did
18 you have any discussions with Ms. Gordon about
19 whether or not she was going to fire Nick Barone
20 beforehand?
21 A. Not particularly him, just everybody, the
22 whole Archives, you know. And I -- you know, I
23 and...
24 Q. Was part of that discussion the
25 contributions that we've been discussing?

Page 25

1  A. Yes.
2  Q. You also mentioned that Nick had no
3  write-ups. May I take from your deposition that
4  you're unaware of any disciplinary action against
5  Nick Barone at the Register of Wills office?
6  A. Correct.
7  Q. You said you were very upset about his
8  termination. Would you say Nick was a good worker?
9  A. Yes, he was.
10 Q. Was did he -- you ever see him be
11 insubordinate to Ms. Gordon?
12 A. No.
13 Q. Did you ever discuss Nick Barone's
14 termination with anyone, other than Ms. Gordon?
15 A. No.
16 Q. Do you remember, was it known within the
17 Register of Wills office that Nick Barone had been
18 fired?
19 A. Yes.
20 Q. Did people talk about it afterward?
21 A. I mean -- I mean, people would mumble. I
22 mean, you know -- because, I mean, everybody was
23 under a barrage of threat, like, including myself,
24 you know. So, you know, it was a bad atmosphere
25 so...

Page 26

1    Q.   Was part of the -- you said everyone was
2 under a barrage of a threat. Was part of that
3 threat having to do with folks who had not
4 contributed to Ms. Gordon's campaign?
5    A.   Some of it.
6    Q.   So Nick Barone was fired -- I'll represent
7 to you Nick Barone was fired January 7, 2022. Tom
8 Campion, Mark Wilson were each fired in July of
9 2022. Do you know or did you ever learn why Nick
10 was fired first before the others?
11    A.   I don't.
12    Q.   You never had a discussion with anyone
13 about that?
14    A.   No. Well, assessment it was a process.
15 It was, just, you know, I guess, just the process of
16 elimination. I mean, I don't know. But, no, I
17 don't know why he was fired first.
18    Q.   There was a performance review in
19 December 2022 of everyone at the Register of Wills
20 office. Do you remember that?
21    A.   Performance of whom?
22    Q.   Like, employee performance, evaluation
23 that was conducted. Do you remember that?
24    A.   I don't think so.
25    Q.   I'll represent to you that Nick Barone's

Page 27

1 performance review indicated he met or exceeded
2 expectations in each category. Do you have any
3 reason to disagree with that?
4    A.   No.
5    Q.   Have we talked about any conversation you
6 remember having about Nick Barone during your time
7 at Register of Wills?
8    A.   I mean, with Tracey Gordon, yeah. Like I
9 said, I was a little dismayed about, you know, his
10 termination.
11    Q.   How about other people, discussions with
12 other folks that were there like Charmaine Collins,
13 Shariff Roseboro, Emilio De Gregorio, anybody like
14 that?
15    A.   No. I mean, I didn't play second general.
16 I was under threat, too. So, no, I just didn't --
17 something happened, I just let it go.
18       MR. CAPACETE: I don't have any other
19    questions. Jahlee may have some for you.
20 BY MR. HATCHETT:
21    Q.   Mr. Harris, are you -- do you still speak
22 to Ms. Gordon?
23    A.   No.
24    Q.   When was the last time you spoke to
25 Ms. Gordon?

Page 28

1    A.   Probably right after she lost the
2 election.
3    Q.   So we're talking about the --
4    A.   November.
5    Q.   November of 2023?
6    A.   Mm-hmm.
7    Q.   Is that a "yes" or a "no"?
8    A.   Yes.
9    Q.   Okay. In terms of -- I want to make sure
10 I understand your deposition testimony today. In
11 terms of your understanding of why Mr. Barone was
12 terminated, are you saying that he was terminated in
13 part because he didn't contribute to Ms. Gordon's
14 campaign and part because there were issues in the
15 Archives unit?
16    A.   Probably together, yes.
17    Q.   Okay. And is it also your testimony today
18 that, you've never had any conversations with
19 Ms. Gordon concerning her termination of Mr. Barone?
20    A.   Yeah, we had conversations about it. But
21 not in -- we talked about -- I brought it up why did
22 you fire Nick.
23    Q.   Okay. And what was her response?
24    A.   None of your business.
25    Q.   Okay. So based on that, you were able to

Page 29

1 conclude that Ms. Gordon fired Mr. Barone because of
2 his lack of contribution?
3    A.   Some of it, maybe. Some of it.
4    Q.   Okay. As you sit here today, is it your
5 testimony that you don't know whether or not
6 Mr. Barone contributed to Ms. Gordon's campaign?
7    A.   I don't.
8    Q.   Okay. And as you sit here today, it's
9 your testimony you've never seen a list of who
10 contributed to Ms. Gordon's campaign?
11    A.   No.
12    Q.   Okay. You also testified -- I believe
13 your testimony was that Mr. Barone was an excellent
14 employee?
15    A.   He was, I thought so.
16    Q.   Okay. How many of his performance
17 evaluations did you review?
18    A.   Um, actually, I didn't review any. I
19 don't do that. Evaluations was coming out. I
20 didn't look at anyone's revaluations. And then,
21 just for the record, when me and Ms. Gordon spoke --
22 speak -- when I won election, the state rep, she
23 sent me a congratulatory text and it took me a long
24 to --
25    Q.   You didn't text back, did you?

Page 30

1    A.   Took me a while to do it.  Somebody said
2 you should just say thank you.  I was like, I don't
3 see a need to do that.  But I did it after a few
4 months.  I just said as a courtesy, thank you.
5    Q.   That's because your wife made you do it,
6 right?
7    A.   Yeah.
8         MR. CAPACETE:  Objection.  Actually, just
9    let him finish the answer.
10        THE WITNESS:  Yeah.  My wife did ask me to
11   do it, yeah.
12 BY MR. HATCHETT:
13   Q.   Okay.  Other than your wife asking you to
14 do it, you wouldn't have text Ms. Gordon back,
15 right?
16   A.   I wouldn't, no.
17   Q.   Now, my question, though, was:  How many
18 of Mr. Barone's evaluations did you see?
19   A.   None.
20   Q.   Okay.  So how were you able to determine
21 what kind of employee Mr. Barone was?
22   A.   Because I -- you know, when I went to the
23 Archives or we engaged, like, when we get to
24 basketball and everybody was so happy with one
25 another, it's coworkers, everybody just -- um, just

Page 31

1 came together at those events.  And then when I went
2 with Ms. Gordon and also by myself as a Special
3 Assistant, it just seemed, you know, he just did
4 everything that was expected him of to do.
5    Q.   So you determined his effectiveness as an
6 employee based on his basketball skills; is that
7 your testimony?
8         MR. CAPACETE:  Objection.
9         THE WITNESS:  As an evaluation of going
10   down to Archives.
11 BY MR. CAPACETE:
12   Q.   Okay.  How many times did you personally
13 see Mr. Archives work in the Archives unit?
14   A.   I went down there, I guess, 10, 15 times
15 maybe.  I don't know definitively the number.  I
16 would just pop-up.  I wouldn't give no warning.  I
17 just would pop-up.  Because I had a key card I could
18 just walk right in, you know what I mean.  He would
19 be at work.  He would be, you know, pulling records
20 or he would be at his desk.  You know, and I thought
21 that we would talk and -- not him, per se, but
22 everybody, we'll talk, just conversate.  Office
23 conversation asking, you know, how you guys doing,
24 you know, you don't -- you gotta get this work out
25 to Wayne and Tom.  You don't want any to get

Page 32

1 together or talk, you know, about the work.  Y'all
2 ain't gotta be friends out of work.  Everybody can't
3 get caught in your -- you know, whatever
4 disagreements you and Tom and Wayne has, like, you
5 know what I mean.  And then with Nick and Mark and
6 Chris and, you know, we just would have a
7 conversation.  They'll be working while I'm there
8 talking, you know what I mean.  Or we'll just sit
9 down, you know, once, I guess, they disseminated
10 whatever they needed to do and we'll just have a
11 conversation about, you know, office protocols and
12 things like that.  So I thought he didn't show any
13 signs of being disenchanted to me, like, you know
14 what I mean.  We just go to work.
15   Q.   So, Mr. Harris, there's a couple different
16 questions.  For one, my question was in terms of,
17 have you ever seen Mr. Barone perform his duties?
18   A.   Yes.
19   Q.   Okay.  What were his duties?
20   A.   His duty was to retrieve records from the
21 Records Department and Archives and, you know what I
22 mean, send them through -- well, at first it
23 wasn't -- you couldn't scan them.  They had to be
24 stacked up and somebody had to physically take them
25 down to City Hall.  So he would pull the records

Page 33

1 while I'm witnessing him pull the records.  Or you
2 get the records in order, you know, and on his desk.
3 And then, you know, things like that.  That's what
4 basically consist of his job, or to put the files
5 back in place.
6    Q.   So you watched Mr. Barone either pull
7 records or put files back 10 to 15 times?
8    A.   Yeah, yeah, when I was there.  Yeah, when
9 I was there.  He wouldn't just jump up when I'm
10 there.  He would be working while I come in, he
11 had -- because I didn't go there to personally
12 evaluate him.  But I would witness, you know,
13 everybody working while I was there, you know what
14 mean.  And as I come there, we'll just sit down.
15 Because -- you know, because then we just end up
16 having a conversation.  I witnessed him work.
17   Q.   Okay.  And how long did you work in the
18 Register of Wills office when Mr. Barone worked in
19 the Register of Wills office?  How long did your
20 employment overlap?
21   A.   Well, we were working two different
22 departments.  Archives is on 6th and Spring Garden
23 and I was working at City Hall office.  So we didn't
24 work everyday.  We didn't work together, you know.
25   Q.   So how can you say what kind of employee

Page 34

1 he was?
2    MR. CAPACETE: Object to form. You can
3    answer.
4    THE WITNESS: Well, when I would go in the
5    office I, would just evaluate, you know,
6    visually, you know, he's doing his job.
7 BY MR. HATCHETT:
8    Q. Okay. Ten to 15 times?
9    A. Yeah, I would say some might be more than
10 that. You know, I ain't -- but I don't have to --
11    MR. CAPACETE: Objection.
12    THE WITNESS: -- defend the guy.
13 BY MR. CAPACETE:
14    Q. In order to know kind of work --
15    A. Yeah, I thought he was doing his job, I
16 mean.
17    Q. Okay.
18    A. I thought everybody was doing their job.
19    Q. Did you have any conversations with Tom
20 Campion about Mr. Barone's performance?
21    A. No.
22    Q. Are you aware of the fact that Tom Campion
23 was Mr. Barone's supervisor for a period of time?
24    A. Yes.
25    Q. Are you aware of the fact that

Page 35

1 Mr. Parkinson, Patrick Parkinson, was Mr. Barone's
2 supervisor for a period of time?
3    A. Yes.
4    Q. Did you have any conversations with Mr.
5 Pat Parkinson about Mr. Barone's performance?
6    A. No.
7    Q. Did you do anything to prepare for your
8 deposition today?
9    A. No.
10   Q. All right.
11   A. Oh, no.
12   Q. All right. Mr. Harris, what's your
13 educational background?
14   A. I have a certificate in liberal arts from
15 Community College.
16   Q. Okay. Any other educational background
17 outside of that, not talking about high school?
18   A. No. Well, I had, um, uh, 235, you know
19 what I mean. Just license to carry a gun for
20 Homeland Security as a contract officer, um, in
21 federal buildings, things like that. Um, that's
22 about it.
23   Q. Okay. So you did some law enforcement.
24 I'm gonna call it law enforcement, but I don't want
25 to mischaracterize it. You worked in law

Page 36

1 enforcement for a period of time?
2    A. As a contract officer for Homeland
3 Security, yes.
4    Q. Okay. How did you come to be employed by
5 the Register of Wills office?
6    A. Well, I was a Sergeant of Arms [sic] of
7 City Council. And then Tracey Gordon offered me a
8 position and -- with the Register of Wills, and so I
9 accepted that. It paid more. And I was on a
10 trajectory to retiring. So I said, okay, I'll take
11 the job with her. And, um, that's how I became
12 employed in the Register of Wills.
13   Q. Who did you work for in City Council?
14   A. Darrell Clark.
15   Q. How did you come to obtain that position
16 with Darrell Clark? Was that a kind of, like, a
17 political hire or you just submitted an application?
18   A. No, no. I was in the field during his
19 reelection. I've done that for him for numerous
20 elections.
21   Q. It was some kind of political capacity?
22   A. Yes.
23   Q. What capacity?
24   A. It was a capacity of I helped him, you
25 know, on the ballot. And I told him that, listen,

Page 37

1 you don't have to pay me, just -- I'm gonna apply
2 for the job. So he offered the Sergeant of Arms
3 [sic] job.
4    Q. Let me understand this. You helped
5 Darrell Clark, former Council President, get on the
6 ballot, he gets elected and then you get a job?
7    A. Yeah. It's Patronage.
8    Q. Okay. That -- you know what, I'll go with
9 that, patronage. You got your position in City
10 Council due to political patronage?
11   A. Sure.
12   Q. Okay. And, at that time, were you a
13 committee person, ward leader or some other aspect?
14   A. I was a community person and vice -- his
15 vice chair of 28th Ward.
16   Q. Okay. And then you get your job in the
17 Register of Wills through political patronage as
18 well?
19   A. I was a ward -- a ward leader at the time
20 then.
21   Q. Okay.
22   A. No, I wasn't. Not that. Not then, but,
23 yes.
24   Q. Okay. And then you currently -- you're a
25 state representative as we previously established,

NICHOLAS BARONE vs
TRACEY L. GORDON, et al.

KEITH HARRIS

Page 38

Page 39

Page 40

Page 41

**Page 38**

1 right?
2   A.   Yes.
3   Q.   How did you come to get that position?
4   A.   Well, I was a ward leader, and the young
5 state representative stepped down unexpectedly. And
6 the numbers just added up. And the trajectory was
7 swinging in my direction and I accepted the
8 nomination.
9   Q.   I don't know what you mean when you say
10 the numbers added up. Can you explain?
11   A.   So -- so -- so the ward leaders
12 nominate -- so when you're past the primary in
13 election, right, then the ward leaders through
14 the nomi -- they nominate a candidate. So I went
15 through a nomination process with three other
16 candidates. And since I had the majority of the
17 divisions amongst the wards, which I think was 57.
18 The 32 divisions amongst six wards. I became the
19 democratic nominee of the City of Philadelphia for
20 the 195th State District.
21   Q.   Okay. And then there was a -- was there a
22 formal election?
23   A.   Yes.
24   Q.   Okay.
25   A.   Special elections.

**Page 39**

1   Q.   Special election. And were there any
2 other individuals running for that position?
3   A.   Not on the ballot. The nominee process
4 was -- the primary process was over, so it became a
5 ward leader selection. So we went through that
6 process, like I said. And then that's how I became
7 the nominee and to get on the ballot for the
8 candidacy.
9   Q.   What are the -- what does being a state
10 representative entail?
11   A.   What does that have anything to do with
12 this deposition?
13   Q.   The purpose of a deposition, Mr. Harris,
14 you and I, we've have been through a few of them
15 together, is find out information.
16   A.   This doesn't have anything to do with the
17 Tracey Gordon and her employee situation. I don't
18 see what that has to do with anything by what
19 happened my being a state legislator. I'm not a
20 City employee anymore. And I think that it's just
21 kind of insultive [sic] just to even ask me all
22 that, um, um, about that.
23   Q.   Mr. Harris, I'm not trying to insult you
24 and I --
25   A.   I know you're not. But I'm just saying,

**Page 40**

1 it doesn't have anything to do with it. So either
2 stick to what we talking about, about these
3 employees, like, you know what I mean, Register of
4 Wills. Like, that don't have anything to do with
5 anything.
6   Q.   Are you refusing to answer that question?
7   A.   Yeah, I am.
8   Q.   Okay.
9   A.   I don't think I have to answer.
10   Q.   All right. Well, I'm going to ask you
11 again. What does being a state representative
12 entail?
13   A.   A state representative entails state
14 agencies making sure they're running in efficiencies
15 and providing services to our prospective
16 constituents in our districts.
17   Q.   Well, you know, as a matter fact, you
18 asked what does that have to do with anything. I
19 believe your testimony so far is, most of your
20 positions have come through political patronage.
21 And did you come to learn -- do you understand that?
22 Do you agree with that?
23   A.   Okay.
24   Q.   I want to take that as a "yes". Is that a
25 "yes" or a "no"?

**Page 41**

1       MR. CAPACETE: It's not a "yes".
2       THE WITNESS: All right. Okay. Patronage
3 or -- well, the nomination process came in, so
4 that wasn't patronage. That was just
5 relationships. That's work as a committee
6 person, as a ward leader and just happen to be
7 the process of the political process within the
8 City, State and Federal government. Just like
9 Kamala Harris became the nominee to succeed Joe
10 Biden because through the delegation. She
11 didn't have to run a primary. So through the
12 delegates she had the most delegates, that's
13 why. It wasn't a primary. They wanted a
14 primary, but that was the process through the
15 DNC. So it's a process that we all go through
16 in the political atmosphere that some people
17 may not understand. Because once you get past
18 a primary, there is a process with that.
19 BY MR. HATCHETT:
20   Q.   Well, so when you mentioned political
21 patronage, let me try to -- here's what it has to do
22 with this case. You -- is it fair to say that
23 you're in, so to speak, with the Philadelphia
24 Democratic City Committee? And when I say in,
25 you're on good terms with them?

Page 42

1  A. I'm a ward leader, but I'm not rubber
2  stamped. So I have a lot of pushback how things is
3  done. So it's a democracy, like, you know what I
4  mean. So we don't all have to agree. Like, you
5  know, we can agree to disagree. We have arguments.
6  We have, like, hard discussions. It's just, like,
7  you're a rubber stamp and you just go through the --
8  you know, the process, oh, he's my buddy. It don't
9  work that way.
10  Q. My question was, are you still on good
11 terms with the Philadelphia Democratic City
12 Committee?
13  A. I this would think so.
14  Q. All right. Is it fair to say that, as we
15 sit here today and going back to Tracey Gordon's
16 last election, she wasn't on good terms with them,
17 was she?
18  A. No, she wasn't.
19  Q. All right. Are you no longer friendly or
20 talk to Ms. Gordon because she's not on good terms
21 with the Democratic City --
22  A. Absolutely not.
23  Q. -- Committee?
24  A. Absolutely not. She doesn't -- she
25 doesn't know how to be a friend. She's, like -- you

Page 43

1 know what I mean. It's, like, all dictatorship.
2 I've tried to talk to her through the political
3 process with Bob Brady as our chairman and tried to
4 bring a resolution also with Pat Parkinson and
5 Councilman Harrity. We've tried to bring that
6 together. But, you know, and she didn't listen to
7 none of our advice, you know what I mean, so her and
8 Bob Brady, chairman of party, can have a rational
9 conversation. And she didn't like what was said to
10 her. Well, she says the same thing to other people.
11 You know, Brady just voiced some concerns about her
12 firing people and she marched out the office. And
13 this is why Pat Parkinson had -- you know, won a
14 lawsuit. Because she thought that me and Pat should
15 march out the door with her. And we're a part of
16 the democratic party. Bob Brady is the chairman.
17 There's a decorum, you know what I mean. Because we
18 work for her doesn't mean that we can be dictated
19 to. So I don't speak to Tracey because she is not
20 rational. It's not no decorum, you know. If she
21 would have listened to our advice, she possibly
22 would have been reelected.
23  Q. Okay. Let me ask you this: You
24 mentioned -- well, Pat Parkinson has come up. You
25 just mentioned Pat Parkinson's politically related

Page 44

1 -- I'm gonna call it the DCC.
2     MR. CAPACETE: Hold on. Why are we
3  talking about Pat? This is not Pat Parkinson's
4  case. This is Nick Barone's case. To get into
5  why Pat Parkinson filed a lawsuit, I agree, is
6  inappropriate.
7     MR. HATCHETT: I'm not getting into
8  anything about Pat Parkinson filing a lawsuit.
9  I just want him to answer the question. You
10  may have a better understanding. And I don't
11  even know if that was an objection.
12     MR. CAPACETE: It was an objection.
13     MR. HATCHETT: Okay.
14     MR. CAPACETE: I object to this line of
15  questioning.
16 BY MR. HATCHETT:
17  Q. My question is: You mentioned Pat --
18 well, Pat Parkinson has come up. Is Pat Parkinson
19 politically connected to the DCC?
20     MR. CAPACETE: Objection. You can answer.
21     THE WITNESS: He's a ward leader. He's a
22  part of the Democratic Party of the City of
23  Philadelphia.
24 BY MR. CAPACETE:
25  Q. Okay. Tom Campion, is he connected to the

Page 45

1 DCC?
2  A. By association. He's not a ward leader,
3 he's a committee person. So, yes. I would say,
4 yes. Tracey is a committee person also. Tracey was
5 a committee person.
6  Q. Mr. Harris, just going back to the
7 political contributions. You said you're not aware
8 of who would have made contributions to Ms. Gordon's
9 campaign?
10     MR. CAPACETE: Objection to form. You can
11  answer.
12     THE WITNESS: No, I know I did. But, no.
13 BY MR. HATCHETT:
14  Q. Okay. You said you did?
15  A. I have.
16  Q. Okay. By that same logic, are you aware
17 of anyone who did not contribute to Ms. Gordon's
18 campaign?
19  A. No, I'm not. I never -- no.
20  Q. Are you aware of any employees that did
21 not contribute to her campaign, but were not
22 terminated?
23  A. I don't know. I don't know who
24 contributed. I've been to fundraisers and seen
25 people that -- and at the fundraisers. So anybody

Page 46

1 that wasn't there, you know, I didn't bring any
2 calculations to that. I try to stay out that, like,
3 you know what I mean, because it was volatile, you
4 know. And I warned over and over again, you know,
5 about soliciting contributions to employees on or
6 off the job. Not only unethical, but it was
7 pressure. People would feel a need to contribute,
8 and you don't know their living conditions. Like,
9 so I said this for four years. Ron Donatucci, he
10 didn't do it that way. He did a bus -- a boat ride
11 once a year. But, to do this twice a year. And I
12 tried to talk to her over and over again. So the
13 situation with her and the party was her doing, you
14 know what I mean. So, you know, when you don't
15 listen to people rational, like other people's
16 conversations or just try to bring some resolution
17 to some conflicts, you know, this is the stuff that
18 happens. You know, we wouldn't even be here. All
19 these employees, you know, it didn't make sense to
20 even -- for me to be here. You know, she could have
21 possibly been reelected, you know, and the rest --
22 this wouldn't even been a memory.
23    Q.    Mr. Harris, have you ever spoken
24 to Charmaine Col -- well, let me ask the question
25 over. Do you know who Charmaine Collins is?

Page 47

1    A.    Yes.
2    Q.    What's your understanding of who Charmaine
3 Collins is as it relates to the Register of Wills
4 office?
5    A.    She was in HR.
6    Q.    Okay. Do you know who Shariff Roseboro
7 is?
8    A.    Yes.
9    Q.    What's your understanding of Ms. Roseboro
10 as it relates to the Register of Wills office?
11    A.    Could you repeat that?
12    Q.    What's your understanding of who Shariff
13 Roseboro was as it relates to the Register of Wills
14 office?
15    A.    I kept both of them from getting fired.
16 Both of them was on the chopping block.
17    Q.    Mr. Harris, I'm sorry.
18    A.    You know, both of them.
19    Q.    Mr. Harris.
20    A.    Like, both of them felt threatened.
21    Q.    Mr. Harris.
22    A.    Go ahead. Yeah, I know who they are.
23    Q.    Let me repeat my question because I don't
24 know if you answered the question.
25    A.    Yeah.

Page 48

1    Q.    Do you know who Shariff Roseboro was as it
2 relates to the Register of Wills office?
3    A.    She was in HR and she also worked in
4 Orphans Court prior to --
5    Q.    Okay.
6    A.    -- you know, getting hired for that.
7    Q.    Limited to their capacity in HR, have you
8 spoken to Ms. Collins about why Mr. Barone was
9 terminated?
10    A.    No.
11    Q.    Okay. Limited to her capacity in HR, have
12 you spoken to Ms. Roseboro about why Mr. Barone was
13 terminated?
14    A.    No.
15         MR. HATCHETT: All right. Thank you. I
16    don't have any other questions.
17 BY MR. CAPACETE:
18    Q.    Sir, there was a lot of questions about
19 campaign contributions. Did any of those questions
20 change the testimony you offered in response to my
21 questions?
22    A.    Repeat that again.
23    Q.    Yeah. Mr. Hatchett just asked you a lot
24 of questions about campaign contributions. Did any
25 of those questions change your answers as it related

Page 49

1 to my questions?
2    A.    No.
3    Q.    You testified during my questioning that,
4 one of the reasons Nick Barone was terminated was
5 because he failed to contribute to Ms. Gordon's
6 campaign. Do you remember testifying to that?
7    A.    I don't.
8    Q.    Did you develop an understanding that
9 Mr. Barone was terminated, I believe you said,
10 because of the pressures of the office and because
11 of the contributions?
12    A.    Yes, yes.
13    Q.    I'm sorry. How did you develop that
14 understanding?
15    A.    Because collectively every employee felt
16 it. They would tell me, I can't afford it. You
17 know, why do I have to do this. And I didn't -- and
18 it wasn't -- it wasn't a conversation, it was just,
19 they would say this, I would leave it alone.
20 Because I wasn't acting as the general of Tracey
21 Gordon. I would tell her don't do it. They would
22 complain to me and I would just -- they would vent,
23 and I would just leave it alone.
24    Q.    At the time, in 2021, were you working
25 closely with Ms. Gordon?

Page 50

1    A.   What you say?
2    Q.   Back in 2021, were you in close proximity
3 with Ms. Gordon?
4    A.   Yes.
5    Q.   Did you work with her everyday?
6    A.   Yes.
7    Q.   Did you talk to her everyday?
8    A.   Mostly, yes.
9    Q.   You said that Charmaine Collins and
10 Shariff Roseboro were both on the chopping block.
11 What did you mean by that?
12   A.   I mean, they felt the same pressures.
13   Q.   Did they ever tell you that they felt
14 pressured to donate to Ms. Gordon's campaign?
15   A.   They did.  And she would say I'mma fire
16 them, and I was like, why.  You know, not because of
17 donations, just, like, cause you know, they -- you
18 know, they was just afraid.
19   Q.   When you said she said, I'm going to fire
20 them, are you referring to Tracey Gordon?
21   A.   Yes.
22   Q.   Is Nick Barone -- strike that.  Was Nick
23 Barone a political appointee of the Register of
24 Wills office?
25   A.   What you say?

Page 51

1    Q.   Was Nick Barone a political hire at the
2 Register of Wills office?
3    A.   Yes, before my time.
4    Q.   So you had a conversation with Ms. Gordon
5 about hiring Mr. Barone?
6    A.   She didn't hire him.  He was working
7 there.  Ron Donatucci hired him.
8    Q.   How did you learn that he was a political
9 appointee?
10   A.   We all political appointees.
11   Q.   So is it your testimony that everyone that
12 works at City Hall is a political appointee?
13   A.   I don't know about the whole City Hall.
14   Q.   At the Register of Wills office?
15   A.   Yeah.  Basically, yes, patronage
16 appointments.  And I don't have no animosity towards
17 you.  For the record, I don't have any animosity
18 towards Ms. Gordon.  I don't.  It's -- I'm not here
19 because I matter or anything.  You know, if she
20 would have listened to some common sense, you know,
21 this wouldn't even be the situation.
22   Q.   To be fair, I think you testified -- you
23 did testify that Ms. Gordon would talk to you about
24 soliciting campaign contributions from employees who
25 had not yet contributed; is that fair?

Page 52

1    A.   No.  She just in a general context, not
2 particularly anybody individual.
3    Q.   She would ask about individuals who had
4 not yet contributed; is that fair?
5    A.   No.
6    Q.   Generally speaking?
7    A.   Yes.
8    Q.   Generally speaking, she would ask whether
9 there were people that did not contribute?  Not by
10 name, but --
11   A.   Yes.
12   Q.   And you told her that it was a bad idea to
13 solicit campaign contributions from those folks,
14 right?
15   A.   Continuously, yes.
16   Q.   You told her it was a bad idea to
17 continuously solicit contributions from those folks,
18 right?
19   A.   Yes.
20   Q.   And yet she still did, correct?
21   A.   Yes.
22   Q.   Were those facts some of the bases for how
23 you developed the understanding that Nick Barone was
24 fired for not contributing to Ms. Gordon's campaign?
25   A.   Can you repeat that?

Page 53

1    Q.   Yeah, sure.  You just testified that you
2 had these conversations with Ms. Gordon, right?
3    A.   What conversations?
4    Q.   The ones about the continuous pressure to
5 contribute to her campaign.
6    A.   Yes, yes.
7    Q.   You also talked to employees at the
8 Register of Wills office as they would vent about
9 the pressure to donate to the campaign, right?
10   A.   Yeah.  They would talk to me and vent,
11 yes.
12   Q.   Were those two facts, those two sets of
13 conversations that you experienced, were those the
14 basis for your understanding that Nick Barone was
15 fired, at least in part for not contributing to
16 Ms. Gordon's campaign?
17   A.   Yes.
18        MR. CAPACETE:  All right.  I don't have
19   any other questions.
20        MR. HATCHETT:  I don't have any questions,
21   Mr. Harris.  Thank you for being here today.
22        THE WITNESS:  All right.
23        MR. CAPACETE:  Thank you very much.
24        THE WITNESS:  You're welcome.  Thank you.
25        THE VIDEOGRAPHER:  This concludes today's

Page 54

1  deposition. We are going off the record at
2  11:39 a.m. Eastern Standard Time.
3              - - -
4  (Videotaped Deposition concluded at 11:39 a.m.)
5              - - -

Page 55

1              C E R T I F I C A T E
2
3       I hereby certify that the proceedings and
4  evidence noted are contained fully and accurately in
5  the notes taken by me in the deposition of the above
6  matter, and that this is a correct transcript of the
7  same.
8
9
10
11
12
13       *Tisa R. Francis*
14       ---------------------------
15       Tisa R. Francis,
16       Professional Court Reporter
17
18       (The foregoing certification of this
19  transcript does not apply to any reproduction
20  of the same by any means, unless under the
21  direct control and/or supervision of the
22  certifying reporter.)
23
24
25