# EXHIBIT K



Transcript of the Testimony of

**EMILIO DIGREGORIO**

October 28, 2024

**NICHOLAS BARONE**

*v*

**TRACEY L. GORDON, individually, and CITY OF PHILADELPHIA**

Reliable Court Reporting

Phone – 215-563-3363

Fax – 215-563-8839

www.reliable-co.com

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


NICHOLAS BARONE,          CIVIL ACTION
            Plaintiff,

      Vs.

TRACEY L. GORDON, individually, and
CITY OF PHILADELPHIA,
            Defendants.      No. 2:23-cv-02821-MSG


      Video deposition of EMILIO

DiGREGORIO, held in the law offices of Cohen,

Placitella & Roth, Two Commerce Square, 2001 Market

Street, Suite 2900, Philadelphia, Pennsylvania, on

Monday, October 28, 2024, commencing at 10:18 a.m.,

before Kathleen McHugh, RPR, CRR, CCR-NJ, and

Notary Public.


**COPY**

1  APPEARANCES:
2  COHEN, PLACITELLA & ROTH
   BY:  MATTHEW A. CAPACETE, ESQUIRE
3  Mcapacete@cprlaw.com
   Two Commerce Square
4  2001 Market Street, Suite 2900
   Philadelphia, PA 19103
5  215-567-3500
   Counsel for Plaintiff
6
   MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN, P.C.
7  BY:  JAHLEE J. HATCHETT, ESQUIRE
   Jjhatchett@mdwcg.com
8  2000 Market Street, Suite 2300
   Philadelphia, PA 19103
9  215-575-2780
   Counsel for Defendants
10
   ALSO PRESENT:
11
   Ed Caswell, IV, Video Operator
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1              EXAMINATION INDEX
2
   Emilio DiGregorio
3     BY MR. CAPACETE . . . . . . . . . . . . 5
4
              EXHIBIT INDEX
5
6                                         PAGE
   P
7
   1    Work History Detail, DEFENSE 00017    20
8
   2    Email to Gordon from DiGregorio,      25
9         1/6/22, with attachment, DEFENSEB00084
          and DEFENSEB00093-96
10
   3    Email to DiGregorio from Fontain,     25
11        1/6/22, with attachment, DEFENSEB01105
          and DEFENSEB01114-117
12
   4    Email to Campion from Collins,        32
13        11/21/21, DEFENSEB01735
14 5    Email to Barone, et al from Campion,  48
          12/21/21, DEFENSEB01485
15
   6    Email chain, DEFENSEB00411            58
16
   7    Email chain, DEFENSEB00414            61
17
18
19
20
21
22
23
24
25

1              VIDEO OPERATOR:  We're now on the
2  record.  My name is Ed Caswell, IV.  I'm the
3  videographer retained by Reliable Reporting.
4              This is a video deposition for the
5  United States District Court for the Eastern
6  District of Pennsylvania.
7              Today's date is October 28th, 2024,
8  and the time is 10:18.
9              This deposition is being held at 2001
10 Market Street in Philadelphia, in the matter of
11 Nicholas Barone versus Tracey Gordon, et al.
12             The deponent is Emilio DiGregorio.
13             Counsel, if you want to introduce
14 yourselves and who you represent.
15             MR. CAPACETE:  Go ahead.
16             MR. HATCHETT:  My name is Jahlee
17 Hatchett.  I represent the City of Philadelphia, as
18 well as Tracey Gordon in this deposition.
19             And a quick correction, it's
20 pronounced Emilio DiGregorio.  Correct?
21             **THE WITNESS:  Correct.**
22             VIDEO OPERATOR:  Oh, thank you.
23             MR. CAPACETE:  My name is Matt
24 Capacete.  I represent Nick Barone, plaintiff.
25             VIDEO OPERATOR:  The witness will now

1  be sworn in.
2              EMILIO DiGREGORIO, having been duly
3  sworn, was examined and testified as follows:
4              COURT REPORTER:  And, Counsel, usual
5  stipulations?
6              MR. HATCHETT:  Yes, for the defense.
7              MR. CAPACETE:  Yep.
8                     EXAMINATION
9  BY MR. CAPACETE:
10 Q.    Good morning.
11 **A.    Good morning.**
12 Q.    Thanks for being here.  I know you've done
13 this a few times.
14       I'm going to try and be quick.  First,
15 just make sure you answer the questions out loud.
16 You know, we're on video, but nods of the head and
17 stuff, they don't get translated well to the
18 transcript.
19 **A.    Okay.**
20 Q.    Any questions I ask you, I don't want to
21 know about your conversations with counsel.  So if
22 that comes to mind, you can omit that.  It's not
23 what I'm looking for.
24       I may ask you about discussions, but
25 to the extent I do, it's not about your

Page 6

1 conversations with Jahlee or anyone from his
2 office. Okay?
3 **A.        Okay.**
4 Q.        You were deposed on -- I just want to walk
5 through just so I know the dates and stuff. It
6 looks like it was March 5th, 2024, in the matter of
7 Mark Wilson. Does that sound correct?
8 **A.        I mean, the dates I won't remember, but**
9 **yeah.**
10 Q.        In the spring this year?
11 **A.        Possibly.**
12 Q.        Okay. April 4th, 2024, I have that you were
13 deposed for the matter of Thomas Campion.
14 **A.        Okay. Yeah.**
15 Q.        And then, finally, on September 10th, 2024,
16 you were deposed in the matter of Patrick
17 Parkinson.
18 **A.        Yes.**
19 Q.        Okay. I've got a lot of information from
20 those, but I just want to confirm a few things.
21 **A.        Sure.**
22 Q.        Are you still at the register of wills
23 office?
24 **A.        Yes.**
25 Q.        What is your role there?

Page 7

1 **A.        Currently, deputy of government affairs.**
2 Q.        And you've been there for about how long?
3 **A.        15 or so years.**
4 Q.        I believe I read that you changed positions
5 around 2020 or so.
6 **A.        Yeah. New administration in 2020. Prior to**
7 **that, I was executive administrator to the**
8 **register, and then they came in and created**
9 **director of intergovernmental affairs, which later**
10 **changed to deputy of government affairs.**
11 Q.        In the 15 years you've been at the register
12 of wills office, who were the elected registers of
13 wills?
14 **A.        Register -- Ron Donatucci, Tracey Gordon,**
15 **and now John Sabatina.**
16 Q.        All right. So, as I understand it, reading
17 your depositions, you wear a couple of hats at the
18 register of wills office; is that fair?
19 **A.        Fair to say.**
20 Q.        Like, I know you said deputy governmental
21 affairs. I think there's like an IT component to
22 that.
23 **A.        Yeah. I also handle all the IT admin stuff**
24 **for the register of wills as well.**
25 Q.        What's does that entail?

Page 8

1 **A.        So just basically anything technical, IT**
2 **related. I'm the liaison in our department that**
3 **coincides with central IT that the city has, which**
4 **is like a separate department.**
5          **So if there's, you know, networking**
6 **issues, hardware issues, any kind of security**
7 **updates that the city rolls out that our**
8 **departments have to manually roll out, I'm in the**
9 **middle there.**
10 Q.        And you're saying departments, plural.
11 Those are the sort of departments within in the
12 register of wills office?
13 **A.        Well, the entire office. And the city**
14 **deploys things across all departments, all city**
15 **departments.**
16          **It could be law. It could be register**
17 **of wills, city council. So that central OI -- IT**
18 **handles everything, and then each individual**
19 **department has their own admin.**
20 Q.        And for the register of wills that's you?
21 **A.        That's me.**
22 Q.        Okay. That's what I was getting at.
23          I believe I read something about you
24 are a liaison with the city council, state reps,
25 state senators and such.

Page 9

1 **A.        In the governmental side with policy and any**
2 **kind of issues that council brings to the office,**
3 **as far as constituents, state rep constituents, I**
4 **interact with them.**
5 Q.        Is that with regard to register of wills
6 issues, so to speak?
7 **A.        Exactly.**
8 Q.        Who generates those legislative initiatives
9 for the register of wills?
10 **A.        Pretty much, you know, what the register**
11 **deems priorities are then -- try to, you know, turn**
12 **that into some sort of legislation or policy**
13 **change.**
14 Q.        So the policy changes the register seeks or
15 -- strike that. Let me ask a better question.
16          The policy, policy initiatives or
17 legislative initiatives, they originate with the
18 register themselves?
19 **A.        Correct.**
20 Q.        The deputy of governmental affairs, is that
21 a leadership position within the register of wills
22 office?
23 **A.        I mean, I wouldn't -- I mean, it's one of**
24 **the deputy slots, so, I guess, you know, whatever**
25 **you want to judge that as.**

1  Q.     In the hierarchy of the office, is there
2  like deputies come next --
3  A.     Yeah, I'd say it's like third level.  You
4  know, chief deputies, I report to the chief deputy,
5  and the register, obviously.
6  Q.     I don't want to go through every chief
7  deputy that you've worked under --
8  A.     Yeah.
9  Q.     -- but let's say the time frame in which
10 we're going to focus on mostly here is January 2019
11 to January 2021 -- or excuse me, January 2022, and
12 a little after.
13 A.     Um-hum.
14 Q.     Do you remember who the chief deputy or
15 chief deputies were during that time?
16 A.     So initially you want to go back to 2019?
17 Q.     Sure.  Yeah.
18 A.     Okay.  So in 2019 was Alba Collazo-Irwin.
19 And then the new administration brought in Regina
20 Hairston.  And then she left. -- I'm not sure the
21 exact date, but I want to say maybe in November or
22 December of 2020.
23        And then we were without a chief
24 deputy for the rest of the administration until
25 they named an interim chief deputy, which more so

1  was kind of just reporting to the register as a
2  senior role, was Rasheen Crews.
3        And then officially we received the
4  chief deputy in the last year of the
5  administration, 2023, probably in, let's say,
6  February, Wazir El was chief deputy.
7  Q.     Do you remember when Rasheen Crews became
8  the sort of interim chief deputy?
9  A.     Yeah.
10 Q.     When was that?
11 A.     Well, the exact date I'm not 100 percent
12 sure, but I would say maybe January of 2021.
13 Q.     Okay.  Is it fair to say that you also
14 report to the register of wills?
15 A.     Yeah, on occasion.
16 Q.     Does everybody sort of in some way or
17 another report eventually to the register of wills?
18 A.     I'd say, you know, any kind of decisions
19 that are made by the register eventually trickle
20 down or you send something up the ladder, you know,
21 but he's final say.
22 Q.     The register has final say?
23 A.     Yeah.
24 Q.     And in what -- regard to what?  Is that sort
25 of every --

1  A.     Everything.
2  Q.     Okay.  So everything -- every decision or
3  policy that's made for the register of wills office
4  is -- runs up to the register of wills who has
5  final decision?
6  A.     I -- yeah.  I mean, in -- I'd say important
7  decisions that need to be made that would change
8  policy, workflow, personnel.  I mean, that's all
9  register related.
10 Q.     Okay.  We'll get into that a little bit
11 later, too, but I just wanted to sort of orient
12 myself with your role.
13        In your capacity as sort of an IT
14 administrator, do you pull information or documents
15 or reports for the register themselves?
16 A.     Occasionally.
17 Q.     Okay.  I want to turn specifically to, to
18 Nick Barone.  Do you know Nick Barone?
19 A.     Yeah.
20 Q.     Did you work with Nick Barone?
21 A.     We worked in the same office.  Not side by
22 side or in the same unit, but --
23 Q.     By "office," do you mean under the --
24 A.     Under the register of wills.  We both were
25 register of wills employees.  He worked at

1  archives, separate location.
2  Q.     Did you work with him from about January
3  3rd, 2019, to January 7th, 2022?
4  A.     Yes.
5  Q.     Do you remember when he was hired, any of
6  the circumstances?
7  A.     No.  I mean, I, I recall when he came on
8  board, but, you know, not any circumstances.
9  Q.     Did you have any input to his hiring?
10 A.     No.
11 Q.     Is that something you have any input for?
12 A.     No.
13 Q.     I think you said you interacted with Nick
14 while he was at the office.  Is that fair to say?
15 A.     Yeah, when I saw him.
16 Q.     Was there any formal relationship, meaning,
17 you know, were you his supervisor in any way,
18 anything like that?
19 A.     No.
20 Q.     Did you collaborate on any projects or
21 initiatives?
22 A.     No.  I mean, if, if the archive location
23 needed any support that I could help with, I would
24 help, whether it be technical or workflow as far as
25 things were -- how City Hall was communicating or

1 collaborating with the archives location, and if
2 there are any, you know, holes to close as far as
3 the way things were done.
4    Q.    What do you mean by "holes to close"?
5    A.    Well, I mean, communication gaps or workflow
6 gaps that were causing issues with how information
7 was flowing back and forth to the archives, or
8 files not turning up or not being delivered on
9 time, and to see if there's any -- anything that we
10 can do to kind of help facilitate a smoother
11 process.
12    Q.    Do you remember any specific instances of
13 miscommunications or, or files not showing up from
14 archives?
15    A.    Yeah.  I mean, there was always -- there --
16 you know, once a new administration came on board,
17 they, you know, kind of changed the staff down at
18 archives somewhat.
19    Q.    Do you know why they changed the staff at
20 archives?
21    A.    Just, I guess, transition.  You know, new
22 administration.  So a couple of the people who were
23 there for a long time who had a lot of
24 institutional knowledge left or were released or
25 terminated.

1          And then I think Nick was -- he hung
2 on.  I believe someone else, Chris Guest, was with
3 the old administration into the new one.  So they
4 kind of had an idea of what was going on.
5          But for, I guess, a little bit of time
6 they didn't have a direct supervisor, someone
7 overseeing -- they had someone overseeing the
8 operation, and then they brought on some new
9 people, and then eventually a new supervisor.
10          And then, you know, personalities
11 clash, work is missing, stuff like that, but...
12    Q.    Let me see if I can break some of this down
13 a little bit.  But -- this is my fault, too.
14          When you're saying "new
15 administration," is that Miss Gordon's
16 administration?
17    A.    Yeah.
18    Q.    And old, would that have been
19 Mr. Donatucci's?
20    A.    Mr. Donatucci's.
21    Q.    Do you -- were you a part of any of the
22 conversations as to who to keep, who to release or
23 terminate --
24    A.    No.
25    Q.    -- from archives?

1    A.    No.
2    Q.    Did you ever hear anything about why that
3 happened?
4    A.    No.  No.  I mean, you know, the new
5 administration felt they had the right to kind of,
6 you know, go through the staff, see who was a fit,
7 who was not a fit, and then make decisions based on
8 that.
9    Q.    Did you ever learn what the sort of
10 qualifications they considered to be a good fit or
11 a bad fit were?
12    A.    No.
13    Q.    Did -- I'm sorry, I know I asked you this
14 question.  I -- whatever you said before obviously
15 will stand.  But did you ever work directly with
16 Nick on implementing anything?
17    A.    No.
18    Q.    Okay.  From your perspective, was Nick a
19 good employee at archives?
20    A.    Yes.
21    Q.    Do you remember whether he had any write-ups
22 while he was there?
23    A.    Not that I can recall or heard of.
24    Q.    Do you remember any disciplinary action
25 toward Nick while he was at archives?

1    A.    No, not that I can recall.
2    Q.    Do you remember whether he was ever sent to
3 HR for any disciplinary action while at archives?
4    A.    No.
5    Q.    Do you remember any instances of
6 insubordination from Nick while he was at archives?
7    A.    No.
8    Q.    Do you remember any incidents where Nick
9 refused to deliver materials from archives to any
10 other department?
11    A.    No.
12    Q.    It's fair to say that you knew other
13 employees at archives during this time frame, 2019
14 to 2022?
15    A.    Yes.
16    Q.    Who were the other individuals who worked at
17 archives?
18          I'm not -- it's not a quiz.  I'm just
19 trying --
20    A.    Yeah, yeah.  No, I'm just going to go
21 through the list here.
22          So we had Pat Parkinson, who was kind
23 of like the interim overseer of the unit until the
24 eventual supervisor was hired, Tom Campion.
25          Prior to Tom Campion's arrival, the

1 administration brought in Mark Wilson.  So for the
2 longest time there was Mark Wilson, Tom Campion,
3 Chris Guest and Nick Barone.
4 Q.      Did you ever see Nick interact with Tracey
5 Gordon?
6 A.      Probably not.
7 Q.      Do you remember -- Ms. Gordon testified in
8 one of her depositions that Nick Barone was in some
9 sort of fight with Mark Wilson.  Do you have any
10 knowledge about that incident?
11          MR. HATCHETT:  Objection to the form
12 of the question.
13          You can respond.
14          THE WITNESS:  No.
15 BY MR. CAPACETE:
16 Q.      Have you ever heard whether that happened?
17 A.      I've never heard anything like that.
18 Q.      Do you know whether that's something that
19 would have been documented in somebody's file at
20 the register of wills office?
21 A.      I mean, if that occurred, it should have
22 been documented, but I didn't -- I never heard that
23 to occur.
24 Q.      Was maintaining those sorts of -- strike
25 that.  Let me start a new question.

1          Was maintaining an employee's
2 employment file within the scope of your role at
3 the register of wills office?
4 A.      No.
5 Q.      Who would have been in charge of maintaining
6 that sort of stuff?
7 A.      Our deputy HR director, Charmaine Collins.
8 Q.      Do you remember any complaints or issues
9 with Nick Barone related to his ability to perform
10 essential functions of somebody -- a records
11 custodian?
12 A.      No.
13 Q.      Any issues or complaints with his knowledge
14 or skills or ability as a register of wills
15 employee?
16 A.      No.
17 Q.      Do you remember whether Nick Barone was
18 respectful to others at the archives or register of
19 wills office?
20 A.      As far as I know.
21 Q.      Was he courteous?
22 A.      Yeah, I mean, nice guy.
23 Q.      I have here -- we can mark them, I suppose,
24 a few exhibits.
25          MR. CAPACETE:  Here you go, Jahlee, I

1 got them for you.
2          MR. HATCHETT:  Thank you.
3          MR. CAPACETE:  And then do you want me
4 to fill these out or do you --
5          COURT REPORTER:  No, I will.
6          MR. CAPACETE:  Okay.
7          COURT REPORTER:  What would you like
8 it marked as?
9          MR. CAPACETE:  Just P-1.
10          Well, do you want to do -- do you want
11 to mark them or do you just want to use Bates
12 numbers?  Do either of you --
13          MR. HATCHETT:  Whatever your
14 preference is.
15          MR. CAPACETE:  Let's just mark them.
16          So this will be P-1.
17          (Exhibit P-1 was marked for
18 identification.)
19          COURT REPORTER:  And I'll hand it to
20 the witness.
21          MR. CAPACETE:  Yeah, that would be
22 great.  Thank you.
23 BY MR. CAPACETE:
24 Q.      Sir, take a look at that.  Have you ever --
25 this is DEFENSE 00017.  It's the Bates number.

1          Have you ever seen this document
2 before?
3 A.      Yeah.
4 Q.      What do you recognize it to be?
5 A.      So, I guess, it's from -- this is from his
6 OnePhilly Manager Self-Service.  Every employee
7 has, you know, the ability to pull this up, and it
8 shows, you know, from when they started to, to date
9 where they are.
10 Q.      Is this something that -- this is like a
11 printout of a website page, right?
12 A.      Yeah.
13 Q.      Is this something that you pulled -- again,
14 not for counsel, but perhaps for Miss Gordon or
15 somebody in her administration at any point?
16 A.      No.  No.  This is Self-Service -- or no.  So
17 this is Manager Self-Service.  Okay.  So this --
18 someone in our HR department could probably
19 possibly have pulled this.
20 Q.      Okay.  Are you familiar with this platform,
21 this sort of page?
22 A.      Yes.
23 Q.      There's, there's tabs at the -- sort of
24 under the Work History Detail, then it has some
25 biographical information, and there are four --

Page 22

1  A.    Yes.
2  Q.    -- tabs.  This one looks like it's the
3  Assignment Details.
4  A.    Um-hum.
5  Q.    Sorry, is that a yes?  I'm not trying to be
6  rude.
7  A.    Oh, I'm sorry.  Yes.
8  Q.    So it's the Assignment Details.  It looks
9  like there are three other ones, including Extra
10 Information, Performance Ratings.
11         Do you see that?
12 A.    Yes.
13 Q.    Do you know what is contained in extra
14 information?
15 A.    No.
16 Q.    Generally speaking, are an individual's
17 performance ratings contained within performance
18 ratings?
19 A.    I mean, according to this, ideally, you
20 would expect that to be, but I know we didn't -- we
21 didn't do any performance measure -- performance
22 reports until I think 2022 they started to do them
23 in the office hard copy, and they would be in the
24 personnel files.
25         They were never -- I don't believe

Page 23

1  they were ever uploaded to OnePhilly, which
2  platform this is.
3  Q.    So the personnel files, they are physical
4  hard copies?
5  A.    Yes.
6  Q.    And any -- to your knowledge, any
7  performance review or report would be contained in
8  that file?
9  A.    That's where it should be.
10 Q.    Do you know whether -- and it's okay if you
11 don't, I know you said you're not the person
12 that --
13 A.    Yeah.
14 Q.    -- maintains these.
15         Do you know whether those files are
16 maintained for individuals who are no longer
17 working at the register of wills office?
18 A.    Yes.
19 Q.    Do you know where they're stored?
20 A.    In the HR director's office.
21 Q.    The HR director for the register of wills
22 office?
23 A.    Correct.
24 Q.    Who is the current HR director?
25 A.    Currently, it's Shariff Roseboro.

Page 24

1  Q.    Pre -- before Shariff Roseboro, who was the
2  HR director?
3  A.    Charmaine Collins.
4  Q.    When did Shariff take over from Charmaine?
5  A.    I'd say February of 2023, maybe.  Around
6  there.
7  Q.    I know it's kind of hard to see on that
8  document, at the bottom, it's like right where it
9  says DEFENSE 00017, it looks like there's a date
10 under it.
11         Do you see that?
12 A.    January 19th, 2022.
13 Q.    Does that -- do you remember having any
14 discussions about this page or, you know, hey, can
15 you pull this page around January 2022?
16 A.    No.
17 Q.    You can put that aside.
18         I have a couple of documents here.
19 They're substantially similar, but I'm going to
20 hand you both.
21         MR. CAPACETE:  Can we mark these P-2
22 and P-3 respectively.
23         The top one will be P-2 and the bottom
24 one P-3.
25         COURT REPORTER:  Thank you.

Page 25

1          MR. CAPACETE:  Here you go, Jahlee.
2          MR. HATCHETT:  Thank you.
3          MR. CAPACETE:  The top one is P-2.
4          MR. HATCHETT:  Thanks.
5          (Exhibit P-2 and Exhibit P-3 were
6  marked for identification.)
7  BY MR. CAPACETE:
8  Q.    Sir, P-2, just the date at the top, says
9  Thursday, 6th of January, 2022, at 7:18 p.m.; is
10 that correct?
11 A.    Yes.
12 Q.    And then just so we can distinguish between
13 the two, P-3 is, if you look at the date on that,
14 it's Thursday, 6th of January, 2022, at 3:38 p.m.,
15 correct?
16 A.    Yes.
17 Q.    All right.  Let's start with P-2.  It looks
18 like this is an email from you to Tracey Gordon.
19 Is that fair to say?
20 A.    Yes.
21 Q.    And there are attachments here with four
22 individuals from the archives department's names,
23 correct?
24 A.    Yes.
25 Q.    It says these are key swipe reports for

Page 26

1 archives, right?
2 A.    Yes.
3 Q.    What are key swipe reports?
4 A.    When -- the location has a card swipe key,
5 so any time anyone enters the door to our location
6 it records it.
7 Q.    So it's like -- I would call it like a fob,
8 like something --
9 A.    Yeah.  Yeah.
10 Q.    -- to scan in with?
11 A.    Yes.
12 Q.    Okay.  That's DEFENSEB00084.
13        The next page of this exhibit, P-2, is
14 DEFENSEB00093.  I'll represent to you the numbers
15 between 84 and 93 --
16 A.    Um-hum.
17 Q.    -- are just other individuals.
18        Have you seen this before?
19 A.    Yes.
20 Q.    What is this?
21 A.    So this is the log of entry, entry --
22 entries by the employees at the archives location.
23 Q.    Is this one specifically for Nick Barone?
24 A.    It looks like it's just Nick.
25 Q.    Do you remember why -- strike that.

Page 27

1        So you sent it to Ms. Gordon.  Do you
2 remember why you sent it to her?
3 A.    Yes.
4 Q.    Why did you send it to her?
5 A.    So there were some issues at archives with
6 files not being delivered.  Supervisors at the City
7 Hall location contacting archives, not able to get
8 in touch with people.
9        Sometimes, you know, they wouldn't
10 hear from them for a day or -- not know anyone's
11 schedule really of who -- when they were going in,
12 when they were leaving.  And Miss Gordon wanted to
13 see what the timing was for people, when they're
14 arriving to work, when they're not.
15        I think there was a little bit of
16 faith lost in the supervisor as to how he was
17 administering the staff down there.  So this was
18 just kind of like a fact-finding mission to see
19 what arrival times for employees.
20 Q.    How did you learn that?  Was it with
21 conversations with Ms. Gordon?
22 A.    On our Monday meetings, Monday staff
23 meetings, you know, there were a lot of issues from
24 the supervisors at City Hall in regards to the
25 files from archives.

Page 28

1        So there were a couple times where
2 Rasheen Crews and Pat Parkinson tried to facilitate
3 a smoother, you know, workflow from archives, and
4 it was like a recurring issue.  But I think it was
5 more of a personality thing with some of the
6 supervisors from archives side and the City Hall
7 side kind of clashing.
8 Q.    What do you mean by personality clashing?
9 A.    I guess, the estate services supervisor,
10 Wayne Perry, had some words with Tom Campion from
11 archives on the way things were being done.  Prior
12 to this administration -- or to Miss Gordon's
13 administration, we had two individuals at archives
14 who were there for a long time and we never had any
15 issues.
16        The new administration comes in, new
17 people, and, you know, several issues, timing.
18 We even -- at some point there was some talk about,
19 you know, they were delaying stuff for whatever
20 reason.  We have some time-sensitive cases.
21        So just -- instead of, you know,
22 alleviating some of the problems, people, you know,
23 creating issues where there didn't need to be any.
24        So -- but this was more so related to
25 the time.  If -- you know, if we start at 8:00, you

Page 29

1 know, what time is everyone getting there.
2        But even during COVID there were some
3 flex hours.  Time was, you know, a little bit of
4 a -- it depended on the situation.
5 Q.    So I believe, and correct me if I'm wrong, I
6 read in one of your depositions that Nick Barone
7 had the most consistent hour --
8 A.    Yes.
9 Q.    -- sign-ins.  Is that fair to say?
10 A.    Yes.
11 Q.    Did you see when you pulled this -- first of
12 all, did you review this when you pulled it?
13 A.    I looked it over.
14 Q.    Do you remember believing that Nick Barone
15 was punctual to work during this time frame?
16 A.    I -- yeah, I would say.
17 Q.    Of the reports you pulled, was Nick Barone
18 the most consistently punctual employee at
19 archives?
20 A.    Yes.
21 Q.    You said flex hours during COVID.  Can you
22 explain just sort of how that would work?
23 A.    It, it was a little bit of a gray area.  I
24 mean, early on in COVID they were concerned about
25 the amount of people in one location.  There were

1 all kinds of, you know, crazy rules that were being
2 rolled out.
3         And, you know, a lot of city workers
4 weren't even back to work.  But the archive
5 location was like a physical work location, so we
6 needed personnel on-site, and if they chose to
7 stagger each other's time, early on they, they
8 allowed that.
9         But it depended on what the supervisor
10 was kind of putting forth for his staff.  But once
11 issues started arising as far as stuff not being
12 delivered, stuff not being pulled, no
13 communication, then, you know, the microscope
14 starts to go over and see, well, what's, what's
15 really happening.  And that's what caused this to
16 be created.
17 Q.    You mentioned issues arising with regard to
18 archives.  Do you remember whether there were
19 concerns of Nick Barone's work at archives during
20 this time?
21 A.    Not him personally that I know of, but just
22 the unit as a whole.
23 Q.    Do you remember conversations with
24 Ms. Gordon after you sent her this email about
25 this -- these reports?

1 A.    Yeah.  Yeah.  We had a conversation and, you
2 know, just from looking over the, the sheet, you
3 know, it was clear to see who was consistent, who
4 wasn't.
5 Q.    Do you remember any comments she made about
6 Nick Barone?
7 A.    No.  No, not that I -- not that I recall.  I
8 mean, I think I would have highlighted the fact
9 that he was the most consistent in my review of
10 what I saw.
11 Q.    If she had asked you at this time, January
12 6th, 2022, whether you thought Nick Barone should
13 be terminated based on your findings, what would
14 you have told her?
15         MR. HATCHETT:  Objection to the form
16 of the question.
17         You can respond.
18         THE WITNESS:  I would say no.
19 BY MR. CAPACETE:
20 Q.    Do you remember whether she asked you that?
21 A.    She did not.
22 Q.    P-3, we're not going to go through it very
23 much, but it says it's from a Michael Fontain.  Who
24 is Michael Fontain?
25 A.    So this was, I guess, the security

1 supervisor.  So all requests had to go through
2 his -- him so can kind of put these reports
3 together.
4         He maintained all the swipe -- key
5 swipe, I guess, of the entire city, city office
6 buildings.
7 Q.    So you reached out to Michael to say, hey,
8 can you pull these for me?
9 A.    Yeah.
10 Q.    Okay.
11 A.    Yeah.
12 Q.    Now, there is an email -- strike that.
13 Sorry.
14         MR. CAPACETE:  This will be P-4.
15         (Exhibit P-4 was marked for
16 identification.)
17 BY MR. CAPACETE:
18 Q.    We just handed you P-4.  It's an email from
19 Charmaine Collins to Tom Campion and you on
20 November 21st, 2021; is that fair?
21 A.    Yes.
22 Q.    This email, in sum and substance -- well,
23 why don't you tell us, what, what is this email
24 about?
25         Do you remember it?  What were the

1 circumstances?
2 A.    So they were just, you know, trying to put
3 some, some new measures on the archives staff to
4 kind of have some oversight or more oversight on
5 what was going on, and when, when people were
6 coming to work, signing in.
7         And, ideally, you would expect the
8 supervisor to kind of keep control of this
9 timesheet, just to, you know, kind of say, hey,
10 listen, we're -- this is not a free-for-all.  We
11 need some -- you know, some measures in place.
12         COVID really threw things, you know,
13 into disarray.  And then, you know, they tried to
14 pull the reins in.  So, I guess, this was an
15 attempt to kind of say, you know, we're, you know,
16 utilizing timesheets from this point.
17 Q.    Do you remember conversations with Tracey
18 Gordon about implementing these daily sign-in
19 sheets?
20 A.    I don't recall.
21 Q.    Do you -- it says here, Per our
22 conversation, attached is a timesheet template for
23 capturing your team's daily sign-in/sign-out of
24 work.
25         Were you a party to that conversation

Page 34

1  that Charmaine Collins is sending to Tom Campion?
2  A.    I don't recall.
3  Q.    Besides what you've already --
4  A.    Yeah.
5  Q.    -- the background you've given us, is there
6  anything else you remember about this, lead-up to
7  this?
8  A.    I don't know if -- there was a time when we
9  went to archives, myself, Charmaine, I believe
10  Rasheen Crews and Pat Parkinson, to kind of try and
11  right the ship of, you know, the disarray that was
12  occurring at archives.
13          She may be referring to that
14  conversation, but I'm not 100 percent sure.
15  Q.    Tell me about the time you went to archives
16  with those folks.
17  A.    Well, I was there for setting up some
18  hardware for microfilm scanning with a computer,
19  and I believe Charmaine, Rasheen and Pat were
20  discussing, you know, the operations, and lack
21  thereof, of what was going on there.
22  Q.    Were you a part of those discussions about
23  operations?
24  A.    Only in the sense that if they needed
25  anything, you know, some spreadsheets or something,

Page 35

1  tracking system to put in place, I can assist with
2  that.  But outside of that, I was there for the set
3  up of the hardware.
4  Q.    Do you remember any details about their
5  discussions that day?
6  A.    Just that Tom was somewhat defensive about
7  Charmaine's questioning.  He felt that he was being
8  singled out, I guess, by Wayne from City Hall, the
9  supervisor of estate services, and that it was more
10  of a Wayne issue than anything else.
11  Q.    Were any of the other archives employees
12  involved in that discussion as to your knowledge?
13  A.    I believe the staff was in the room, the
14  entire staff.
15  Q.    Does that include Nick Barone?
16  A.    Yeah.  If he was there that day, it would
17  have included him.  I don't recall.
18  Q.    Do you remember which day it was, the
19  specific day?
20  A.    Yeah, I don't recall.
21  Q.    Do you have an idea of the time frame of it?
22  A.    I'd say it would be mid-afternoon.
23  Q.    I'm sorry, like month, year?
24  A.    No, I don't recall.
25  Q.    Okay.  Do you remember whether it was around

Page 36

1  the time these sign-in sheets were implemented?
2  A.    It may have been.
3  Q.    Do you remember any specific discussions
4  about Nick Barone during that discussion?
5  A.    No.
6  Q.    Do you remember whether his name came up at
7  all?
8  A.    No, I don't think it did.
9  Q.    It says here in the second paragraph, Please
10  scan and email the timesheet to Emilio and me at
11  the end of each day.
12          Did that procedure begin after these
13  were implemented?
14  A.    It may have, and it may have slowly, you
15  know, dissipated.  I don't recall getting the
16  timesheets daily.
17  Q.    Is it that you don't have a specific memory
18  or you think you did not receive them?
19  A.    I may have received them early on, but since
20  I was on like a, you know, cc list, I -- they may
21  have dropped and directly sent them to Charmaine.
22          I don't know how long this carried
23  out -- was carried out for.
24  Q.    Is it still in place, do you know?
25  A.    I'm not sure what the current policy is at

Page 37

1  archives.
2  Q.    Do you know where the spreadsheets were
3  keeped -- kept, excuse me?
4  A.    Well, if they -- if they reached Charmaine,
5  she would have maintained them.
6  Q.    Do you know how she would have maintained
7  them?
8  A.    I'm not sure if she used cloud storage or
9  physical, but there could have been a possibility
10  she physically stored them and they would be with
11  the current deputy HR director.
12  Q.    You said "cloud storage."  Does the register
13  of wills office have its own cloud storage system?
14  A.    Yes.  So each employee has a OneDrive that
15  they can utilize.  It's a Microsoft application for
16  cloud storage.
17  Q.    Is there a larger register of wills specific
18  cloud storage system, or is it each employee has a
19  OneDrive?
20  A.    Each employee has a OneDrive, and there is
21  also, a, you know, office drive, like a register of
22  wills drive, but that's used for more, you know,
23  general work operations.
24  Q.    Are you aware of the claims made by Nick
25  Barone against Miss Gordon and the city generally?

Page 38

1  A.      Generally.
2  Q.      Are you aware -- I'm just wondering if you
3  know -- that he claims that he was asked to
4  contribute to Miss Gordon's campaign around
5  November 2021?
6  A.      I mean, if that's what the complaint is.
7  Q.      Have you ever heard that before?
8  A.      A lot of the complaints have had that
9  underlying theme.
10 Q.      Do you remember any individuals, either
11 Ms. Gordon or folks from her campaign, asking
12 employees for donations?
13 A.      I do not.
14 Q.      Were you involved in Ms. Gordon's reelection
15 campaign?
16 A.      I was invited to a reelection campaign
17 meeting that I attended.
18 Q.      What kind of meeting?
19 A.      Right.  There were some new individuals who
20 were, you know, helping her, and one of them worked
21 in our office, and she asked if I could attend, so
22 just out of courtesy I said, sure, I'd go.
23          And when I went to the meeting, you
24 know, everyone who was there was assuming some role
25 in her campaign and...

Page 39

1  Q.      Did you assume a role in her campaign?
2  A.      No.  No.
3  Q.      Do you remember what was discussed at that
4  meeting?
5  A.      Just, you know, what everyone's role was
6  going to be.  I guess campaign strategy.  This was
7  in -- I don't know if it was February or March of
8  2023.
9  Q.      So this meeting you're describing was in
10 2023?
11 A.      Yeah.
12 Q.      Okay.
13 A.      Yeah.
14 Q.      Did you ever hold any sort of official role
15 in Ms. Gordon's either reelection or election
16 campaign?
17 A.      No.
18 Q.      There were register of wills employees who
19 did hold positions in Ms. Gordon's reelection
20 campaign.  Is that fair to say?
21 A.      Yes.
22 Q.      Do you remember who it was?
23 A.      I don't know if they were like official
24 roles, but from the one meeting we had Jacqueline
25 Jeffries Barnett.  I don't know if you would say

Page 40

1  she was campaign manager or she was helping her
2  organize a campaign team.  Then I think -- I think
3  she ended up leaving before the election even
4  occurred.
5          Malik Boyd, who was an employee at the
6  time, was handling, either formally or informally,
7  her communications, and, you know, literature
8  creation.  I forget the other guy's name.
9  Q.      Was Kesha Traurig (phonetic) an employee of
10 the register of wills office and a member of the
11 reelection campaign?
12 A.      At that time I don't think she was.  I think
13 she was not an employee nor a campaign person.
14 Q.      Do you remember whether she was ever either
15 an employee or a campaign person?
16 A.      Early on, in the beginning of their -- her
17 administration, she was an employee.  And, from my
18 knowledge, she was the treasurer of Miss Gordon's
19 campaign.
20 Q.      And I'm sorry, you said during that time
21 frame.  Are we still talking about 2023?
22 A.      No.  So Kesha started in 2020 of January,
23 and I'm not -- I don't recall her separation date,
24 but she left prior to the campaign.  Maybe in early
25 '23 or end of '22, around that time she separated.

Page 41

1  Q.      So, between 2020 and January of 2022, was
2  Kesha Traurig working for the register of wills
3  office, to your knowledge?
4  A.      To my knowledge.
5  Q.      During that time, was she involved in Miss
6  Gordon's reelection campaign, to your knowledge?
7  A.      I guess -- I mean, she was part of her
8  campaign team.  I guess the reelection campaign
9  really didn't kick off until 2023.  But she was the
10 treasurer for a majority of the time that she was
11 there.
12 Q.      You said the campaign didn't kick off until
13 2023.  Do you remember whether Miss Gordon was
14 fundraising in 2021/2022?
15 A.      Yeah, there were fundraisers periodically
16 throughout the years.
17 Q.      Did that go back to the beginning of her
18 administration?
19 A.      Yes.
20 Q.      Do you remember any of those specifically,
21 or, you know, how many there were, or anything like
22 that?
23 A.      A couple a year, maybe.
24 Q.      Do you remember the office's general
25 attitude toward those?

1  A.     Everyone was, you know, involved in some
2  sort of, I guess, political campaign, you know.
3  Everyone -- I think everyone was used to seeing
4  those pass through from here in there.
5  Q.     What do you mean by that?
6  A.     I mean, even when Ron Donatucci was the
7  register, you know, he had fundraisers.  Some
8  people attended fundraisers of city council
9  candidates.  You know, just up to your discretion
10 what you wanted to participate in.
11 Q.     Was there any sort of pressure on any
12 employee to participate in Miss Gordon's events?
13 A.     No.
14 Q.     Keith Harris, is that somebody that worked
15 at register of wills and Ms. Harris's election or
16 reelection campaign from 2019 to 2022, to your
17 knowledge?
18 A.     Keith Harris worked at the register of
19 wills.  He was one of the individuals part of the
20 campaign team.
21 Q.     What about Stephanie Graham?
22 A.     I believe at the time of that meeting she
23 was no longer with the register of wills.
24 Q.     That was early 2023, right?
25 A.     Yes.  But prior to that -- I think she came

1  on board in 20 -- maybe late 2020, early 2021.  And
2  then she stayed on for maybe two years or so.
3  Q.     Do you remember what she did?
4  A.     She was the register's, I guess, personal
5  assistant.
6  Q.     Did she also work for the campaign, do you
7  know?
8  A.     Well, at that meeting she was no longer an
9  employee, but, you know, she was supporting, I
10 guess, Miss Gordon in whatever capacity outside of
11 the register's office as well.
12 Q.     You were asked at one of your previous
13 depositions -- and I just want to follow up on this
14 and see if I can punch it out at all.
15        The question was, Kesha Traurig,
16 Stephanie Graham and Keith Harris, they did ask
17 people to donate to Miss Gordon's political action
18 committee, to her reelection campaign, right?
19        Your answer was, Not to me
20 individually.
21        Do you remember --
22 A.     Yes.
23 Q.     -- testifying to that?
24        You said, Not to me individually.
25 Were there others that they asked for these

1  donations, to your knowledge?
2  A.     Not -- I mean, from hearsay, maybe someone
3  asking if they were going, but I didn't hear any
4  kind of like, are you going to be donating, those
5  types of questions.
6  Q.     Meaning you didn't hear these three
7  individuals asking those questions?
8  A.     No.
9  Q.     Sorry.  I'm correct, is that what you mean?
10 A.     Yeah.  Yeah.
11 Q.     It just -- the transcript is going to be
12 weird so I wanted to make sure.
13        Do you remember being told by others
14 that these three folks were asking them to donate
15 to the campaign?
16 A.     Through hearsay you may have heard someone
17 say like, oh, you know, they asked if I was going,
18 but that was the extent of it.
19 Q.     Were you surprised to hear that?
20 A.     I really didn't think anything of it.
21 Q.     Was that sort of normal for the register of
22 wills office, in your experience?
23 A.     Well, if it was an event, like will I see
24 you at the event tonight type of general
25 conversation is what I took it as, not as a, you

1  know, threat or a questioning of anything.
2  Q.     So were you ever aware of Ms. Gordon asking
3  employees to donate to her campaign?
4  A.     No.
5  Q.     Were you ever aware of Kesha Traurig asking
6  employees to donate to the campaign?
7  A.     No.
8  Q.     How about Keith Harris?
9  A.     No.
10 Q.     Stephanie Graham?
11 A.     No.
12 Q.     Any of the other folks in her campaign?
13 A.     No.
14 Q.     You were also asked at your September
15 deposition whether you were aware, quote, that
16 there was at least one employee that refused to
17 give money and was retaliated against; is that
18 correct?
19        You said, I'm unaware of who it is.
20        Were you aware that that happened?
21 A.     What was the question again?
22 Q.     Sure.  I'll read it to you.
23        The question was, Are you aware that
24 there was at least one employee that refused to
25 give money and was retaliated against; is that

Page 46

1  correct?
2              And your response was, I'm unaware of
3  who it is.
4  **A.     I guess they were referencing with that**
5  **question someone's complaint.**
6              MR. HATCHETT:  Mr. DiGregorio, I'll
7  remind you not to guess.  If you don't know the
8  answer --
9              **THE WITNESS:  Okay.**
10             MR. HATCHETT:  -- just say you don't
11 know who it was.
12             **THE WITNESS:  Yeah, I don't know the**
13 **answer to that question.**
14 BY MR. CAPACETE:
15 Q.    Okay.  You began to say -- you said I guess
16 this or that.  Was there something you were
17 thinking back to, a specific event that you were
18 forming that belief?
19 **A.     Oh, now I'm stuck in the middle of --**
20 Q.    Oh, I'm just curious if like -- you know,
21 like sometimes I'll say like, I think it was X, and
22 I'm trying to remember -- I'm thinking of a certain
23 instance, but I don't know specifically.
24             Was there any sort of mind's eye image
25 you were thinking of when I asked you that

Page 47

1  question?
2  **A.     No.  I was thinking of how that question was**
3  **posed to me, and if it was from another deposition.**
4  **My best guess was that --**
5              MR. HATCHETT:  Mr. DiGregorio, I ask
6  you not to guess.
7              **THE WITNESS:  I don't -- I don't know**
8  **how to answer that question without --**
9  BY MR. CAPACETE:
10 Q.    Why don't you -- why don't you answer the
11 question and I'll flush it out, understanding
12 counsel's instruction.
13 **A.     Yeah.  So, you know, frame a question I**
14 **guess for me to answer because I don't know what to**
15 **say from here.**
16 Q.    Okay.  Did you ever hear that an employee
17 refused to give money and was retaliated against?
18 **A.     No.**
19 Q.    Did you ever hear that an employee refused
20 to give money and was fired from the register of
21 wills office?
22 **A.     No.**
23 Q.    At the register of wills office, does
24 donating to the register's campaign provide
25 employees job security, to your knowledge?

Page 48

1  **A.     No.**
2  Q.    All right.  Let's talk about -- I have a --
3  an email here.
4              MR. CAPACETE:  We're going to mark
5  this as P-5, I think.
6              COURT REPORTER:  Yes.
7              MR. CAPACETE:  Here you go, Jahlee.
8              MR. HATCHETT:  Thank you.
9              (Exhibit P-5 was marked for
10 identification.)
11 BY MR. CAPACETE:
12 Q.    Have you ever seen this email before?
13             You're not cc'd on it or anything.  I
14 just -- I'm hoping it will refresh your --
15 **A.     Yeah.**
16 Q.    Orient -- you know, orient you.
17 **A.     This is the performance evaluations that I**
18 **referenced prior.**
19             MR. HATCHETT:  To the extent that
20 Mr. DiGregorio hasn't seen this email prior to
21 today, I have a standing objection to any questions
22 concerning this email.
23             You can answer the questions, though,
24 Mr. DiGregorio.
25 BY MR. CAPACETE:

Page 49

1  Q.    Have you seen this before today?
2  **A.     No.**
3  Q.    Did you receive an email like this ever?
4  **A.     Yes.**
5  Q.    When did you receive it, do you know?  Was
6  it around the same time?
7  **A.     Most likely.**
8  Q.    Again, I'm just wondering if this will
9  refresh your recollection.
10             So it says, from Tom Campion to, it
11 looks like, the archives staff; is that fair?
12 **A.     Yes.**
13 Q.    And copied is Charmaine Collins, the deputy
14 HR manager, right?
15 **A.     Correct.**
16 Q.    It says, I've been directed to complete and
17 submit a written evaluation for staff by the end of
18 this calendar year.
19             You already said you remember those
20 evaluations.
21 **A.     Correct.**
22 Q.    Do you remember when they took place?
23 **A.     They were due by the end of the year.**
24 Q.    So by December 31st, 2021?
25 **A.     Correct.**

Page 50

1  Q.    Do you remember why those evaluations took
2  place?
3  A.    Ms. Gordon felt though we needed these
4  performance evaluations to better gauge employee
5  performance, to have some -- you know, a good
6  barometer on, you know, what people were doing as
7  far as work, how supervisors felt about employees,
8  and then, therefore, she can kind of, you know,
9  understand who were strong, who was a weak person
10 in the unit.
11 Q.    Were these -- oh, I'm sorry.  I didn't mean
12 to cut you off.
13 A.    Yeah, just general employee, you know, work
14 product evaluations.
15 Q.    Were these limited to the archives
16 department?
17 A.    This was the entire office.
18 Q.    Okay.
19 A.    Yes.
20 Q.    Did you ever review any of the employees
21 performance reviews?
22 A.    For -- I wrote evaluations for people who I
23 was responsible for and each supervisor did the
24 same.  I did not review anyone else's performances.
25 Q.    You never reviewed Nick Barone's

Page 51

1  performance?
2  A.    No.
3  Q.    Did you ever discuss the results of these
4  performance reviews with -- pertaining to archives
5  with anyone in the register of wills
6  administration?
7  A.    No.
8  Q.    Ever discuss it with Miss Gordon?
9  A.    No.
10 Q.    Again, it says, "written evaluation."  Do
11 you know where those evaluations are kept at the
12 register of wills office?
13 A.    They would be with the deputy HR director.
14 Q.    Sort of in the same manner as the sign-in
15 sheets?
16 A.    Should be.
17 Q.    Like if they're scanned, they'll be in maybe
18 a drive, and if they're not, they'll be in a hard
19 copy?
20 A.    I would say there's a good chance they're
21 hard copy.
22 Q.    Okay.  Employee Feedback Forms, are those
23 the sort of feedback of the supervisors you were
24 discussing, or are they things that were given
25 directly to the employees?

Page 52

1  A.    No.  I believe with these performance
2  evaluations the supervisor made their comments, and
3  then on the same form there was an employee
4  feedback, based on -- you know, they were seeing
5  what they were -- evaluations were.
6  Q.    And so if they had any comments or
7  responses --
8  A.    Yeah, they could kind of, you know, refute
9  or rebut against what the supervisor reports.
10 Q.    Do you remember how those performance
11 reviews were graded, so to speak?
12 A.    They were just submitted to HR and that's
13 the last we saw them.
14 Q.    Were there specific performance indicators
15 on these review sheets themselves?
16 A.    I believe so.  I believe there was a scale,
17 and there was a section for, you know, some
18 comments from the supervisor.
19 Q.    Based on your experience of filling these
20 out, first, do you remember what any of the
21 sections were, like, you know, job performance,
22 personalities --
23 A.    Yeah.
24 Q.    You know, like different categories.  Do you
25 remember any of those?

Page 53

1  A.    I don't recall.
2  Q.    Okay.
3  A.    Yeah.
4  Q.    Do you remember whether -- like, for
5  instance, you filled some out you said for your --
6  A.    Um-hum.
7  Q.    -- your group, right?
8        Do you remember whether you discussed
9  the results with Miss Gordon for your group?
10 A.    I did not.
11 Q.    Okay.  Do you remember whether they were
12 submitted eventually to her for her consideration?
13 A.    I know we submitted them to HR, and then
14 whether she wanted to review them or not, I'm not
15 sure.
16 Q.    Was this the first time you remember there
17 being performance reviews at the register of wills
18 office?
19 A.    Yes.
20 Q.    Have there been performance reviews since
21 this?
22 A.    No.
23 Q.    So, to the best of your knowledge, it was
24 this one time performance review?
25 A.    This might have occurred two years, so I

1 guess the end of 2021 and 2022.
2          Then 2023 Miss Gordon was -- you know,
3 lost the election, leaving office, and I don't
4 think anyone -- oh, and at that time, 2023,
5 Charmaine Collins left.  So it was kind of like,
6 you know, a gray area of what direction we were
7 going in as far as, you know, the last six months
8 of the administration.
9 Q.     The performance reviews that were performed
10 were on an annual basis, though, if they were?
11 A.     Correct.
12 Q.     All right.  Were you aware that Nick Barone
13 was fired on January 7th, 2022?
14 A.     Yes.
15 Q.     Do you remember learning about that?
16 A.     Yes.
17 Q.     Do you remember any discussions leading up
18 to that termination?
19 A.     No discussions prior.
20 Q.     Meaning you weren't involved in any of those
21 discussions.
22 A.     No.
23 Q.     What do you remember about learning that
24 Nick had been fired?
25 A.     I just received a phone call from Charmaine

1 Collins that she was directed to terminate Nick and
2 had no, no reason as to why.
3 Q.     Meaning she told you she had no reason to do
4 it, she was just directed?
5 A.     She was directed by the register to
6 terminate Nick and did not have an underlying
7 reason as to why his termination was occurring.
8 Q.     Did she tell you anything else about that
9 conversation she had with Miss Gordon?
10 A.     Just that, you know, she -- I guess Miss
11 Gordon just, you know, gave her the directive and
12 that's it.
13 Q.     And I'm sorry, I know you've been pretty
14 clear, I want to make sure I'm clear with it.
15          You're saying that Ms. Collins told
16 you Miss Gordon gave her no reason for the
17 termination.  Is that fair to say?
18 A.     Yes.
19 Q.     Were you ever provided with a reason for
20 Nick Barone's termination?
21 A.     No.
22 Q.     And your last deposition you said you have
23 no understanding as to why he was terminated.
24 That's still true?
25 A.     Still true.

1 Q.     Is it fair to say you did not play any role
2 in the decision to terminate Nick Barone?
3 A.     No role.
4 Q.     If asked, would you have recommended he be
5 fired on January 7th, 2022?
6          MR. HATCHETT:  Objection to the form
7 of the question.
8          You can respond.
9          THE WITNESS:  I would say no, do not
10 fire him.
11 BY MR. CAPACETE:
12 Q.     So Nick Barone is terminated in January
13 2022.  And then there's other folks in the archives
14 that are terminated later on, months and/or years
15 later.
16          Is that consistent with your memory
17 generally?
18 A.     Yes.
19 Q.     Did you ever learn why he was terminated in
20 January 2022 while the others were terminated
21 later?
22 A.     No.
23 Q.     When was that call you received from
24 Ms. Collins?  Do you remember whether it was before
25 or after Nick's termination?

1 A.     I think it was before.  The morning of.
2 Q.     So I'll represent to you he was terminated
3 January 7th, 2022.  You're saying you believe it
4 was that morning that you talked to her?
5 A.     Yeah.
6 Q.     That was a Friday, if it helps.
7 A.     Yeah.  I mean, if that's what day it was,
8 then I talked to her that morning.  You know, we
9 were kind of in shock that, you know, that was
10 taking place.
11 Q.     Why did it shock you?
12 A.     Nick was one of the stronger employees of
13 the archives, if not the strongest.
14 Q.     Did you have any conversations with
15 Charmaine Collins after that phone call about Nick
16 Barone's termination?
17 A.     Yes.
18 Q.     Tell me about those conversations.
19 A.     Just how awkward it was to have to terminate
20 someone and not be able to really provide a reason
21 as to why the termination.
22          Nick was kind of taken aback as well.
23 And just, just how, you know, disappointing it was
24 to have to do that.
25 Q.     And she expressed to you that she didn't --

1 she wasn't able to provide him a reason when she
2 terminated him?
3 **A.      Yeah.  I mean, she kind of, I guess, for**
4 **lack of better words, was embarrassed that she had**
5 **to, you know, follow through on that and not really**
6 **be able to substantiate as to why.**
7 Q.    Did she ever -- and you may have said this,
8 I'm just thinking more directly.  Did she ever tell
9 you she was shocked that Nick was fired?
10 **A.     She was surprised upon receiving the**
11 **directive to terminate him, you know.**
12               MR. CAPACETE:  I have here -- this
13 will be P-6, I believe.
14               (Exhibit P-6 was marked for
15 identification.)
16 BY MR. CAPACETE:
17 Q.    We're getting close to being done, too.  I
18 appreciate your patience.
19 **A.     No problem.**
20               VIDEO OPERATOR:  Stand by.
21               Going off record.  11:24.
22               (Recess.)
23               VIDEO OPERATOR:  We're back on.
24 11:27.
25 BY MR. CAPACETE:

1 Q.    All right.  We are looking at P-6.  Do you
2 still have that in front of you?
3 **A.     Yes.**
4 Q.    Have you ever seen this email before?
5               You're not cc'd on it.  I'm just
6 curious if you've ever seen it.
7 **A.     I don't recall.**
8 Q.    Okay.  Again, I'm not going to ask you to
9 get in their minds.  I'm just curious if any of
10 this will refresh your recollection.
11               So this is dated, Friday, 7th of
12 January, 2022, at 3:56 p.m.  And it's a note from
13 Charmaine Collins to Register of Wills Tracey
14 Gordon.
15               It says, Nick was terminate -- excuse
16 me.  Nick was notified of his termination.  His
17 accounts and badge have also been deactivated.  Is
18 it okay to inform Tom, at this time?
19               Were you involved in any conversations
20 with Miss Gordon around this time about Nick
21 Barone's termination?
22 **A.     No.**
23               MR. HATCHETT:  You answered.
24               I have a standing objection concerning
25 any questions to this witness as relates to this

1 document.
2               You can answer, though.
3 BY MR. CAPACETE:
4 Q.    So the, the email chain at the bottom begins
5 around Thursday, January 6th, 2022, at 11:40 a.m.
6               Do you see that there?
7 **A.     Yes.**
8 Q.    Earlier we looked at those -- I don't know
9 how you describe -- archives read -- reader
10 reports.  Do you remember that?
11               The scan-in sheet.  I think it's P --
12 **A.     Okay.  Yes.  Yes, I do recall.**
13 Q.    At the bottom here it looks like it's
14 saying, Reason Code.  This is relating to Nick
15 Barone's termination.
16               Do you know what Exempt Assignment
17 Complete means versus Layoff?  Do you have any idea
18 what that is?
19 **A.     Yeah.  So those are codes for separation**
20 **that are in the city's options.  We're exempt**
21 **employees at the register of wills, so, you know, I**
22 **guess, whatever your assignment could be they can**
23 **use that code.**
24 **             If you're exempt, assignment complete.**
25 **Your time at the register of wills you fulfilled**

1 **and now you're no longer employed based on that**
2 **selection.  And then the other option would be to**
3 **lay off someone.**
4 Q.    What do you mean by you're exempt employees?
5 **A.     So there's a job code classification.  So**
6 **some are union, some are nonunion, and nonunion**
7 **most likely are exempt.  It's kind of labor, you**
8 **know, language.**
9 Q.    So that archives reader report that we saw
10 earlier, that was sent to you around 3:38 p.m., on
11 Thursday, January 6th.
12               Do you remember any discussions with
13 either Miss Gordon or Miss Collins about Nick
14 Barone between this January 6th, 2022, at 11:40 and
15 that time 3:38 p.m.?
16 **A.     No.**
17 Q.    I'm going to jump around a little bit and I
18 apologize for that.  Just there's a few documents I
19 want to look at with you.
20               MR. CAPACETE:  This will be P-7.
21               (Exhibit P-7 was marked for
22 identification.)
23 BY MR. CAPACETE:
24 Q.    Do you have P-7 in front of you?
25 **A.     Yes.**

1  Q.      This is an email from Sunday, November 21st,
2  2021, to you and Charmaine Collins at the bottom
3  from Miss Gordon.
4              Do you remember receiving this email?
5  A.      Yes.
6  Q.      Do you remember what the context of this
7  was?
8  A.      That -- you know, I, I believe that there
9  was a conversation with Miss Gordon and Mr. Wilson,
10 and Mr. Wilson may have said, you know, I don't
11 have email, which every employee once they're
12 onboarded, they get an employee number, an email.
13             But, to my knowledge, they were not
14 really accessing their email on a regular basis.
15 Therefore, after -- there's a security protocol in
16 place where after I believe 60 or 90 days your
17 password expires unless you change it, and if
18 you're not consistently logging in, you'll never
19 know when that date is.
20             And then they would get locked out of
21 the account.  And only when a communication may
22 have been sent to the entire office, an individual
23 may say, oh, I never received it.  Well, why didn't
24 you receive it?  I'm not able to get into my email.
25 I haven't been into my email in X, Y, Z days.

1              So this transpired just for me to
2  confirm to Miss Gordon that all employees have
3  email, and if they -- you know, and I may have
4  called down there and said, Is anyone having issues
5  accessing their email?  Please let me know if it
6  requires a password reset, and so forth.
7              But we don't monitor to see if, you
8  know, you're accessing it or not.  It's on the
9  employee to.
10 Q.      Do you know whether folks at archives --
11 strike that.  I'm sorry.
12             So this email to me looks like she's
13 asking for their emails.  Is that -- do you know
14 why she was asking for their emails?
15             Is it what you just explained, that
16 they were locked out for some reason?
17             MR. HATCHETT:  Objection to the form
18 of the question.
19             You can respond.
20             THE WITNESS:  I believe on -- if she
21 was using her, her city email account, once you --
22 once you start typing some, some of the employees'
23 names, it automatically populates.
24             I'm not sure what technical issue she
25 was having that it was not populating.  Maybe she

1  was using a different, you know, email platform,
2  but these emails existed and were accessible to
3  anyone in the city domain.
4              And I just wanted to reemphasize that
5  if she was typing them according to what I wrote,
6  they should automatically populate.
7  BY MR. CAPACETE:
8  Q.      So let me see if I can summarize, and tell
9  me if I'm wrong.
10             The extent of your involvement in
11 this was she said it's not auto-populating.  Do
12 they have emails?  You said, yes, these are their
13 emails?
14 A.      Yes.
15 Q.      Okay.
16 A.      But I think this was initiated by something
17 that was sent, and Mark may have said, well, I
18 don't -- I didn't get it.  I don't -- I don't even
19 have email, when knowingly he did.  Just didn't
20 access it on a regular basis.
21 Q.      Do you remember whether Nick Barone had the
22 same issue, like, hey, I didn't get it, something
23 like that?
24 A.      No.  Mark was the one who usually would
25 contact me and said he couldn't get in.  Nick never

1  had an issue, Chris never had an issue, and Tom
2  never had an issue.
3  Q.      During his time working for the register of
4  wills office, do you remember Nick Barone having
5  any IT issues specifically?
6  A.      No.  Only on the occasion if someone
7  doesn't -- if you -- if that 90th, 90th day lands
8  on the weekend, you're not in work to reset it, it
9  locked out, I would get a phone call, can you reset
10 it.
11             But outside of that, that's just --
12 every employee eventually runs into that issue.
13 Q.      Do you remember him having any sort of
14 technical problem that disrupted his work at the
15 archives department?
16 A.      No.
17 Q.      All right.  I think you've already testified
18 you have -- you had no involvement in the hiring at
19 archives?
20 A.      No.
21 Q.      Did you have any involvement in firing
22 employees at archives?
23 A.      No.
24 Q.      At the register of wills generally, do you
25 have the power to terminate individuals?

Page 66

1  A.      No.

2  Q.      Who has the power to terminate individuals?

3  A.      The register.

4  Q.      Is there anyone else at the register of
5  wills office with the final decision on when to
6  terminate someone?

7  A.      No.

8  Q.      If Ms. Gordon has testified that you
9  recommended that she fire Nick Barone, would that
10 be incorrect?

11            MR. HATCHETT:  Objection to the form
12 of the question.

13            You can respond.

14            THE WITNESS:  That be would incorrect.

15 BY MR. CAPACETE:

16 Q.      If Miss Gordon said that you -- strike that.
17 Sorry.

18            If Miss Gordon said that Nick Barone
19 was fired at your recommendation, would that be
20 incorrect?

21            MR. HATCHETT:  Objection to the form
22 of the question.

23            You can respond.

24            THE WITNESS:  That would be incorrect.

25 BY MR. CAPACETE:

Page 67

1  Q.      If Ms. Gordon said you were involved in the
2  decision to fire Nick Barone, would that be
3  incorrect?

4             MR. HATCHETT:  Objection to the form
5  of the question.

6             You can respond.

7             THE WITNESS:  That would be incorrect.

8  BY MR. CAPACETE:

9  Q.      If Ms. Gordon said Nick Barone was
10 insubordinate, to your knowledge, would that be
11 incorrect?

12            MR. HATCHETT:  Objection to the form
13 of the question.

14            Emilio, at this time, unless I tell
15 you not to answer, you can respond.

16            MR. CAPACETE:  Well, hold on.  There's
17 no privilege or order at issue here.  Rule 30 says
18 you can only instruct him not to answer to protect
19 a privilege or a court order.

20            MR. HATCHETT:  So what's your point?

21            MR. CAPACETE:  So he should be able to
22 answer.

23            MR. HATCHETT:  I didn't tell him not
24 to.

25            MR. CAPACETE:  Oh, I'm sorry.  That's

Page 68

1  my fault.  I misheard.

2             Let me ask the question again.

3             MR. HATCHETT:  Okay.

4  BY MR. CAPACETE:

5  Q.      And he -- let him put the objection in.

6             If Ms. Gordon said that Nick Barone
7  was insubordinate, would that be incorrect?

8             MR. HATCHETT:  I have the same
9  objection.

10            You can respond.

11            THE WITNESS:  I mean, it wasn't voiced
12 to me if he was insubordinate, so I wouldn't know.

13 BY MR. CAPACETE:

14 Q.      Based on the documents you've seen, if
15 Ms. Gordon said Nick Barone showed poor
16 performance, would that be incorrect?

17 A.      Based on these documents?

18 Q.      Any documents you reviewed relating to his
19 performance while at the register of wills office.

20 A.      I have not seen any documents relating to
21 his performance.  So just based on my knowledge of
22 his performance in general terms, I'd say he
23 performed well.

24 Q.      This may be a stupid question.  The register
25 of wills herself is the head of the department, the

Page 69

1  register of wills, correct?

2  A.      Correct.

3  Q.      She is the final decision-maker in that area
4  of the government, right?

5  A.      Correct.

6  Q.      The register of wills oversees all the
7  employees at the register of wills office, right?

8  A.      Correct.

9  Q.      In January of 2022, Ms. Gordon was the head
10 of the register of wills office, right?

11 A.      Correct.

12 Q.      In January of 2022, she oversaw the
13 employees of the register of wills office, right?

14 A.      Correct.

15 Q.      The register of wills office has its own HR
16 department; is that true?

17 A.      Yes.

18 Q.      The register of wills office sets its own
19 policies for hiring and firing?

20 A.      We, we adhere to city policies.  There's a
21 gray area as to far -- as far as some employees who
22 are represented by FOP contract, but that's --
23 it's, it's a little bit of a gray area with that --
24 respect to that.

25 Q.      When it gets down to the actual decision

Page 70

1  whether to terminate someone, that power lies with
2  the register of wills, though, right?
3  **A.      Yes.**
4  Q.      The register of wills herself does not
5  report to the mayor's office, right?
6  **A.      No.**
7  Q.      Nor city council's office, right?
8  **A.      No.**
9  Q.      Are the register of wills' decisions
10 reviewed by any other city department?
11 **A.      What, what decisions?**
12 Q.      Like, are -- let me -- let me see if I can
13 ask you a better question.
14                Are -- I'm -- strike that.
15                Can other departments in the city
16 override the register of wills' decisions with
17 regard to policies in that space, the register of
18 wills business?
19 **A.      So, I guess, register of wills business,**
20 **when it comes to the services we provide, anyone**
21 **can appeal a, a decree from the register to**
22 **Orphans' Court.  So, in that respect, you know, I**
23 **guess that's the oversight.  You know, it could**
24 **eventually work its way through the courts.**
25                I mean, there's certain, I guess,

Page 71

1  **procedures and policies in place when it comes to**
2  **personnel that the city put forth.  I guess, you**
3  **know, the main OHR, and if something were -- if the**
4  **register would try to do something personnelwise,**
5  **OHR may intercede and say, okay, we can't do that,**
6  **it's not allowed, or whatever the case.**
7  Q.      Have you ever seen that happen where they
8  intervened, tell her no?
9  **A.      No, it would be more of like**
10 **administrative-type stuff.  You know, I'm just**
11 **brainstorming as to, you know, your question of**
12 **what parameters would be put on the register.  I**
13 **mean --**
14 Q.      As far as the business of the register of
15 wills office, is that policy set by the register of
16 wills themselves?
17 **A.      Some are, and then some are set by statute,**
18 **so...**
19 Q.      Which policies are set by the register of
20 wills office?
21 **A.      Anything that's not set by statute.**
22 Q.      Okay.  Do you know -- do you have any
23 examples of that?
24 **A.      I mean, I guess fees.  Fees are some things**
25 **that the register has autonomy with.  Certain fees**

Page 72

1  of -- on services we provide.
2  Q.      After Nick Barone was terminated, did you
3  have discussions with anyone, other than Charmaine
4  Collins, about his termination?
5  **A.      No.**
6  Q.      Did you ever talk to anyone at the office,
7  like, hey, did you hear about what happened with
8  Nick, anything like that?
9  **A.      I mean, it was -- you know, once it started**
10 **to spread through the office, I mean, there was**
11 **just general conversation, but not anything**
12 **in-depth.  More people in shock as to why.**
13 Q.      Did it become pretty well known throughout
14 the office that he had been terminated?
15 **A.      Yeah.  I mean, when anyone gets terminated,**
16 **it becomes pretty well known.**
17 Q.      What about like other departments that, you
18 know, the register of wills or archives works with
19 within the city government, do you know if it
20 spread to any of those other departments?
21 **A.      So the only department that -- I mean, it's**
22 **only register of wills, specifically, so estate**
23 **services and marriage records interact with**
24 **archives on a daily basis.  I'm sure they found**
25 **out.**

Page 73

1  Q.      Did you ever hear from any of them or talk
2  to them about it?
3  **A.      Maybe just in general passing.**
4  Q.      Do you know in -- sort of the application
5  process for a job at the city generally, do you
6  need to disclose whether you've been terminated by
7  the city in the past?
8  **A.      There may be an option for that.**
9  Q.      You're not --
10 **A.      I'm not --**
11 Q.      -- sure one way or another?
12 **A.      I'm not aware, yeah.  I'm not 100 percent**
13 **sure.**
14 Q.      Did you ever talk to Nick Barone about
15 donations to Miss Gordon's campaign at any point?
16 **A.      Not that I recall.**
17 Q.      Do you remember any conversations about him
18 donating to her campaign?
19 **A.      No.**
20                MR. CAPACETE:  I think that's all the
21 questions I have for you.
22                MR. HATCHETT:  I don't have any
23 questions.
24                Mr. DiGregorio, before we go off the
25 record, I'll just remind you, please don't discuss

Page 74

```
 1  your testimony with anyone.
 2              THE WITNESS:  Okay.
 3              MR. HATCHETT:  Thank you.
 4              VIDEO OPERATOR:  Dep concluded.
 5  11:45.
 6              COURT REPORTER:  Mr. Hatchett, do you
 7  want a copy of the transcript?
 8              MR. HATCHETT:  Yes.  Digital only.
 9  Full and mini with any exhibits.
10              MR. CAPACETE:  I'll do the same.  Do
11  you have text files?
12              COURT REPORTER:  Yes.
13              MR. CAPACETE:  Can I have one of
14  those, too.
15              (The deposition concluded at
16  11:46 a.m.)
17
18
19
20
21
22
23
24
25
```

Page 75

```
 1              CERTIFICATION
 2
 3          I, KATHLEEN McHUGH, an RPR, CRR,
 4  CCR-NJ, and Notary Public, in and for the State of
 5  Pennsylvania, hereby certify that the foregoing is
 6  a true and accurate transcript of the deposition of
 7  said witness who was first duly sworn by me on the
 8  date and place herein before set forth.
 9          I FURTHER CERTIFY that I am neither
10  attorney nor counsel for, not related to nor
11  employed by any of the parties to the action in
12  which this deposition was taken; and further that I
13  am not a relative or employee of any attorney or
14  counsel employed in this action, nor am I
15  financially interested in this case.
16
17
18
19  Kathleen McHugh  -----------------
20  KATHLEEN McHUGH
21  RPR, CRR, CCR (NJ,)
22  and Notary Public
23
24
25
```